1  GOLDBERG, STINNETT, DAVIS & LINCHEY
   A Professional Corporation
2  DENNIS D. DAVIS, ESQ. CA Bar #070591
   44 Montgomery Street, Suite 2900
3  San Francisco, CA 94104
   Telephone: (415) 362-5045
4  Facsimile: (415) 362-2392

5  Attorneys for Appellant, Jeffrey E. Hoffman

6

7                  IN THE UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 JEFFREY E. HOFFMAN,                    No. 3:07-CV-2417 MHP

11            Plaintiff,

12 vs.

13 THOMAS R. LLOYD, an individual,
   EDWARD L. BLUM, an individual, and
14 DOES 1 through 20, inclusive,,

15            Defendants.

16

17 THOMAS LLOYD,

18            Cross-Plaintiff,

19 vs.

20 JEFFREY E. HOFFMAN, dba H&B
   PROPERTIES; H&B PROPERTIES, LLC;
21 J. EDWARDS INVESTMENT GROUP,
   INC., and NORCAL FINANCIAL, INC.,
22
              Cross-Defendants.
23

24

25         **APPELLANT'S EXCERPTS OF RECORD ON APPEAL**

26                        **VOLUME II**

27

28

| | | Bktcy Ct Docket No. | Pages |
|---|---|---|---|
| 1. | Answer – Unlawful Detainer (Trial Exhibit 10) | | 1-4 |
| 2. | Settlement and Mutual Release Agreement (Trial Exhibit G) | | 5-9 |
| 3. | Complaint for Damages and to Cancel Instrument (filed April 5, 2005) | | 10-29 |
| 4. | Cross-Complaint for (1) Declaratory Relief: (2) Avoidance of Fraudulent Conveyances and/or Obligations; (3) Transferee Liability; (4) Quiet title; (5) an Accounting; (6) Determination of Validity, Extent and Priority of Liens; and (7) Objection to Claim (filed June 16, 2005) | | 30-60 |
| 5. | Declaration of Thomas Lloyd in Support of Motion for Summary Judgment (filed 1/20/06) | 39 | 61-82 |
| 6. | Tentative Ruling Re Plaintiff's Motion for Summary Judgment (filed February 16, 2006) | 55 | 83-85 |
| 7. | Order Denying Motion for Summary Judgment (filed February 21, 2006) | 57 | 86-89 |
| 8. | Trial Transcript (filed February 28, 2006) | | 90-294 |
| 9. | Decision After Trial (Phase One) (filed March 20, 2006) | 59 | 295-297 |
| 10. | Hearing Transcript of Defendant's Motion for Summary Judgment (filed April 28, 2006) | | 298-330 |
| 11. | Order Granting Defendant Thomas Lloyd's Motion for Summary Judgment (filed May 15, 2006) | 83 | 331-338 |
| 12. | Tentative Ruling Re Rescission Payment (filed November 9, 2006) | 95 | 339-344 |
| 13. | Tentative Ruling Re Terms for Cancellation of Deed (filed 1/24/07) | | 345-347 |
| 14. | Declaration of Asher Robertson (filed 2/13/07) | 108 | 348-366 |

-1-

| 15. | Opinion (filed April 30, 2007) | 116 | 367-392 |
|---|---|---|---|
| 16. | Judgment and Rule 54(b) Certification (filed April 30, 2007) | 117 | 393-396 |
| 17. | Order Denying Stay Pending Appeal (filed May 7, 2007) | 125 | 397-399 |
| 18. | Plaintiff's Brief Relating to Court's Tentative Ruling of January 24, 2007 | 108 | 400-414 |
| 19. | Declaration of Jeffrey E. Hoffman in Support of Plaintiff's Opposition to Defendant Lloyd's Motion for Summary Judgment. | 75 | 415-444 |
| 20. | Trial Scheduling Order. | 29 | 445-448 |
| 21. | Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 42 | 449-472 |
| 22. | Reply Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 78 | 473-485 |
| 23. | Declaration of Jeffrey Goodrich in Reply to Plaintiff's Opposition to Defendant Thomas Lloyd's Motion for Summary Judgment. | 80 | 486-510 |

DATED: July 13, 2007

GOLDBERG, STINNETT, DAVIS & LINCHEY
A Professional Corporation


By:      /s/ Dennis D. Davis
         Attorneys for Appellant Jeffrey E. Hoffman

**DOCUMENT 8**



UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 04-32921 TEC |
| | ) Chapter 11 |
| THOMAS LLOYD, | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| JEFFREY E. HOFFMAN, | ) Adv. No. 05-03328 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS R. LLOYD, an individual; | ) TRIAL |
| EDWARD L. BLUM, an individual; | ) (Transcript of complete |
| and DOES 1 through 20 inclusive, | ) proceedings except for |
| | ) closing arguments) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| AND RELATED CROSS-ACTION, | ) |
| | ) |
| Cross-Defendants. | ) Tuesday, February 28, 2006 |
| _____ | ) San Francisco, California |

Appearances:

For the Plaintiff:       Pahl & Gosselin, P.C.
                         By:  Stephen D. Pahl, Esq.
                         160 West Santa Clara Street, 14th Floor
                         San Jose, California  95113-1700

For Defendant            Goodrich & Associates
Thomas R. Lloyd:         By:  Jeffrey J. Goodrich, Esq.
                         336 Bon Air Center, Suite 335
                         Greenbrae, California  94904

For Defendant Blum:      Phillips Greenberg & Hauser, LLP
                         By:  Jerry R. Hauser, Esq.
                         Four Embarcadero Center, 39th Floor
                         San Francisco, California  94111

Plaintiff's EOR-090

2

Appearances continued:

Digital Court                    United States Bankruptcy Court
Recorder:                        Clerk of the Court
                                 Gordon Hom
                                 235 Pine Street, 23rd Floor (94104)
                                 Post Office Box 7341
                                 San Francisco, California  94120-7341
                                 (415) 268-2366

Certified Electronic             Palmer Reporting Services
Transcriber:                     P. O. Box 30727
                                 Stockton, California  95213-0727

        Proceedings recorded by digital recording;
  transcript produced by federally-approved transcription service.

Plaintiff's EOR-091

3

I N D E X

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **Jeff Hoffman** |  |  |  |  |
| By Mr. Pahl: | 4 |  | 83 |  |
| By Mr. Goodrich: |  | 30 |  | 85 |
| **Julie Gustavson** |  |  |  |  |
| By Mr. Pahl: | 88 |  |  |  |
| By Mr. Hauser: |  | 94 |  |  |
| By Mr. Goodrich: |  | 125 |  |  |
| **Todd Rothbard** |  |  |  |  |
| By Mr. Paul: | 131 |  |  |  |
| By Mr. Goodrich: |  | 141 |  |  |
| By Mr. Hauser: |  | 147 |  |  |
| By the Court: | 151 |  |  |  |
| **Edward Blum** |  |  |  |  |
| By Mr. Goodrich: | 154 |  |  |  |
| By Mr. Pahl: |  | 167 |  |  |
| **Thomas Lloyd** |  |  |  |  |
| By Mr. Goodrich: | 179 |  | 202 |  |
| By Mr. Pahl: |  | 190 |  |  |

Exhibits:                                Received in Evidence

None.

*Trial*                                                                    4

1  <u>Tuesday, February 28, 2006</u>                    <u>9:47 o'clock a.m.</u>

2                        P R O C E E D I N G S

3            THE CLERK:  All rise.

4            THE COURT:  Please be seated.  Good morning.

5            THE CLERK:  The matter of Hoffman versus Lloyd.

6            MR. GOODRICH:  Good morning, Your Honor.  Jeff

7  Goodrich appearing for defendant and cross-plaintiff.

8            THE COURT:  Good morning.

9            MR. PAHL:  Good morning, Your Honor.  Stephen Paul,

10  Paul and Gosselin, appearing for plaintiff and cross-defendant

11  H&B Properties.

12            THE COURT:  Okay.  I read your briefs.  We had a

13  summary judgment motion and the issue that's before us today.  I

14  think it probably would be best to get to this, get started as

15  quickly as possible.  Are there any preliminary issues?

16            MR. PAHL:  None, Your Honor.

17            MR. GOODRICH:  I don't believe so.

18            THE COURT:  The exhibits are all —

19            MR. GOODRICH:  Correct.

20            THE COURT:  — agreed upon?

21            MR. GOODRICH:  Yes.

22            THE COURT:  Okay.  Is there — I don't want to hear the

23  argument over again.  Is there anything that either of you want

24  to stress by way of opening statement following, in light of the

25  ruling on the summary judgment motion?

Plaintiff's EOR-093

*Trial*                                                              5

1          MR. PAHL:  No, Your Honor.

2          MR. GOODRICH:  No, Your Honor.

3          THE COURT:  Okay.  I think in this case you are

4    seeking to enforce the —

5          MR. PAHL:  Correct, Your Honor.  I think we agreed —

6          THE COURT:  — the release.  And I think you probably

7    ought to go first.

8          MR. PAHL:  That's fine.

9          THE COURT:  Okay.

10          MR. PAHL:  We'll call Jeffrey Hoffman as our first

11   witness.

12          MR. GOODRICH:  Your Honor?

13          THE COURT:  Yes.

14          MR. GOODRICH:  I believe we should exclude witnesses

15   other than parties.

16          MR. PAHL:  Your Honor, —

17          THE COURT:  Is she a party?

18          MS. GUSTAVSON:  No.

19          MR. PAHL:  Well, she is the general counsel of H&B

20   Properties.  As such, she's a corporate representative and is

21   certainly entitled to be here.

22          THE COURT:  Probably so.

23          Okay.  Is this Mr. Blum here?

24          MR. HAUSER:  No, Your Honor.  It's Jerry Hauser.  I

25   represent Ed Blum.

Plaintiff's EOR-094

*Hoffman - Direct/Pahl*                                               6

1          THE COURT:  Okay.

2          MR. HAUSER:  Sorry.

3          THE COURT:  All right.  Because I was going to say

4    you're probably each going to get one of these exceptions.

5          Okay, go ahead.

6          <u>JEFF HOFFMAN, PLAINTIFF'S WITNESS, SWORN</u>

7          THE WITNESS:  Yes.

8          THE CLERK:  Please be seated.  Please state your full

9    name and address for the record, please.

10          THE WITNESS:  Name is Jeff Hoffman.  6138 North Ennis

11    Boulevard, Fresno, California 93704.

12          MR. PAHL:  And, Your Honor, do you have the Court's

13    courtesy copy — which is a copy of all the exhibits.

14          THE COURT:  I have not seen them yet, but I think I'm

15    just about to get them.

16          MR. PAHL:  And we have a set that has been premarked

17    that I was going to give up.

18          THE COURT:  That's fine.

19                        DIRECT EXAMINATION

20    BY MR. PAHL:

21    Q.  Now, Mr. Hoffman, I've now set in front of you Exhibits A

22    through H for your — that we'll be referring to this morning.

23          And, Mr. Hoffman, what is your relationship with H&B

24    Properties?

25    A.  H&B Properties is managed — which is a limited liability

*Hoffman - Direct/Pahl*            7

1   company managed by J. Edwards Investment Group, Inc.  I am the

2   owner of J. Edwards Investment Group, Inc.

3   Q.  And J. Edwards is the manager then of H&B?  It is

4   essentially a subsidiary?

5   A.  I don't know if the term "subsidiary" — but, yes, that's

6   correct.

7   Q.  And when was J. Edwards formed?

8   A.  It — it incorporated, I don't know the exact date as to when

9   it actually incorporated.

10  Q.  In the last few years?

11  A.  Yes.

12  Q.  Okay.  And H&B Properties is a limited liability company?

13  A.  Correct.

14  Q.  And when was H&B Properties formed?

15  A.  Within a couple of years as well, some time in — oh, I would

16  say that to be, I believe, '03.

17  Q.  What is the purpose of H&B Properties?  What business does

18  it engage in?

19  A.  Buying and selling property.

20  Q.  You personally contracted with Mr. Lloyd to purchase a piece

21  of real estate in 2003?

22  A.  That's correct.

23  Q.  Okay.  I want to direct your attention to what's been

24  premarked as Exhibit A.  And this is a PRDS, real estate

25  purchase contract, and the buyer is identified as J. E. Hoffman?

Plaintiff's EOR-096

*Hoffman - Direct/Pahl*                                                    8

1   A.   Correct.

2   Q.   Is that you?

3   A.   That is me.

4   Q.   Okay.  And how was it that you became familiar with the

5   availability of this property at 940 Elizabeth Street?

6   A.   A broker had contacted me.

7   Q.   And who was the broker?

8   A.   Name was Asher Robertson.

9   Q.   And do you know — have you known Asher Robertson before this

10  transaction?

11  A.   Yes, I had.

12  Q.   And what is your contact with Mr. Robertson?  What is his

13  relationship to you or to H&B?

14  A.   No relationship other than an independent broker who will

15  once in a while bring a deal to me.

16  Q.   So he approached you?

17  A.   Correct.

18  Q.   And what did he tell you about the property?

19  A.   Had a situation where I believe it was in foreclosure.  He —

20  and I believe what was needed was someone that would come in and

21  buy it and would be able to utilize their credit in order to

22  obtain financing on it and cure the delinquencies and pay any

23  and all other fees that were associated with it.

24  Q.   And did you agree to do that?

25  A.   Yes, I did.

*Hoffman - Direct/Pahl*                                                    9

1  Q.   And does Exhibit A reflect your offer to purchase the

2  property for the amount of $900,000?

3  A.   Correct.

4  Q.   Did you ever meet Mr. Lloyd prior to preparing this Exhibit

5  A?

6  A.   No.

7  Q.   Now this contract is dated May 28th, 2003?

8  A.   Okay.

9  Q.   It's the fourth line down.

10 A.   Yes.

11 Q.   Okay.  And did this agreement come with several further

12 attachments, such as — and I'll just make reference to page 7,

13 the as-is addendum as well as a further addendum, a CAR

14 addendum?

15 A.   Yes.

16        MR. GOODRICH:  Objection, leading.

17 BY MR. PAHL:

18 Q.   The purchase price says $900,000.  Did you then pay off all

19 the — or assume or pay off all the existing liens on the

20 property?

21 A.   Yes, I did.

22 Q.   And did you put a new loan on the property?

23 A.   Yes.

24 Q.   Did you pay all the closing costs?

25 A.   The closing costs were deducted out of — I suppose one would

Plaintiff's EOR-098

*Hoffman - Direct/Pahl*                                    10

1   look at it as such — as out of the buyers, yes.

2   Q.  And did Mr. Robertson get a fee?

3   A.  Yes, he did.

4   Q.  Was that also paid for out of the buyer?

5   A.  Yes.

6   Q.  Were there delinquent real property taxes?

7   A.  I believe there was, yes.

8   Q.  And you indicated that the first mortgage was in

9   foreclosure?

10  A.  Yes.

11  Q.  Did — as part of this acquisition, did Mr. Lloyd also

12  receive moneys?

13  A.  Yes, he did.

14  Q.  In cash — cash funds?

15  A.  Through the close of escrow.

16  Q.  Did Mr. Lloyd contribute any moneys to this transaction?

17  A.  No.

18  Q.  Now as part of this transaction did you agree to lease the

19  property back to Mr. Lloyd for a period of time?

20  A.  Yes, I did.

21  Q.  Directing your attention over to Exhibit B, do you have

22  Exhibit B in front of you?

23  A.  Yes.

24  Q.  That's a residential lease after-sale agreement?

25  A.  Yes, it is.

Plaintiff's EOR-099

*Hoffman - Direct/Pahl*                                        11

1    Q.   And does your signature appear on the fourth page of that

2    document?

3    A.   Yes.

4    Q.   And the term of this lease was to commence at the close of

5    escrow?

6    A.   Whatever it states in there, the date of the —

7    Q.   Well, I was going to ask —

8    A.   — term.

9    Q.   Paragraph 2, it indicates the close-of-escrow date as

10   scheduled for June 30th of 2003.  Do you see that?

11   A.   I believe it closed much later than that.

12   Q.   In fact, it closed some time in August?

13   A.   Yes.

14   Q.   The — in paragraph 4, the rent is reflected as $3595?

15   A.   Yes.

16   Q.   Was that an amount of rent that you set as the, now, the

17   landlord?

18   A.   Yes.

19   Q.   And this was a month-to-month tenancy?

20   A.   Correct.

21   Q.   Does Mr. Robertson in your — in the transactions you've been

22   associated with him, does he assist in setting the rent amounts?

23   A.   He finds the clients through whether — excuse me — whatever

24   means, I don't know, if it's through his — the real estate

25   company with which he works or how he locates them.  But, in any

Plaintiff's EOR-100

*Hoffman - Direct/Pahl*                                                12

1   event, he winds up with a particular client and will then look

2   for, I suppose, on the other side, an investor client that is

3   willing to do the transaction.  And that's basically what had

4   happened here.

5          So in the negotiations relative to most of the

6   numbers, it's really him cutting the deal with his client and

7   bringing — and, if you will, pitching it to me to see if I will

8   accept it.

9   Q.  Was there a late fee affiliated with this residential lease

10  after sale in the event that payments were not made on a timely

11  basis?

12  A.  There should be.  Yes, as a rule.

13  Q.  And if you can help us out and see if you can find it for

14  us —

15  A.  Number 9.

16  Q.  Number 9?  Two hundred and fifteen dollars, seventy-four

17  cents?

18  A.  Correct.

19  Q.  Okay.  At the time you executed Exhibit B had you met Mr.

20  Lloyd?

21  A.  No.

22  Q.  Had you ever spoken to Mr. Lloyd?

23  A.  No.

24  Q.  Now after the transaction was consummated and Mr. Lloyd

25  became a tenant, did he make any lease payments or any rental

*Hoffman - Direct/Pahl*                                           13

1   payments?

2   A.   None.

3   Q.   Never made a rental payment?

4   A.   Never.

5   Q.   Did you have any conversations with Mr. Lloyd at some point

6   asking him to begin making his rental payments?

7   A.   Absolutely.

8   Q.   And what was his response?

9   A.   I can't say on each individual occasion what it would be,

10  but it was always something to buy more time, telling me, 'Well,

11  it's in the mail' type of thing, 'I'll get it.  I'm working on

12  it.  I'm doing this' or 'I'm doing that.'

13  Q.   During the entire time that Mr. Lloyd occupied the 940

14  Elizabeth Street premises after the close of escrow, did he ever

15  pay any rent?

.16  A.   As I say, he's never paid.  Never paid any rent.

17  Q.   Never paid any rent?

18  A.   Never has paid a dime.

19  Q.   Okay.  Directing your attention over to Exhibit C, if I

20  might.  This is entitled an "Option Agreement?"

21  A.   Correct.

22  Q.   And did you sign this Option Agreement?

23  A.   Yes, I did.

24  Q.   How does this Option Agreement fit into the purchase

25  agreement and the lease agreement?

Plaintiff's EOR-102

*Hoffman - Direct/Pahl*                                                      14

1    A.   The transaction is structured in a fashion whereby what he's

2    looking for is he's looking for an investor such as H&B to

3    acquire the property, utilizing its credit to borrow the moneys

4    necessary to cure any and all ills; lease it back to Mr. Lloyd

5    so he remains in the premises or on the premises and later on

6    has the ability to, through an option of either acquiring it

7    back or liquidating the property, or whatever he so desires.

8    Q.   This has an option period that commences on June 30th of

9    2003 and expires under its own terms on June 30th of 2005?

10   A.   Correct.

11   Q.   So it's a two-year option period?

12   A.   That's correct.

13   Q.   And it indicates that Mr. Lloyd was required to exercise the

14   option, however, no later than April 15th of 2005?

15   A.   That's correct.

16   Q.   I want to direct your attention, if I might, to the second

17   page under the "Other Terms and Conditions" paragraph, Section

18   13.   Do you see that?

19   A.   I see it.

20   Q.   In the second numbered — or the subnumbered paragraph,

21   that'd be 13, subparagraph 2, who drafted this paragraph which

22   had the, "Option shall remain in full force until all terms and

23   conditions set forth" — terminates if it's in breach?   Who

24   drafted that language?

25   A.   It had been Mr. Robertson.

Plaintiff's EOR-103

*Hoffman - Direct/Pahl*                                                          15

1    Q.   Okay.   And "Any breach under the terms of the residential

2    lease" — "residential lease after-sale agreement shall make the

3    option null and void"?

4    A.   Correct.

5    Q.   In light of the fact that Mr. Robertson didn't pay any

6    moneys to you for rent, did you view that as a breach of the

7    residential lease after-sale agreement?

8    A.   Yes.

9    Q.   So after — when you started calling Mr. Robertson for his

10   rent, you viewed the Option Agreement then as already being

11   void?

12   A.   It was in default and at that point I was still willing to

13   work with him, but I did want income.   I did want some

14   compensation to start flowing through.

15   Q.   Directing your attention over to Exhibit D and it's entitled

16   "Grant Deed"?

17   A.   Yes.

18   Q.   Is this a copy of the Grant Deed that was provided to you by

19   Mr. Lloyd upon close of the property?

20   A.   Yes.   This would have gone through escrow.

21   Q.   And it reflects a closing date at the top, a recording date

22   of August 25, 2003?

23   A.   Correct.

24   Q.   Is that your best recollection as to when this whole

25   transaction finally came together?

Plaintiff's EOR-104

*Hoffman - Direct/Pahl*                                                16

1   A.   That's when it was actually recorded and that would have

2   been the date of the — or the close of escrow.

3   Q.   Now you indicated earlier that Mr. Lloyd never paid any rent

4   of any type to you after August 25 of 2003?

5   A.   That's correct.

6   Q.   As a result, did you initiate an unlawful detainer action?

7   A.   I did.

8   Q.   Directing your attention over to Exhibit E?

9   A.   Okay.

10  Q.   This is a three-day notice to pay rent or quit.  And it is

11  dated May 27th, 2004.

12  A.   Okay.

13  Q.   Do you see that?

14  A.   Yes.  I'm looking for the date here.

15  Q.   The date's —

16  A.   Oh, yes, I see it.  Yes, yes, yes.

17  Q.   Is that your signature?

18  A.   Yes, it is.

19  Q.   Okay.  Why did you wait from August of 2003 until May of

20  2004 to implement a three-day notice to pay rent or quit?

21  A.   Again, as I say, there was many conversations relative to

22  the fact of how he was going to be able to make good on what our

23  initial understanding of the transaction, what was also our

24  written understanding of the transaction, and so we kept going

25  on and on and on with further and further stories until such a

Plaintiff's EOR-105

*Hoffman - Direct/Pahl*                                              17

1    point in time where I had no other choice but to take

2    possession.

3    Q.   I note that the three-day notice reflects in the second

4    paragraph — or actually the first full paragraph an amount due

5    and unpaid of a little over $41,800?

6    A.   That's correct.

7    Q.   And I note that the payment shall be made to H&B Properties,

8    LLC.  Do you see that?

9    A.   Yes.

10   Q.   Had this property been transferred to H&B Properties?

11   A.   Yes, it was.

12   Q.   Do you know when that occurred?

13   A.   I don't.

14   Q.   Some time between August of '03 and May of '04?

15   A.   It required — the lender required me to be the initial

16   purchaser.

17   Q.   Okay.  After the three-day notice was served upon Mr. Lloyd,

18   was an unlawful detainer action commenced?

19   A.   Yes.

20   Q.   So he did not pay the $41,000?

21   A.   No.

22   Q.   Directing your attention over to Exhibit F, is this a copy

23   of the Complaint for Unlawful Detainer that was filed on behalf

24   of H&B Properties against Mr. Lloyd?

25   A.   Yes.

Plaintiff's EOR-106

*Hoffman - Direct/Pahl*                                         18

1   Q.   And this was commenced by Todd Rothbard?

2   A.   Correct.

3   Q.   Okay.  And did the Unlawful Detainer Complaint ever go to

4   trial?

5   A.   Yes, it did — well, it — actually we had it set.  I believe

6   we never made it there because we settled.

7   Q.   So it was settled before the complaint and unlawful detainer

8   was tried?

9   A.   Exactly, but not before, I think, the trial date.

10  Q.   Did — after the Complaint and Unlawful Detainer and was

11  served, did you have any conversations with Mr. Lloyd concerning

12  resolution of the case?

13  A.   Yes.

14  Q.   When — how many conversations with Mr. Lloyd did you have?

15  A.   Numerous conversations.

16  Q.   Were they telephonic, were they in person?

17  A.   Telephonic, always; in person, once.

18  Q.   Okay.  When you had conversations with Mr. Lloyd either

19  telephonically or in person that one time, was anyone else

20  present?

21  A.   I couldn't say whether they were or not.

22  Q.   You don't remember?

23  A.   No, I don't.

24  Q.   Okay.  The one time you had a conversation with Mr. Lloyd in

25  person, when was that?

*Hoffman - Direct/Pahl*                                         19

1   A.   Mid-summer and I believe it was mid-July.

2   Q.   And where did that meeting take place?

3   A.   It was in Fresno —

4            THE COURT:  And that's 2004?

5            THE WITNESS:  That's correct.

6            It was an Applebee's restaurant in Fresno, California.

7   BY MR. PAHL:

8   Q.   So Mr. Lloyd drove down from San Francisco to Fresno to meet

9   with you?

10  A.   Correct.

11  Q.   He didn't say he was down there for some other reason?

12  A.   No.  Specifically to meet with me.

13  Q.   Was this meeting promulgated — was it preceded by a

14  telephone conversation between you and Mr. Lloyd setting up that

15  meeting?

16  A.   Yes, it was.

17  Q.   And what was the — what was your understanding of the

18  purpose of the meeting when you set up the meeting?

19  A.   We were pretty well tired of the battles, if you will, back

20  and forth, and we wanted to settle.

21  Q.   Okay.  And so you met at Applebee's?

22  A.   Correct.

23  Q.   And when you met at Applebee's what was the subject of the

24  conversation between you and Mr. Lloyd?

25  A.   Predominantly the fact that we both were interested in

Plaintiff's EOR-108

*Hoffman - Direct/Pahl*                                         20

1    settling.  He had problems relative — it went back and forth.

2    He had a problem relative to wanting to settle, because he was

3    being advised by his counsel, which was Ed Blum — Ed Blum, to

4    the fact that Ed's contention was the whole thing could be

5    rescinded.

6            He had to weigh that out in his mind as to whether Ed

7    was a hundred percent sure that that's a fact versus cutting a

8    deal with me, if you will.  And so we went back and forth on

9    that.  And we agreed upon the close of our meeting, shook hands

10   and said:  Okay, we will instruct Blum to commence forward with

11   putting a settlement together.

12   Q.  And what was the deal that you and Mr. Lloyd —

13           THE COURT:  You met pers- — your counsel wasn't there?

14   You two just met directly?

15           THE WITNESS:  Just ourselves, yeah.

16           THE COURT:  Okay.

17   BY MR. PAHL:

18   Q.  And what was the deal that you and Mr. Lloyd struck

19   personally?

20   A.  That I would still grant him the ability to buy it back,

21   obviously relative to any and all demands that were going to

22   come through, which at that point in time there was a

23   significant amount of additional moneys that had accrued, and

24   that I would give him 90 days within which to perform.

25   Q.  And at that juncture did you believe you had to provide to

Plaintiff's EOR-109

*Hoffman - Direct/Pahl*                                           21

1   Mr. Lloyd an additional 90 days in which to exercise his option?

2   A.  I don't feel I had to.  But, again, there had been enough

3   conversations bandied around back and forth relative to how far

4   they're willing to get into this litigation, if you will, that's

5   kind of what was being bandied around, I didn't — he didn't want

6   anything to do with it, I don't believe, any more than I did.

7   We wanted to settle it.

8           So between the two of us, we — we both felt it was in

9   our best interest if he had the ability of going and buying it

10  back.  So, no, but I don't have to — in my mind I didn't have to

11  because we were so — this was beyond just a small breach.  We

12  were, you know, a year and a half out.

13  Q.  And during the 90 days that Mr. Blum was going — excuse me —

14  that Mr. Lloyd was going to be able to continue to reside in the

15  premises, was he going to pay you rent?

16  A.  I don't recall what our — I don't recall what was in the

17  agreement on that, but presumably the rent would obviously still

18  continue to tick away.

19  Q.  Did Mr. Lloyd ever use the words "home equity sales

20  contract" to you?

21  A.  That was the thing that was difficult for us.  As I say, he

22  — he's weighing out in his mind that Mr. — his counsel had told

23  him that he felt as though he could unwind this transaction.  He

24  had to weigh out in his mind as to whether — you know, whether

25  that's really true, is it possible.  Again, he's not an

*Hoffman - Direct/Pahl* 22

1    attorney, nor am I.  So between the two of us we're looking at

2    this and saying:  We do know one thing, it's going to require a

3    tremendous amount more litigation, of which neither one of us

4    want.

5    Q.  During your Applebee's conversation you indicated that Mr.

6    Lloyd told you that Mr. Blum was not in favor of resolving the

7    matter?

8    A.  Oh, that's absolute, yeah.

9    Q.  And that was made expressly clear to you by Mr. Lloyd?

10   A.  Yes.

11   Q.  Did Mr. Lloyd tell you that Mr. Blum didn't think the

12   transaction that was done was even legal?

13   A.  No.  He — he made it very clear that he felt it was not.

14   Q.  And by undone, what did you understand Mr. Lloyd to be

15   saying in terms of what would occur if you undid the

16   transaction?

17   A.  In essence, we'd — title would revert back to him and we

18   would have to make some obvious type of settlement, or whatever.

19   I don't know the exact — how it would all come about.  But the —

20   the issue is, is the fact that under our contractual

21   arrangement, basically saying that all the contractual

22   arrangement we had was basically null and void, useless, if you

23   can unwind it.

24   Q.  I'd like to direct your attention to Exhibit G.

25   A.  Okay.

Plaintiff's EOR-111

*Hoffman - Direct/Pahl*                                             23

1    Q.   Should be your last exhibit there.   And is that — that's

2    entitled "Settlement and Mutual Release Agreement"?

3    A.   Correct.

4    Q.   Do you have that in front of you?

5    A.   Yes, I do.

6    Q.   Directing your attention to the last page, page 5, is that

7    your signature on — signed for H&B Properties as well as J.

8    Edwards as well as individually?

9    A.   Correct.

10   Q.   And Ms. Gustavson's signature is right below yours?

11   A.   Correct.

12   Q.   Who drafted this Settlement and Mutual Release Agreement?

13   A.   I believe it was a mutual effort between Lloyd's attorney

14   and inhouse.

15   A.   Ms. Gustavson and Mr. Blum?

16   A.   Yes.

17   Q.   Okay.   During the time between your Applebee's conversation

18   with Mr. Lloyd and signing what is now Exhibit G, did you

19   personally have any conversations with Mr. Blum?

20   A.   Countless.

21   Q.   Countless, meaning more than one?

22   A.   Oh, yes.

23   Q.   More than five?

24   A.   Yes.

25   Q.   I'll keep going.   More than ten?

Plaintiff's EOR-112

*Hoffman - Direct/Pahl*                                      24

1    A.   I — I can't say the exact number, but I do know there was —

2    there was back-and-forth conversation, yes.

3    Q.   Was there a general substance to your conversations?   In

4    other words, was there a general tenor as to what the subject

5    matter was related to your conversations?

6    A.   He — again, as I say, he did not want to — he was not

7    heavily inclined to want to settle this because of the fact,

8    again, as Ed Blum said to me, you know, he believes it's

9    rescindable under the equity sales contract provisions of the

10   law, which under — whatever, like I say, there's a whole section

11   on that.   He felt that it was rescindable.

12           I told him that — and, again, if this was before the

13   meeting with Tom Lloyd, my conversation with him at that point

14   was that we — I felt that if Tom and I were to get together, we

15   could settle it.   I felt that person- — you know, the two of us

16   probably could settle it.   But, on the other hand, I've got his

17   attorney who is feeling as though that he should — his legal

18   advice should be such that maybe he shouldn't.

19   Q.   And was that the tenor of all the conversations you had with

20   Mr. Blum?

21   A.   Until what date?

22   Q.   Till the date you signed the settlement agreement.

23   A.   Yes.   That and bandied around, like I say, the — you know,

24   what it was going to take to settle it.   In other words,

25   monetarily what's it going to take for them to come back and —

*Hoffman - Direct/Pahl*                                          25

1    and exercise their option.

2    Q.  When you — you had Ms. — you had Mr. Rothbard representing

3    you on the unlawful detainer, you had Ms. Gustavson working out

4    the language of the settlement agreement, why were you talking

5    to Mr. Blum?

6    A.  Probably much to — I just — I'm a hands-on person.  I would

7    prefer and — most of the times I would prefer dealing person- —

8    face to face with the individual which would have been, say,

9    like Tom, rather than letting attorneys battle it out.  I feel

10   as though — I probably feel it's a little more productive if the

11   two of us talk and then go back and tell our attorneys what our

12   agreement is and see if they can't then finalize it.

13   Q.  Did you and Mr. Blum ever agree as to the amount of money it

14   would acquire — require to exercise the option within the 90

15   days?

16   A.  The specific number had never been sat down, down to the T

17   and figured out exactly what number it was going to be.  But,

18   yes, we did talk numbers in terms of what —

19            THE COURT:  Can I interject here?  You know, you know

20   these documents better than I.  I've read them only a second,

21   but what is the option price?

22            THE WITNESS:  That's what he — I think he's asking me

23   right now.

24            THE COURT:  I don't see it in the option.

25            THE WITNESS:  In this here?

Plaintiff's EOR-114

*Hoffman - Direct/Pahl*                                      26

1          THE COURT:  Yeah.  And, see, I don't see a price,

2   but —

3          THE WITNESS:  Well, —

4          THE COURT:  — I may have just missed it.

5          THE WITNESS:  The initial thing, had the contract been

6   adhered to, the option price would have been the moneys that

7   were acquired and expended, thereby being his expenses.  In

8   other words, the close of the escrow and everything else

9   relative to any — the offsets of what other income we may have

10  gotten back from title, or whatever.  So that the fees that we

11  initially had gotten in the initial purchase transaction were

12  net to us.  It was not that minus, you know, another 3,000, or

13  whatever.  I think the — I don't recall the exact amount we made

14  on the —

15         THE COURT:  In other words, you were going to be made

16  whole?

17         THE WITNESS:  Absolutely.

18         THE COURT:  Just for what you put in?

19         THE WITNESS:  Yes.

20         THE COURT:  And the compensation would come from the

21  option price itself —

22         MR. PAHL:  The additional $15,000.

23         THE COURT:  — and any rent?

24         THE WITNESS:  Yes.

25  BY MR. PAHL:

Plaintiff's EOR-115

*Hoffman - Direct/Pahl*                                              27

1  Q.  And then the great question so we'll finish it up with:

2  After — after that's been voided and you've got a new deal, the

3  Applebee's deal we'll call it, —

4  A.  Right.

5  Q.  — what was the option price that was agreed upon, if one was

6  agreed upon, between you and Mr. Lloyd or you and Mr. Blum?

7  A.  Lloyd wasn't really so much relative — was not as much

8  concerned about the fact of how much it was going to be.  He —

9  we had discussed the fact that it was a considerable amount over

10 what we initially had into it and initially what the initial

11 option would have been had everything been adhered to —

12 significantly different.

13          He wasn't so much interested in that as just being

14 able to exercise his option, period.  And that was really more

15 of the concern, not money.  Just:  Look, I want to go back.  I

16 want to be able to have that ability to buy it back.

17 Q.  The Settlement and Mutual Release Agreement doesn't provide

18 a price?

19 A.  Correct.

20 Q.  And it just says the option will be exercisable, and it

21 talks about — it has to be exercisable within 90 days of July

22 12th?

23 A.  Which is the day, I believe, if I'm not mistaken, I think

24 that might be the very day with which Tom and I had met.

25 Q.  Directing your attention, if I might, on Exhibit G to page

*Hoffman - Direct/Pahl*                                      28

1    3, paragraph 4, and you see that the stipulation was going to be

2    held for 90 days from July 12th for the entry of an unlawful

3    detainer?

4    A.   Correct.

5    Q.   And in paragraph 5 there was the — essentially reinstatement

6    of the option?

7    A.   Yes.

8    Q.   And it says the option price to be, in paragraph B, "By

9    paying all moneys now due H&B as well as those which come due

10   during the 90-day forbearance period as the results of Lloyd's

11   status as holdover tenant, and paying of all existing debt

12   within the 90-day period."  Do you see that?

13   A.   Correct.

14   Q.   Okay.  Directing your attention, if I might, on page — the

15   same document, Exhibit G, this time page 2, subparagraph G,

16   where it indicates — this is in the recital section — where it

17   indicates that Lloyd filed an answer claiming that the sales

18   transaction was a disguised security device and therefore

19   unenforceable.  Do you see that?

20   A.   Yes, I do.

21   Q.   When you signed this did you read that sentence?

22   A.   Yes, I did.

23   Q.   And was it your understanding at the time you signed this

24   agreement that this was making reference to the equity sales —

25         MR. GOODRICH:   Objection, calls for — that's a leading

*Hoffman - Direct/Pahl*                                    29

1    question.

2           MR. PAHL:  Going for his state of mind, Your Honor.

3           MR. GOODRICH:  You can't do it by a leading question.

4    You can ask his state of mind.

5           THE COURT:  Sustained.

6    BY MR. PAHL:

7    Q.  Did you have any thoughts when you read Exhibit G — excuse

8    me — paragraph G in the recital section of the settlement

9    agreement?

10   A.  This was clearly Lloyd's attorney believing that the entire

11   transaction was rescindable —

12          MR. GOODRICH:  Objection.  Calls — move to strike.

13   He's now speculating as to what Lloyd's attorney said about

14   this.  There's no evidence that —

15          THE COURT:  I think the question was what it meant to

16   you.

17          MR. GOODRICH:  Right.

18          THE COURT: .Well, it's not just speculation in that.

19   We had conversations relative to this, prior to this.  So this

20   is not just speculation.  I mean he — like I say, he had made it

21   well known to me as to what the status of it was.  And, as I

22   said, and reluctantly gave the okay, if you will, to his client

23   to move forward.

24   BY MR. PAHL:

25   Q.  Now at the bottom of page —

*Hoffman - Cross/Goodrich*                    30

1        THE COURT:   Is anybody going to introduce the answer?

2        MR. PAHL:   Yes.

3        THE COURT:   Okay.

4    BY MR. PAHL:

5    Q.   On page 2 at the very bottom, there's a release and it makes

6    reference to Section 1542.   Do you see that?

7    A.   Yes, I do.

8    Q.   Was it your desire to resolve everything?

9    A.   That is exactly what our thoughts of it were, so that we

10   would not wind up like we are here today.

11   Q.   Was a general release important to you in reaching the

12   agreement that you did with Mr. Lloyd?

13   A.   That's the only reason I would have entered into one.

14   Q.   So but for this general release, you wouldn't have entered

15   into this settlement agreement?

16   A.   I entered into a settlement agreement to avoid any further

17   litigation and especially since I knew that Blum was — felt in

18   his mind he had — he was pretty strongly against me relative to

19   the rescissionable aspects of it.   This was worth it to me to

20   cut a deal and enter into another 90-day extension.

21       MR. PAHL:   I have no further questions, Your Honor.

22   Thank you.

23       THE COURT:   Okay.   Cross-exam.

24                    CROSS-EXAMINATION

25   BY MR. GOODRICH:

Plaintiff's EOR-119

*Hoffman - Cross/Goodrich*                                           31

1    Q.    Good morning, Mr. Hoffman.

2    A.    Hi.

3    Q.    You have a degree from Cal Poly Technic in architecture,

4    correct?

5    A.    Correct.

6    Q.    And you've been a real estate investor, developer,

7    experienced real estate person ever since then, in fact before

8.   you went to school, correct?

9    A.    I wouldn't say before I went to school.

10   Q.    Well, while you were in school you were actually doing real

11   estate investments, correct?

12   A.    I built some houses.

13   Q.    Okay.

14   A.    Yes.

15   Q.    And since then you've done nothing but real estate for a

16   living?

17   A.    Yes.

18   Q.    And all aspects of real estate?

19   A.    Correct.

20   Q.    And specific to the issues in this case, you've both been a

21   lender and a buyer of residential property, correct?

22   A.    I have done loans, but that's never really been my forte.  I

23   mean I only do it if I bought a trust deed or maybe made a loan

24   to someone and who — with whom gave me a trust deed, but that's

25   never really been our — my business.

Plaintiff's EOR-120

*Hoffman - Cross/Goodrich*                                    32

1    Q.   Okay.  Have you invested in entities that have provided such

2    hard-money loans?

3    A.   No, not invested in — no.

4    Q.   Okay.  Have you yourself made hard-money loans?

5    A.   That's what I just said, yeah, I have.  Yeah.

6    Q.   And by "hard money," what would you mean?

7    A.   I prefer the term equity lending, if you will.  It's — an

8    equity lender is an individual who is not so much concerned with

9    the creditworthiness of the borrower as much as he is what's the

10   underlying asset in case there is a breach.

11   Q.   And that's exactly what happened here.  You weren't

12   interested in Mr. Lloyd's ability to repay the loan from income,

13   correct?

14   A.   This is not — this is not a loan to Mr. Lloyd.

15   Q.   You didn't view it as a loan?

16   A.   No.  Number one, what we're doing is going in and purchasing

17   the property, using my credit, if you will, to borrow from

18   Greenpoint Mortgage.  And Greenpoint Mortgage provided the

19   financing, not Jeff Hoffman.

20   Q.   Okay.  And for this two-year period Mr. Lloyd remains in

21   possession of the home and has to pay all taxes, insurance, and

22   maintenance, correct?

23   A.   That would be correct.

24   Q.   Okay.  And at any time during that two-year period, if he's

25   in compliance with the terms of the lease, he can buy back the

Plaintiff's EOR-121

*Hoffman - Cross/Goodrich*                                           33

1  home under —

2  A.   That's correct.

3  Q.   — the option?

4        And the purchase price under the option, your

5  testimony was today, it was basically everything that you had

6  been out of pocket for at the time you bought the property plus

7  the option agreement, plus any unpaid lease obligations,

8  correct?

9  A.   That would be correct — well, it wouldn't be — no, we

10 wouldn't look at it as any unpaid lease obligations because if

11 you're not paying on your lease then you now made it null and

12 void.

13 Q.   Okay.  So you're saying that if he misses one lease payment

14 then there is no option and he forfeits his equity?

15 A.   From — from a technical standpoint, that could have been

16 done.  But, as you can see, this was a year and a half, so we

17 didn't rush to judgment on this.

18 Q.   Okay.  So you actually were trying to work with him over

19 this year-and-a-half period and at some point, you don't know

20 when, you were no longer willing to work with him?

21 A.   Correct.

22 Q.   Would it be fair to say that in the first year that if he

23 came to you wanting to buy it back, you would have agreed that

24 he could buy it back?

25        MR. PAHL:  I'm going to object.  It calls for

Plaintiff's EOR-122

*Hoffman - Cross/Goodrich*                                34

1    speculation of the witness.

2            MR. GOODRICH:   I'm just trying to get the idea of when

3    in his mind —

4            THE COURT:   I think you already got the idea of what's

5    going on.

6            MR. GOODRICH:   Okay.

7            THE COURT:   Move on.

8    BY MR. GOODRICH:

9    Q.   With respect to the purchase agreement, can you tell me if

10   Mr. Lloyd had wanted to buy back his property the day after

11   escrow closed, approximately how much money would he have to

12   pay?

13   A.   I would have to take the settlement sheet at the close of

14   escrow and determine if there was any additional costs to me at

15   that point in time, which I don't know if there were any, but in

16   the event, those would be offset under that.  And he could

17   purchase it back for that as long as he provided — you know, he

18   paid for any and all costs associated with the repurchase or

19   whatever the other end of his transaction was.

20           If he was repurchasing it, there would be an escrow

21   presumably again.  He would have to pay for that in order to buy

22   it back because, again, we're looking at it from our standpoint.

23   We went in under a — for a single fee, did this transaction,

24   gave him the option, and we were satisfied with that until such

25   time as he went into breach.

*Hoffman - Cross/Goodrich*                                    35

1    Q.   I'm going to hand you our witness book and ask you to take a

2    look at Exhibit 18, which is a proof of claim that I believe

3    your company filed.

4    A.   Can you give me that number again?

5    Q.   Exhibit 18.   It's a proof of claim.

6    A.   The very last one; is that correct?   Okay.

7    Q.   The very last one, yes.

8    A.   With the U.S. Court?

9    Q.   Correct.   It's — on the first page, is that your signature?

10   A.   Yes, it is.

11   Q.   And that's a signature on behalf of H&B Properties, LLC and

12   Jeffrey Hoffman?

13   A.   Yes.

14   Q.   Take a look at — this is an extensive document and it has a

15   number of attachments.   The second attachment is identified as

16   Exhibit B and it starts with page 18.20.

17   A.   I had Exhibit A as 18.34, so does it go backwards?

18   Q.   No.   I think what you're looking at is a different exhibit.

19   A.   I've gone too — well, it's no longer the one 18 heading,

20   that the 18 header, and then I look through here.   And, as I

21   say, I go to 18.34 which at the top was the residential lease

22   which says "Exhibit A."

23            MR. GOODRICH:   If I may approach the witness, Your

24   Honor?

25            THE WITNESS:   Here.   See, this right here.

Plaintiff's EOR-124

1         So they don't necessarily go — okay.  All right.

2   BY MR. GOODRICH:

3   Q.  Is this a correct copy of the closing statement on your

4   purchase of the property from my client?

5   A.  Yes.

6   Q.  Okay.  Now taking a look at that closing statement, you

7   mentioned that in looking at the closing statement you could

8   tell us how much Mr. Lloyd would have to pay you to get the

9   property back if he tried to do so, let's say, August 26th, the

10   day after escrow closed.

11   A.  Okay.

12   Q.  Okay.  So how — can you take a look at that, and I have a

13   calculator if you need it, and tell us what the option price is?

14   A.  Well, you have to pay off the principal of the first.

15   Q.  Is that line —

16   A.  Which would be 640,000, which is the principal —

17   Q.  Okay.

18   A.  — amount of the new loan.  Plus any and all costs associated

19   with his escrow, which I'm looking at, you know, there's $603,

20   you know, there's miscellaneous fees, as you can see them in

21   there.  On both sides you can see the — like there's a home

22   warranty I see on the other side, which shows as a seller's —

23   you know, a part of the seller's transaction.  But, again, we

24   combine seller and buyer, all the costs associated with doing

25   the transaction.  And so that's what we looked at, is all of

Plaintiff's EOR-125

Case 3:07-cv-02417-MHP    Document 11-2    Filed 07/13/2007    Page 41 of 65

*Hoffman - Cross/Goodrich*                                            37

1   those.  So all of those costs associated with that, plus — less

2   any offsets.

3   Q.   What would the offsets be?

4   A.   We borrowed — from NorCal Financial we borrowed I don't know

5   if it was 262,- or 264,-, and that's — and I don't recall the

6   exact amount.  It shows here buyer's funds of 262,-, but there

7   may have already been a deposit that had been given to them, so

8   I don't know.  But we borrowed the additional funds required for

9   the downpayment.

10  Q.   So you're saying that that would be deducted —

11  A.   Yes.

12  Q.   — from your total option price?

13  A.   Correct.

14  Q.   That's because the $262,000 didn't go to Mr. Lloyd, it went

15  into the escrow and went back out to NorCal, right?

16  A.   Correct.

17  Q.   So the purchase price was just artificially $900,000 so you

18  could get the loan from Greenpoint up to 640,000?

19  A.   I don't know if Mr. Lloyd had an appraisal done or who did

20  an appraisal, but there was an appraisal done and I don't —

21  Q.   But my question is you didn't —

22  A.   Well, I'm —

23  Q.   — really pay $900,000?

24  A.   I'm — I'm trying to answer your question.

25  Q.   Okay.

PALMER REPORTING SERVICES
P. O. Box 30727   Stockton, California   95213-0727   (800) 665-6251

Plaintiff's EOR-126

*Hoffman - Cross/Goodrich* 38

1  A.  Yes, I did pay 900,000, but there were —

2  Q.  But usually the buyer —

3  A.  No.  Let's — let me finish, please.

4  Q.  Okay.

5  A.  We paid 900,000.  I borrowed from NorCal 262,000.  Now if

6  that obligation is retired because it's paid back to them, Lloyd

7  certainly is not obligated to me to pay me for 262,000 that I

8  did not inure to the benefit of.  So, no, he doesn't have to pay

9  that.

10  Q.  Okay.  Let's go through the lease.  You say escrow closed in

11  August — late August, I think, and the grant deed shows a

12  recording date of August 25th.  And I think we just saw the

13  settlement statement said August 25th as the closing date.  Does

14  that refresh your recollection as to the exact date that escrow

15  closed?

16  A.  I'm sorry.  I'm looking for the documents as you're talking

17  to me.

18  Q.  Sure.

19  A.  The document would speak for itself; whatever the

20  recordation date is of — on the grant deed would be the close of

21  escrow, —

22  Q.  Okay.

23  A.  — and I'm sure matches the settlement agreement.

24  Q.  Now the monthly rent in the lease is $3,595.64.  So after a

25  year's time, which would be August at the time you executed the

*Hoffman - Cross/Goodrich*                                            39

1    settlement agreement, there would be 12 months of rent payments

2    due, correct?

3    A.   Okay.

4    Q.   In fact, I think you executed the settlement agreement on or

5    before August 4th, correct?

6    A.   Okay.

7    Q.   So at the time of the execution of the settlement agreement

8    there wasn't even 12 months of rent that had accrued under your

9    lease, correct?

10   A.   I believe the lease started, states here, June 30th.

11   Q.   Well, I think your testimony on direct was that it was

12   actually from the commencement of the close of escrow, which is

13   exactly what the residential lease says. You can take a look

14   at —

15   A.   I'm looking at the residential lease. Okay. It states here

16   close of escrow scheduled to occur on June 30th of '03.

17   Q.   Right. But the term of the lease, you see that? The term

18   begins on the date that escrow closes, —

19   A.   Okay.

20   Q.   — on the purchase-and-sale agreement. You've just testified

21   that that date was August 25th, correct?

22   A.   Okay.

23   Q.   So is it correct to say that your rent as of August 4th was

24   no more than 12 months of rent plus late charges?

25   A.   If that's what you say that's, you know, —

Plaintiff's EOR-128

*Hoffman - Cross/Goodrich*                                        40

1    Q.   Okay.  Any reason to believe —

2    A.   Yeah.

3    Q.   — that that's not correct?

4    A.   No.

5    Q.   Okay.  As of August 4th, 2004 had you paid anything out of

6    pocket for insurance for the subject property?

7           MR. PAHL:  Your Honor, I'm going to move to — I've

8    allowed —

9           THE COURT:  What is all this related to?

10          MR. GOODRICH:  Well, —

11          THE COURT:  What does it have to do with the waiver?

12   We're only dealing with the waiver issue.

13          MR. GOODRICH:  Well, we're trying the issue of the

14   enforceability of the settlement agreement.  And one issue was

15   whether the waiver is enforceable, but another is whether there

16   has been any consideration for what Mr. Lloyd gave up if, in

17   fact, the waiver is enforceable.  There has been an issue raised

18   as to whether there's a breach, a material breach of the

19   settlement agreement, excusing performance.

20          We believe we have a case strictly on the waiver

21   issue, but certainly we have in our pleadings on the issue of

22   settlement raised the issue that this is unenforceable because

23   really Lloyd didn't get anything for it.  The amounts that we'll

24   show in this settlement agreement were actually in excess of

25   what he owed under the lease.

*Hoffman - Cross/Goodrich*                                    41

1    There was no liquidation of his claim in his favor.
2  There was nothing he got.  The 90 days doesn't get him anything
3  because he would have had that time had he set aside the whole
4  transaction under 1695.  So it goes to the issue of
5  consideration.
6           THE COURT:  I think it's very hard for you to set
7  aside a settlement of a disputed question in trial on the theory
8  that you made a bad settlement in the sense and if you had gone
9  to trial you would have won a hundred percent.
10          MR. GOODRICH:  I think you're right.  What I'm saying
11 is —
12          THE COURT:  Because the one thing he obviously gave up
13 is the right to go to trial.  Very shortly thereafter you get a
14 determination of the unlawful detainer.
15          MR. GOODRICH:  Right.  We're not changing that number.
16 What we're trying to show is that the number that was later
17 submitted in October, which we'll show is over $155,000, doesn't
18 bear any resemblance to the claims that actually these parties
19 agreed on in settlement.  So that goes to the breach.
20          THE COURT:  I don't know how that — you know,
21 consideration doesn't have to be reasonably equivalent
22 consideration.
23          MR. GOODRICH:  Right.
24          THE COURT:  And I think what you're — I mean the only
25 argument that I can see here is the one thing he — the parties

*Hoffman - Cross/Goodrich*                              42

1    avoided is ejection from the premises.  Mr. Lloyd avoided

2    ejection from the premises by doing this.

3              MR. GOODRICH:  Right.

4              THE COURT:  And he got at least — he got at least some

5    assurance that he had — that the option period was extended

6    notwithstanding the alleged breach of the lease.

7              MR. GOODRICH:  Right.

8              THE COURT:  Now I don't know how things that happen

9    later have anything to do with that.

10             MR. GOODRICH:  Well, I guess —

11             THE COURT:  Demands that are made later.  And I don't

12   know how you can say, 'Well, you know you didn't get anything

13   because he could have avoided the whole lease.'  That's again

14   suggesting that, you know, 'We want to get out of the settlement

15   agreement because had we gone to trial we would have won.'

16             MR. GOODRICH:  Well, we're — it's really more to the

17   issue of the amount that was claimed in October.

18             THE COURT:  And why is that relevant to the settlement

19   agreement?

20             MR. GOODRICH:  Because then you get to an issue of was

21   there a material breach of the settlement.  In other words, it's

22   our position that the settlement agreement as it's written and

23   as we understood it said that at the time Mr. Lloyd wants to

24   exercise his option, he pays the $60,000 stipulated judgment.

25   And this is what I'm showing is basically the rent and the

Plaintiff's EOR-131

*Hoffman - Cross/Goodrich*                                    43

1    insurance and the taxes.  That's what the 60,000 —

2              THE COURT:  So basically your argument is that you —

3    you basically tendered performance under the option?

4              MR. GOODRICH:  Right.  And in response we were told,

5    "Well, you have to pay this NorCal claim,' and that's where I'm

6    going, is that —

7              THE COURT:  All right.

8              MR. GOODRICH:  — the NorCal claim is entirely a

9    different animal.

10             MR. PAHL:  Your Honor, may I be heard?

11             THE COURT:  Yes.

12             MR. PAHL:  Thank you.  First, if you look at the

13   complaint filed by counsel, there is no — there is no claim.

14   There is no claim for relief for breach of the settlement

15   agreement.  It's not even — it's not even at issue in this

16   action.

17             Secondly, with regard to — the settlement agreement

18   itself is the operative document.  And the settlement agreement

19   itself does not provide for a hard number.  It provides for a

20   reimbursement of all moneys that were out plus, you know, the

21   costs that have been incurred.

22             So we're going beyond the scope of the pleadings that

23   are before the Court and certainly way beyond the settlement

24   agreement to now assert, for the very first time, that there was

25   somehow some sort of a breach of settlement agreement.  In order

Plaintiff's EOR-132

*Hoffman - Cross/Goodrich*                                    44

1   to show a breach, a — the prima facie case would require that

2   counsel show that they were ready, willing, and able to

3   exercise.  There's no showing.

4        So what they're now asserting — trying to do is assert

5   a breach, but they're forgetting the prima facial aspect of the

6   breach.  Even if you were to allow a breach-of-contract

7   argument, which I don't think is appropriate in this forum at

8   this time, but even if you were to allow that as a predicate to

9   showing actions by H&B, you first have to show that the

10  cross-complainant is ready, willing, and able to perform.

11       THE COURT:  Well, I never understood this to be the

12  issue to be treated at this phase.  I thought we were dealing

13  only with whether the — this waiver was void for the reasons

14  that we've already dealt with in the summary judgment, that it's

15  simply unenforceable under the law because it wasn't express and

16  it wasn't — well, you say it's not waivable at all.

17       MR. GOODRICH:  Right.

18       THE COURT:  And I said, well, it's — anything can be

19  waived by a settlement.  The question is did the settlement

20  address it specifically enough and was the waiver involved

21  therein knowing and intelligent.

22       MR. GOODRICH:  Right.  If we're only going to look at

23  that issue and reserve whatever we've raised in the pleadings,

24  I'm comfortable with that, because we did raise it in the

25  pleadings.

*Hoffman - Cross/Goodrich*                                    45

1      THE COURT:  I think we'd be best off to stick to that

2  because that's the way this trial was set up for today.

3      MR. GOODRICH:  Okay.  Thank you.

4      THE COURT:  And if there's anything — you know, if

5  there's anything left of this, we can deal with the question of

6  what was raised in the complaint.  But I don't have it in my

7  mind in front of me today and I could see why Mr. Pahl is not

8  ready for this issue today because I think it's getting out of

9  the box that we set up for today, a bit.

10     MR. GOODRICH:  Okay.

11 BY MR. GOODRICH:

12 Q.  I think your testimony here today is that you did not

13 discuss with Mr. Lloyd any provisions of Section 1695 of the

14 Civil Code, that those discussions happened with Mr. Blum?

15 A.  I believe I didn't state that.  I stated completely

16 different than that.  I stated the fact that, yes, Lloyd does

17 not know codes much — probably much more so than I know codes,

18 but the issue of rescissionability and that it could be

19 rescinded and that the transaction was illegal was certainly

20 bandied around during the entire discussion.

21     It's what made — you know, it's what made him

22 hesitate, if you will, you know, as to whether — to continue

23 forward.  He has one individual — and he's got both of us

24 knowing that, you know, in — we want to settle.  He also does

25 have his counsel telling him, you know, 'This is what I think

*Hoffman - Cross/Goodrich*                                    46

1   your legal course is.'  So.

2   Q.  I'm going to read to you something from a hearing in front

3   of this Court on August 26th, 2005, and it's from Mr. Pahl.  He

4   says — he's talking about this case, he says, "Unlike the

5   Lacusta [sic] case," which is another case that Mr. Pahl had

6   tried here, "where the issue of 1695 was a subject of settlement

7   negotiations, there is no claim by anybody that 1695 was ever

8   the subject of discussion or comment relating to the settlement

9   agreement."

10           Was Mr. Pahl misinformed when he said that?

11  A.  Are you referring to this case?

12  Q.  Yeah.  That's what he told the judge.  That's what he told

13  us.

14  A.  Read it to me —

15  Q.  On August —

16  A.  Read that to me again, if you would, please.

17  Q.  "Unlike the Lacusta [sic] case," which is a case Mr. Pahl

18  tried, —

19  A.  Uh-huh.

20  Q.  — "where the issue of 1695 was a subject of settlement

21  negotiations, there is no claim by anybody that 1695 was ever

22  the subject of discussion or comment relating to the settlement

23  agreement."

24  A.  Well, it was definitely — no, it was definitely bandied

25  around relative to that, I mean certainly Ed Blum and I had

*Hoffman - Cross/Goodrich*                                     47

1   numerous conversations.  He obviously had informed his client of

2   such or he wouldn't be bringing that to the table during our

3   meeting at Applebee's.  So I mean, no, clearly that was —

4   Q.   Are you —

5   A.   — bandied around.

6   Q.   Are you maybe misunderstanding the nature of the claims that

7   Mr. Blum raised and Mr. Lloyd understood, —

8   A.   Can you —

9   Q.   — assuming that those were 1695 claims that you were

10  discussing with him?

11  A.   He put it — no, we were directed to it.  I mean my counsel

12  and myself, inhouse counsel.  No, we looked it up.  We wanted to

13  know what are we dealing with.

14  Q.   When did you do that?

15  A.   I don't know exactly when, but it was during the time when —

16  I mean, if you will, put it in this term, but I mean kind of

17  like threatened or having it jammed down me saying that, you

18  know, I don't — you know, 'You better settle on our terms or

19  you're going to have some serious problems,' no, I mean it was

20  brought to our attention where we seriously infest- — looked

21  into it.

22  Q.   Who brought it to your attention?

23  A.   On that particular instance that would have been Blum

24  bringing it to my attention and it was before I ever met with —

25  with Tom Lloyd.

*Hoffman - Cross/Goodrich*                                            48

1   Q.  So you were kind of concerned about 1695?

2   A.  Yeah.  Obviously, all I see is further litigation or a

3   potential — there wasn't any really — real litigation outside of

4   the UD, but I saw where it was going to blow up.  All's I wanted

5   to do is — I didn't want it to happen.

6   Q.  And yet you kept no notes of any of these conversations, did

7   you?

8   A.  They're in my head.  I mean, no, I didn't write anything

9   down.

10  Q.  And you produced no correspondence from your lawyer, Ms.

11  Gustavson, from yourself, from anybody suggesting that there had

12  been any discussions about 1695 of the Civil Code prior to the

13  settlement agreement being executed, correct?

14  A.  Well, you — when — during my deposition —

15  Q.  No, just the answer to that question.

16  A.  Let me — I am trying to answer it if I can.  You

17  acknowledged to me that he knew that because you asked me why I

18  didn't send him the five-day notice of rescission, so you know

19  that obviously Ed Blum was at — otherwise you wouldn't have

20  asked me that.

21  Q.  No, no.  You're recalling a document that I showed you that

22  came, according to you, from your files.  And it was a notice of

23  rescission, which I told you my client had never seen and never

24  signed.

25  A.  His signature —

Plaintiff's EOR-137

*Hoffman - Cross/Goodrich*                                        49

1   Q.   That's —

2   A.   — is on it.

3   Q.   His signature is on it, huh?  Do you recall testifying that

4   you never saw him sign that document.

5   A.   I didn't see him sign any of the documents.

6   Q.   Then how do you know it's his signature?

7   A.   Are you going to tell me that's not his signature?

8          MR. PAHL:   Your Honor, I think we've descended into an

9   argumentative stage between counsel and the witness.

10         THE COURT:   I also think that this doesn't deal with

11  the waiver, because that would be compliance, not waiver.

12         MR. GOODRICH:   Right.

13  BY MR. GOODRICH:

14  Q.   So with respect to 1695, your answer is there were no

15  letters or correspondence addressing 1695 prior to execution of

16  the settlement agreement, correct?

17  A.   There was correspondence.  It was telephonic.

18  Q.   I'm sorry.

19  A.   There was correspondence.

20  Q.   There was correspondence?

21  A.   I told you, we spoke numerous times.  If that's not — that

22  is corresponding.  That's —

23         THE COURT:   He doesn't mean written correspondence.

24  He means conversation.

25  BY MR. GOODRICH:

Plaintiff's EOR-138

1  Q.  Okay.  So there's no writing anywhere mentioning anything

2  about 1695 prior to your execution of the settlement agreement?

3  A.  Not — no.

4  Q.  And there's —

5  A.  I mean whatever's been produced is —

6  Q.  And there's no writing anywhere mentioning the home equity

7  sales contract?

8  A.  No.  But if you look in the settlement itself, the

9  settlement — in fact —

10 Q.  Go ahead.  Take a look at it.  I'm curious to know where it

11 is.

12 A.  In here they're even going on to say the sales transaction

13 was a disguised security device, so —

14 Q.  So when you saw those words it was your understanding that

15 that was a claim under Section 1695 of the Civil Code?

16 A.  No.  No.  That's not — not what I'm contending.  But what

17 I'm contending is that — he hit it from two prongs, if you will.

18 One, number one, it's either — either he's going to attack me on

19 the fact that it's that or he's going to attack me on the fact

20 that it's under a 1695.  Let's say — I know more in terms of not

21 so much as a code name as much as I do "home equity sales

22 contract."  Buying up, the purchasing of a property that has had

23 an NOD filed on it, which is a notice of default, that's what

24 qualifies you or puts you within that section.

25 Q.  So you're saying that before you filed the unlawful detainer

Plaintiff's EOR-139

1  you were aware of the provisions of 1695 of the Civil Code?

2  A.  Correct.

3  Q.  So you didn't first learn about it from Mr. Blum?

4  A.  Well, no, that's — no, that's what I told you, obviously,

5  because we even had a five-day in there.

6  Q.  Okay.  On the same date, August 26, 2005, your counsel told

7  the Court, "My understanding from the client, although we'd not

8  had a long discussion over it obviously, is that 1695 was not an

9  issue and the client was unaware of the provisions of 1695."

10          Again, was your attorney mistaken when he made that

11 representation?

12 A.  Well, and that is written by whom?

13 Q.  This is what Mr. Pahl said on the record in August just a

14 few months ago.

15 A.  Well, I would have to say that, no, that's not — I'm sorry.

16 Blum — as I say, the two of them both knew — I shouldn't — you

17 know, predominantly Blum.  I mean he was the one who, you know,

18 would wave the flag and bandied around and say, 'This is what's

19 going to happen to you,' blah-blah-blah and that type of thing.

20 He was not really inclined to want to have his client settle,

21 so —

22 Q.  So you said that there were two prongs to his attack.  One

23 was that it was avoidable because it was a disguised security

24 device and the second was under 1695.  Is that a fair

25 characterization?

Plaintiff's EOR-140

*Hoffman - Cross/Goodrich*                                        52

1   A.   Right.

2   Q.   Can you —

3   A.   The latter being the most important.

4   Q.   Can you identify any writing from Mr. Blum prior to the

5   settlement agreement where he described his claims as including

6   1695?

7   A.   Conversations with myself.  Conversations during the

8   settlement which involved Mr. Rothbard and discussions with,

9   like I say, my inhouse counsel as well.

10         I mean everybody knew what everybody was talking

11  about.  It's not like this is some mystery out there nobody

12  knows and everybody's — you know, we're talking about these are

13  all attorneys.  You know, they —

14  Q.   So the answer is no, there is no writing from Mr. Blum?

15  A.   There is no writing from him, no.  He didn't — but there's

16  no writing from Mr. Blum relative pretty much to anything.

17  Q.   Well, take a look at Exhibit 10, which is his answer.

18  A.   That's your book?

19  Q.   Correct.

20  A.   Okay.  Appears to me that —

21  Q.   Do you recognize that as the answer filed by Mr. Blum in the

22  unlawful-detainer proceeding?

23  A.   Yes.

24  Q.   Can you tell me where in the answer Mr. Blum, in your mind,

25  was seeking to set aside the transaction under the Home Equity

1    Sales Contract Act?

2    A.   I would certainly point to J.

3    Q.   What part of J?

4    A.   Well, making the claim that I'm not the true and lawful

5    owner of the subject property.

6            And then you go down to the very bottom, it says, "The

7    subject transaction, which plaintiff claims to have become owner

8    of record, title are void and illegal."  Well, void — there

9    again what would make it void and illegal?  The provisions under

10   1695 would certainly make it that.

11   Q.   Okay.  So you're saying that you understood that as an

12   affirmative defense, the last part of it, that it was void and

13   illegal, was based on the idea that — his allegation that you

14   had not given Mr. Lloyd a proper notice of a five-day right to

15   rescind?

16   A.   Correct.

17   Q.   So when you understood that that was the argument he was

18   making, did you provide him with a copy of any notice of right

19   to rescind to say, 'Gee, that's your allegation?  Here's the

20   document.  It's a single page.  Mr. Lloyd signed it'?

21   A.   Thinking in that moment that I'm going to send him a single

22   document that's going to put this man to rest when what is — no,

23   no.  That's — it would have been useless.  I mean, like I say,

24   his whole thing is to drive the wedge to try to get me to stop.

25   And certainly if it wasn't that he would go off onto another

Plaintiff's EOR-142

*Hoffman - Cross/Goodrich*                                        54

1  tangent.

2          Again, as I say, he was predominantly:  Don't settle.

3  You know, I hate to say it, to rack up fees.  I don't know.  You

4  know, you tell me.  I don't know what was going on in his mind,

5  but I do know that definitely that was — that was his intent.

6  Q.  Isn't it actually true that you never had any discussions

7  concerning 1695 and the only reason you're saying you did now is

8  because Mr. Pahl could not enforce the settlement agreement

9  under 1542 as an absolute claim?

10 A.  Not true at all.

11 Q.  But you can't show any documents evidencing this very

12 important right —

13          MR. PAHL:  Your Honor, I think that I'll object —

14 BY MR. GOODRICH:

15 Q.  — that you thought —

16          MR. PAHL:  I think we've now asked this question —

17 I've been —

18          THE COURT:  I think there's no writing and he's

19 already said there's no writing.

20          MR. PAHL:  And I think that's been said five times,

21 been asked and answered five times.  I've been keeping chicken

22 scratches here.

23          THE COURT:  Okay.

24 BY MR. GOODRICH:

25 Q.  Did it ever occur to you to provide that document that you

Plaintiff's EOR-143

*Hoffman - Cross/Goodrich*                           55

1   claim you have showing there has been conformity with the

2   requirement of 1695?

3            MR. PAHL:  I don't — again, —

4            THE COURT:  I think he's already answered that.

5            MR. GOODRICH:  Well, I'm asking if it even occurred to

6   him.

7            MR. PAHL:  I objecting it's irrelevant.

8            THE COURT:  Okay.  You can ask whether it occurred to

9   him.

10           Did it occur to you?

11           THE WITNESS:  No, it hadn't.  No.

12           THE COURT:  Okay.

13  BY MR. GOODRICH:

14  Q.  Isn't it true that it didn't occur to you...

15           MR. PAHL:  Your Honor, this is argumentative.

16           THE COURT:  Ask the question.  Your objection, I know

17  what your objection's going to be.  Let's hear the end of the

18  question.

19  BY MR. GOODRICH:

20  Q.  Isn't it true that it didn't occur to you because Mr. Blum

21  never mentioned it?

22  A.  I have already stated that that's not correct.

23           THE COURT:  It's a fair question.

24  BY MR. GOODRICH:

25  Q.  So you're saying that Mr. Blum actually mentioned 1695 of

1  the Civil Code?

2  A.  That's how we were able to look it up.

3  Q.  Well, I thought you knew about 1695 of the Civil Code before

4  Mr. Blum mentioned it to you?

5  A.  We certainly did know about that.

6  Q.  Well, do you recall at your deposition...

7          THE WITNESS:  May I make a statement?  If —

8          THE COURT:  No.

9          THE WITNESS:  No.

10         THE COURT:  You have to wait for questions.

11 BY MR. GOODRICH:

12 Q.  I asked you in your deposition on December 7th, 2005, I

13 said, "He cited," meaning Mr. Blum, "He cited 1695?"

14         And you answered, "I don't" re- —

15         MR. PAHL:  Objection.  It's highly inappropriate,

16 highly improper, violates the Federal Rules of Evidence to cite

17 a deposition without providing the Court, A, with a copy of the

18 deposition, B, — he can use it for any purpose — and citing the

19 page and line.

20         THE COURT:  Do you have a copy?

21         MR. GOODRICH:  Yeah.  We actually have an original and

22 a certified copy.

23         THE COURT:  Okay.  You have a copy, I see?

24         MR. PAHL:  I do have a copy.

25         THE COURT:  Okay.  All right.

*Hoffman - Cross/Goodrich*                                    57

1        MR. GOODRICH:  It starts at page 80, line 23.

2        THE COURT:  Okay.

3        MR. GOODRICH:  The certified copy for the Court.

4        MR. PAHL:  I'm sorry.  The certified copy should be in

5    a sealed container.

6        MR. GOODRICH:  I got that.

7        MR. PAHL:  Your Honor, the appropriate methodology

8    would be for counsel to lodge both originals with the Court and

9    for the Court to utilize the originals rather than utilizing

10   counsel's copy.

11       MR. GOODRICH:  Beginning at trial it was suggested —

12   just that.

13       THE COURT:  Here, I'll get it open.  Here, just hand

14   it to me.  I'm not gentle with these envelopes.

15       Is this the same volume?  I believe it is.  Okay.  I

16   think you're on page 80, you said?

17       Is that where you wanted to be?

18       MR. GOODRICH:  80.

19   BY MR. GOODRICH:

20   Q.  Starting with line 16, this is my question:  "Prior to

21   execution of the settlement agreement you say in discussions

22   with Mr. Blum that he mentioned the Equity Purchase Act."

23       You answer, "He felt that the — it would all be

24   rescinded."

25       "QUESTION:  Did he actually say the words 'Equity

Plaintiff's EOR-146

*Hoffman - Cross/Goodrich*                                    58

1   Purchase Act'?

2           "ANSWER:  He stated the laws, yeah, he did.  Yeah.

3           "QUESTION:  He cited 1695?

4           "ANSWER:  I don't recall him citing the codes to me,

5   but he certainly told me under where I would find the problems,

6   you know.

7           "QUESTION:  Did he say one major item was that you

8   didn't have a written contract with a notice of rescission

9   that's required under 1695?

10          "ANSWER:  He told me I had many problems.

11          "QUESTION:  He didn't get into details?

12          "ANSWER:  No.  I can't recall him saying that there

13  was an issue of, you know, the cancellation notice, or anything

14  specific to that."

15          MR. PAHL:  I'm sorry, Your Honor, could we have the

16  whole answer read?

17  BY MR. GOODRICH:

18  Q.  "But he certainly was aware" —

19          THE COURT:  Yes.  Yes.

20  BY MR. GOODRICH:

21  Q.  — "of what my problems were, which created a problem for me

22  of trying to get this thing hammered out.  Because, again, if

23  your attorney's telling you that he might be able to unwind this

24  whole thing, it could be kind of difficult putting something

25  together."

*Hoffman - Cross/Goodrich*                                                    59

1           Do you recall that testimony?

2    A.    Yeah, I mean if it's there, I can't remember it, no.

3    Q.    Okay.  Is that testimony accurate?

4    A.    Yes, I would say it's accurate.

5    Q.    So Mr. Blum didn't mention 1695 by code section?

6    A.    If you notice what you read in there is you said to me that

7    he — he noted — he had noted it to me again, and I wish I had it

8    in front of me while you were reading it, but I could point out

9    to you as you were reading it one of the things that struck me

10   is the fact that you had mentioned in there that he could — he

11   was able to direct me where it was.

12          Now how else would I — you know, what I'm saying is he

13   can direct me right where to go find where I'm going to have all

14   these problems.  And he's more than happy to do such in order

15   to, like, as I say, to put the fear in me and... so, that's

16   pretty —

17   Q.    But other than what you're claiming, which is that he

18   directed you somehow to the code section, he didn't actually

19   discuss specifically the failure to give a notice of right to

20   rescind, correct?

21   A.    I — I can't quote that, but I would almost have to assume

22   that he would certainly bandy around the different problems

23   within the — within the code.  As I said to you, he told me I

24   had numerous, so, you know, —

25   Q.    But you don't recall —

Hoffman - Cross/Goodrich                                    60

1  A.   — to toss —

2  Q.   — specific problem that he described?

3  A.   No, I mean, like I say, you know, he's — he had many.   I'm

4  sure I cited it, I'm sure he brought it up to me.   Again, like

5  I say, his —

6  Q.   Why are you sure?

7  A.   Well, again, —

8  Q.   You don't have any notes.

9  A.   No.

10 Q.   You didn't send any letters.

11 A.   I'm thinking of what an attorney would do if he's going to

12 call me and tell me where I've got a problem, he's going to try

13 to cite to me as to why I have a problem.

14 Q.   But you don't have any specific recollection that he did

15 that?

16 A.   He did not — he did not put it in writing, no.

17 Q.   No, no.   You don't have a specific recollection that he did

18 that, you're just saying, 'I assume he did'?

19 A.   Well, it's more than just an assumption, that's what I'm

20 saying.   I mean it's kind of like what we're doing is dancing

21 around this large issue, but the issue all goes back down to

22 that one item and we're all looking for that one magic number of

23 1695.   And the only way — although the 1695 is where it's

24 written, everything that we're talking about is going to this

25 one area.

*Hoffman - Cross/Goodrich*                                                      61

1      So it's like, you know, — it's kind of — I mean it's

2  like you're beating the dead horse.  You're going, 'Look, we're

3  all talking about the same thing, but because you specifically

4  didn't mention that was an Eichler house and you just said it

5  was house, then that — therefore probably didn't know' — you

6  know what I'm saying?  I mean it's mincing of words to me.

7  Q.  Well, isn't it fair to say that you were interested in just

8  a complete settlement and so you weren't really giving it much

9  thought as to what you were getting on the other end of the

10  release, you were getting release of everything?

11  A.  Oh, absolutely, I thought I was getting release of

12  everything.

13  Q.  And you certainly weren't telling Mr. Blum where he could go

14  to find provisions of a law that would benefit his client,

15  right?

16  A.  Well, that's not — let's put it this way.  In this

17  particular instance it didn't happen as such, but I don't think

18  that would be my job to educate another individual attorney on

19  how he can come after me, no.

20  Q.  No.  But under 1695 you understood, didn't you, that you had

21  to give that up, that notice?

22  A.  Correct.

23  Q.  And you weren't giving it to him then?

24  A.  Well, he — he didn't demand that I send the paperwork over

25  to him.  He's not saying — all his paperwork's in — you know, I

Plaintiff's EOR-150