1  GOLDBERG, STINNETT, DAVIS & LINCHEY
   A Professional Corporation
2  DENNIS D. DAVIS, ESQ. CA Bar #070591
   44 Montgomery Street, Suite 2900
3  San Francisco, CA  94104
   Telephone: (415) 362-5045
4  Facsimile:  (415) 362-2392

5  Attorneys for Appellant, Jeffrey E. Hoffman

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 JEFFREY E. HOFFMAN,                          No. 3:07-CV-2417 MHP

11                 Plaintiff,

12 vs.

13 THOMAS   R.   LLOYD,   an   individual,
   EDWARD L. BLUM, an individual, and
14 DOES 1 through 20, inclusive,,

15                 Defendants.

16 ─────────────────────────────────

17 THOMAS LLOYD,

18                 Cross-Plaintiff,

19 vs.

20 JEFFREY    E.    HOFFMAN,    dba    H&B
   PROPERTIES; H&B PROPERTIES, LLC;
21 J.  EDWARDS  INVESTMENT  GROUP,
   INC., and NORCAL FINANCIAL, INC.,
22
                   Cross-Defendants.
23

24

25        **APPELLANT'S EXCERPTS OF RECORD ON APPEAL**

26                     **VOLUME II cont.**

27

28

| | | Bktcy Ct Docket No. | Pages |
|---|---|---|---|
| 1. | Answer – Unlawful Detainer (Trial Exhibit 10) | | 1-4 |
| 2. | Settlement and Mutual Release Agreement (Trial Exhibit G) | | 5-9 |
| 3. | Complaint for Damages and to Cancel Instrument (filed April 5, 2005) | | 10-29 |
| 4. | Cross-Complaint for (1) Declaratory Relief: (2) Avoidance of Fraudulent Conveyances and/or Obligations; (3) Transferee Liability; (4) Quiet title; (5) an Accounting; (6) Determination of Validity, Extent and Priority of Liens; and (7) Objection to Claim (filed June 16, 2005) | | 30-60 |
| 5. | Declaration of Thomas Lloyd in Support of Motion for Summary Judgment (filed 1/20/06) | 39 | 61-82 |
| 6. | Tentative Ruling Re Plaintiff's Motion for Summary Judgment (filed February 16, 2006) | 55 | 83-85 |
| 7. | Order Denying Motion for Summary Judgment (filed February 21, 2006) | 57 | 86-89 |
| 8. | Trial Transcript (filed February 28, 2006) | | 90-294 |
| 9. | Decision After Trial (Phase One) (filed March 20, 2006) | 59 | 295-297 |
| 10. | Hearing Transcript of Defendant's Motion for Summary Judgment (filed April 28, 2006) | | 298-330 |
| 11. | Order Granting Defendant Thomas Lloyd's Motion for Summary Judgment (filed May 15, 2006) | 83 | 331-338 |
| 12. | Tentative Ruling Re Rescission Payment (filed November 9, 2006) | 95 | 339-344 |
| 13. | Tentative Ruling Re Terms for Cancellation of Deed (filed 1/24/07) | | 345-347 |
| 14. | Declaration of Asher Robertson (filed 2/13/07) | 108 | 348-366 |

| 15. | Opinion (filed April 30, 2007) | 116 | 367-392 |
|---|---|---|---|
| 16. | Judgment and Rule 54(b) Certification (filed April 30, 2007) | 117 | 393-396 |
| 17. | Order Denying Stay Pending Appeal (filed May 7, 2007) | 125 | 397-399 |
| 18. | Plaintiff's Brief Relating to Court's Tentative Ruling of January 24, 2007 | 108 | 400-414 |
| 19. | Declaration of Jeffrey E. Hoffman in Support of Plaintiff's Opposition to Defendant Lloyd's Motion for Summary Judgment. | 75 | 415-444 |
| 20. | Trial Scheduling Order. | 29 | 445-448 |
| 21. | Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 42 | 449-472 |
| 22. | Reply Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 78 | 473-485 |
| 23. | Declaration of Jeffrey Goodrich in Reply to Plaintiff's Opposition to Defendant Thomas Lloyd's Motion for Summary Judgment. | 80 | 486-510 |

DATED:  July 13, 2007

GOLDBERG, STINNETT, DAVIS & LINCHEY
A Professional Corporation

By:      /s/ Dennis D. Davis
          Attorneys for Appellant Jeffrey E. Hoffman

-2-

**DOCUMENT 8 cont.**

1   mean he wasn't — his feeling is we were already in violation.

2   That's his feeling.  He feels we're already in violation.  He's

3   not — you know, it's kind of like he's not going to ask me to

4   start producing documents to him, because I wouldn't have done

5   it probably anyway, to be honest with you.  I probably would

6   have said, 'Okay.  Hold on, look, you know, I'm here to settle

7   this thing.'

8          And that's why, again, pushed for the fact of the —

9   the discussion was between Tom and myself, and not with him.  I

10  mean because it was this — we were doing a lot of lawyering, you

11  know.  I was trying to get out of that —

12  Q.  You wanted — you wanted to keep the discussion just between

13  you and Tom —

14  A.  I'm trying to —

15  Q.  — because you could convince Tom to enter into the

16  settlement more easily than you could convince Mr. Blum?

17  A.  More importantly is the fact that I would be able to

18  probably reach a settlement, not so much convincing him because

19  of the fact of lack of knowledge, because he certainly is going

20  to go back, and the one who's going to be instrumental in

21  drafting this is going to be his attorney.

22          So when the day is done, you know, it's — they both

23  know.  You know, one has told the other one, 'I want to settle.'

24  The other one is saying, 'Look, this is what — what I think, you

25  know, we could do relative to moving forward on this thing if

Plaintiff's EOR-151

*Hoffman - Cross/Goodrich*                                    63

1   you so desire.' So they're both part and parcel. I mean it's

2   not like —

3   Q. Were you present that they communications between Mr. Lloyd

4   and his attorney, Mr. Blum?

5   A. No, I was not.

6   Q. So what you just testified to is not a matter of personal

7   knowledge?

8   A. It's — I can tell you where the —

9   Q. Just say yes or no.

10  A. Well, it's not a yes or no question. It's an obvious that

11  it was discussed and bandied around, or he would have not been

12  able to make those discussions — or relative of those

13  statements, I should say, with Mr. Lloyd when I met with him

14  down at — in Fresno.

15  Q. What statements?

16  A. Which is the statement that they can be rescinded, that

17  there are problems with it, that —

18  Q. So you're assuming whenever the word "rescission" is stated

19  by Mr. Lloyd, that he's referring to rescission under 1695?

20  A. Since that's what my discussions were prior to that,

21  absolutely.

22           And whatever — what other reason would Mr. Lloyd have

23  or of understanding, if you will, of — I don't know, is there

24  other Civil Code that's available out there for all these types

25  of things? I don't know.

*Hoffman - Cross/Goodrich*                              64

1  Q.  I'm going to refer to the same deposition, page 79, question

2  beginning on line 19, this is in the context of the meeting at

3  Applebee's, "Did Tom discuss with you or did you discuss with

4  him in that meeting his defenses to your unlawful-detainer

5  action?

6        "ANSWER:  I don't recall, but I don't see him bringing

7  up his defenses to me, no."

8  A.  You're referring to the unlawful detainer.  That's different

9  than what we're talking about now.

10 Q.  So you're saying that his defenses in the unlawful detainer

11 weren't defenses under Section 1695?

12 A.  Under our settlement they certainly were.

13 Q.  Well, didn't you testify in your deposition that you and Tom

14 didn't get into any legal discussions about what his defenses

15 were?

16 A.  Not in terms of what one would call legal.  I mean certainly

17 we're not throwing —

18 Q.  Well, in what terms then?

19 A.  We're not lawyering, if you will.  We're talking in generic

20 terms.  I mean he came down there, presumably in good faith as I

21 went to the table to meet with him, and — and in fact he

22 obviously did because we had put something together.

23       So, as I say, he had — had weighing on his mind

24 relative to what his attorney is telling him, which made it

25 difficult to even get to that point.  I don't — in fact, if I'm

*Hoffman - Cross/Goodrich*                                              65

1    not mistaken, I don't think he was — I don't think of Blum or

2    Blum [pronouncing as "bloom"], I can't remember whichever — how

3    to pronounce it — was probably very much inclined to want him to

4    come down and meet with me personally without —

5    Q.  Why do you say that?

6    A.  Just because of the fact, again as I say, he felt very

7    strongly on the issue of being able to unwind this.

8    Q.  But other than the word "rescission," you're saying Mr.

9    Lloyd said he thought he could rescind it?

10   A.  Rescind, unwind.  You know, all's I know —

11   Q.  There was no —

12   A.  All's I know is they mean bad things to me, as — yeah.

13   Q.  But there was no discussion of any failure to provide notice

14   under 1695?

15   A.  State that —

16   Q.  In your discussion with Mr. Lloyd at Applebee's, you didn't

17   discuss with him the theory that this could be unwound under

18   Section 1695?

19   A.  The emphasis of our conversation was settlement, not

20   bantering around —

21   Q.  So the answer's no —

22   A.  He didn't come down — he's not threatening me.  He's not

23   come down to threaten me.  We're trying to cut a deal.  So he's

24   not sitting here saying, 'Although I want you to be aware of

25   what I could do.'  He's just telling me what his attorney is

Plaintiff's EOR-154

1   telling him, so.

2   Q.  So the answer is no?

3   A.  No, I don't think I said no.  I say he's relating — and as

4   far as specifically stating 1695, I'd have to say, you know, I

5   can't recall specifically a number being bandied around.  And,

6   you know, I would be very — I would have to almost make an

7   assumption that would probably be unlikely that numbers would be

8   bandied around, so.

9   Q.  Isn't it fair to say that you don't have any specific

10  recollection of anything that was discussed other than the idea

11  of settlement and an actual settlement structure at Applebee's

12  that day?

13  A.  Isn't that what I've already stating?

14  Q.  Okay.  In the settlement agreement itself you indicated that

15  there was a reference to what you believe to be Tom's claims

16  under Section 1695.  And that's — and that's Item G.  Filed an

17  answer claiming *inter alia* that the sales transaction was a

18  disguised security device and therefore unenforceable.

19          Now you had a lawyer who represented you in the

20  unlawful-detainer action, correct?

21  A.  That's correct.

22  Q.  And you a separate lawyer representing you in drafting the

23  settlement agreement, correct?

24  A.  Yes.

25  Q.  And you have been a party to many cases in litigation over

*Hoffman - Cross/Goodrich*                                                67

1    the years as a real estate investor and developer, correct?

2    A.  No, I haven't.

3    Q.  Well, you've had your deposition taken at least ten times,

4    correct?

5    A.  Oh, no.  No, no, no, no.  I never said ten times.  And if I

6    did, I'll tell you what, I was sadly mistaken.  No.

7    Q.  Let's see.  Okay.  This is from the same transcript, page 5,

8    line 12, "Have you had your deposition taken before?

9            "ANSWER:  Yes.

10           "QUESTION:  How many occasions?

11           "ANSWER:  I don't know how many.

12           "QUESTION:  More than ten?

13           "ANSWER:  More than ten."

14   A.  If you recall during the depositions, one of the things that

15   you liked to do is throw numbers at things.  And you would go,

16   'Is it less than ten or greater than ten.'

17           And I had — in fact, I even made comment, if you

18   continue to read through the transcripts, I had laughingly made

19   jokes, I said, "Well, I don't know.  Throw 'ten' at it," because

20   it was a number that you liked.  And I made the joke to you, I

21   said, "I don't — you know, five, ten, whatever, you know, I

22   don't know."

23           I do know that it has not been that many, no.

24   Q.  Did you think that the deposition was a joke when you took

25   it?

Plaintiff's EOR-156

*Hoffman - Cross/Goodrich*                                                    68

1   A.   I don't consider it as such, no.

2   Q.   Didn't I tell you that the answers were just like the

3   answers you're supposed to be giving in court?

4   A.   That's correct.

5   Q.   And wasn't this question one of my first questions in this

6   deposition on the first day of your deposition?

7   A.   Okay.

8   Q.   So didn't you give a serious answer, not a joking answer at

9   that point?

10  A.   No, I gave — I gave a serious answer.

11  Q.   Okay.

12  A.   Yeah.   But —

13  Q.   So you have had your deposition taken more than ten times?

14  A.   I would have to recant that and say, no, I don't believe I

15  have.   I don't believe that at all.   I'd have to go back —

16  Q.   Well, let's —

17  A.   — and — and redo it.

18  Q.   Let's go back to the settlement agreement.   In the

19  settlement agreement you understood that Mr. Blum was raising

20  issues under Section 1695, correct, that's what your testimony

21  is?

22  A.   Correct.

23  Q.   And that at that point you knew the provisions of Section

24  1695, correct?

25  A.   Correct.

Plaintiff's EOR-157

*Hoffman - Cross/Goodrich*                                        69

1   Q.   You had reviewed it not only personally but with counsel,

2   correct?

3   A.   Correct.

4   Q.   And you were concerned that this transaction could be set

5   aside for a possible violation of Section 1695, correct?

6   A.   It was possible.

7   Q.   And it sounds like you don't care much for lawyers.  You

8   like to do things directly with people, but you've hired lawyers

9   to make sure that your rights are protected, correct?

10  A.   I try to avoid this.

11  Q.   Okay.  And you read the settlement agreement before signing

12  it, correct?

13  A.   Correct.

14  Q.   And yet you made no effort to indicate that among the claims

15  being released were claims arising under Section 1695, correct?

16  A.   My understanding of settlement agreements has always been

17  that 1542 provided for any and all such claims regardless of

18  wherever they fell under whatever code section they may be.

19  That it — you're stating to each other that no matter what it

20  is, past, future, present, wherever, that we're waiving all

21  this.  We're no longer going to fight, no matter what.

22  Q.   Okay.

23  A.   We're done.

24  Q.   So your view of the settlement is that both party — both

25  parties were releasing themselves from any claims known or

Plaintiff's EOR-158

*Hoffman - Cross/Goodrich*                                70

1   unknown, whether specifically referenced in the agreement or

2   not?

3   A.   Correct.

4   Q.   Well, how about your claim for a management fee that you

5   made after the settlement agreement, a $45,000 management fee

6   that you requested and demanded be paid for Mr. Lloyd to

7   exercise his repurchase rights?

8           MR. PAHL:  I'm going to object.  I think we're going

9   right back into the other issue which I don't think is relevant

10  here.  That would be —

11          THE COURT:  I don't think it's really helpful.  Let's

12  keep going.

13          MR. GOODRICH:  If I could along the lines, Your

14  Honor,...

15  BY MR. GOODRICH:

16  Q.   But you understood, your belief was that your claims for a

17  management fee were not being released, correct?

18          MR. PAHL:  I'm going object again, Your Honor.  The

19  document speaks for itself.  And that would be parol evidence in

20  order to vary the terms of the settlement agreement.  If they're

21  excluded, they're excluded.  If they're not, they're not.  But

22  that's not at issue in this matter.

23          MR. GOODRICH:  Well, this witness says that on the one

24  hand Mr. Lloyd's waiving all his claims and on the other I'm

25  trying to show —

*Hoffman - Cross/Goodrich*                                   71

1        THE COURT:  You know, I don't think we — given what I

2    ruled on the summary judgment, I think we're talking about what

3    was actually said between the parties.

4        MR. GOODRICH:  Okay.  Okay.

5        THE COURT:  I don't —

6        MR. GOODRICH:  So we're not getting at this stage

7    into —

8        THE COURT:  It's not subjective intent that's at all

9    relevant here, —

10        MR. GOODRICH:  Right.

11        THE COURT:  — what was discussed between the parties.

12   BY MR. GOODRICH:

13   Q.  Mr. Blum never asked you for a copy of the purchase

14   agreement prior to executing the settlement agreement, correct?

15   A.  I don't believe Mr. Blum ever asked me for any documents.

16   Q.  Okay.  So that includes the — he didn't ask for the option

17   agreement?

18   A.  He had all that.

19   Q.  How do you know?

20   A.  Well, — okay.  I'll step backwards on that.  No, I did not

21   see Lloyd hand it to him, so I do not know.

22   Q.  You don't know if he had the purchase agreement, the option

23   agreement, or the lease at the time he was discussing any of

24   these things with you?

25   A.  I presumed he did.

*Hoffman - Cross/Goodrich* 72

1  Q.  But you don't know?

2  A.  I can't swear to it because, as I say, I never had even met

3  the two.

4  Q.  And you didn't provide any of these documents to him before

5  executing the settlement agreement?

6  A.  To Mr. Blum?

7  Q.  Correct.

8  A.  That would — correct.

9  Q.  In describing your meeting with Mr. Lloyd at Applebee's, you

10  testified on direct that you and Tom were tired of the battles

11  back and forth; do you remember that testimony?

12  A.  Yes.

13  Q.  What battles were your referring to?

14  A.  The going back and forth.  I mean obviously they were

15  contesting even the possession of property.

16  Q.  Well, the battle would be the complaint and the answer,

17  right?

18  A.  Right.  Right.

19  Q.  Was there any discovery in the unlawful-detainer action,

20  meaning any demands for documents, any depositions taken?

21  A.  Not to my knowledge, no.

22  Q.  So the battle really was the fact that you tried to evict

23  him and Tom was defending himself?  That's the battle that you

24  were referring to?

25  A.  That battle as well as the battle being held above my head

Plaintiff's EOR-161

1    as a veiled potential problem.

2    Q.  And I think you testified that Mr. Lloyd was unsure of

3    whether Mr. Blum was correct in believing it could be unwound;

4    is that your testimony?

5    A.  I'm sorry.  Could you state that again?

6    Q.  I believe you testified that in discussing this issue with

7    Lloyd, he was unsure about whether Mr. Blum was correct, that

8    the transaction could be set aside?

9    A.  Well, I don't know if he — well, again, I don't know if he

10   was — if he could necessarily say that he was unsure.  It was

11   more or less really the standpoint of, you know, not wanting to

12   go down that path.  I have no idea what's been transpiring, you

13   know, in his mind for the 12-plus months prior to this, when we

14   first entered into the agreement.  You know, I don't know what's

15   going on.  But I would imagine he's tired at this point and

16   saying, 'You know what, I'll take — I get one more crack at the

17   apple and let's do it.'

18   Q.  Did you tell him at Applebee's that he had a right to

19   rescind the transaction?

20   A.  I — well, I would have to doubt seriously I stated that,

21   yes.

22   Q.  Now you say that you gave him 90 days to buy the property

23   back under the terms of the settlement agreement, but you didn't

24   feel you had to provide the 90 days.  Why is that?

25   A.  Well, I felt it was a material — this thing was such a

Plaintiff's EOR-162

*Hoffman - Cross/Goodrich*                                                    74

1  significant breach that it was way outside the bounds of — I

2  mean it went — it was above and beyond what I think most

3  individuals would do relative to this type of thing.

4          And, like I say, I think I went the extra mile in good

5  faith, kept going on and on and on.  And had it not been for my

6  action we may still be sitting there today and I may still be

7  talking to him, you know, and it's just — how long is it going

8  to go on.

9  Q.  Well, if in fact you thought there might be some exposure

10  under 1695, wouldn't that have gone into your calculation of

11  giving him another 90 days?

12  A.  If not for that being waved above my head, I probably would

13  not have given him the additional 90 days.

14  Q.  I'm going to ask you to take a look at Exhibit 1.

15  A.  When you refer to these, these are always in your book?

16  Q.  In our book.

17  A.  Okay.  Okay.

18  Q.  Is that your signature on the last page of Exhibit 1,

19  verifying the answers to my requests for production of

20  documents?

21  A.  Okay.  There we go.  Would that be page 9 — or —

22  Q.  Yes.

23  A.  It's your — it's your 1-10?

24  Q.  Correct.

25  A.  Okay.  Yes.

Plaintiff's EOR-163

1  Q.  Take a look at Exhibit 2.  Can you identify Exhibit 2 for

2  the record?

3  A.  Are you asking me to identify —

4  Q.  Yeah.

5  A.  The Preliminary Title Report.

6  Q.  Is this a Preliminary Title Report issued in connection with

7  your purchase of the property for Mr. Lloyd?

8  A.  Yes.

9  Q.  Take a look at the page...

10  A.  There may have been other updates, I don't know.

11  Q.  ...2-3.

12  A.  2-3.

13       MR. PAHL:  I'm sorry.  My pages aren't numbered, Your

14  Honor.

15       Is that the third page of Exhibit 2?

16       MR. GOODRICH:  Correct.

17       THE COURT:  It is.

18  BY MR. GOODRICH:

19  Q.  Were you aware when you purchased this property from Mr.

20  Lloyd that there was a notice of default recorded against the

21  property?

22  A.  I would presume I did notice that obviously, yeah.

23  Q.  In fact, there were two notices of default according to this

24  title report, correct?  Item 7 and Item 10.

25  A.  I see 10 — oh, yeah, it's on the previous page.  That's what

Plaintiff's EOR-164

*Hoffman - Cross/Goodrich*                                          76

1   I'm looking for.  I see a transfer.  I don't — where do you see

2   the —

3   Q.  Item 7, Notice of Default, at the very bottom of page 2.2.

4   A.  Oh, okay.  Yup, I missed it.  You're right.  Okay.

5   Q.  And, in fact, the funds that you borrowed from Greenpoint

6   were used to pay off these loans that were in default, right?

7   A.  Correct.

8   Q.  Take a look at Exhibit 5, please.  Is that your signature on

9   page 5.3, the last page of Exhibit 5?

10  A.  Correct.

11  Q.  Did you read that paragraph above your signature before you

12  signed it?

13  A.  Yes.

14  Q.  And on page 1 of this exhibit it says that the property is

15  or will be borrower's primary residence; do you see that?

16  A.  I do see that, yes.

17  Q.  That was not a true statement, was it?

18  A.  I was not the one who filled the documents out.  I can't

19  necessarily say that I saw that.

20  Q.  Well, that's not my question.  My question is:  Is that a

21  true statement, that the property is or will be your —

22  A.  No.  It's his —

23  Q.  — primary residence?

24  A.  No, he was — no.  He was obviously still a tenant.

25  Q.  Okay.  And at that point you had no intention of moving into

Plaintiff's EOR-165

*Hoffman - Cross/Goodrich*                                    77

1    the property?

2    A.   No, that was not my intent.

3    Q.   In fact, you never have moved into the property?

4    A.   That would be correct.

5    Q.   Take a look at Exhibit 6.  Do you recognize that document?

6    A.   I need to see what it is.  Yes.

7    Q.   Is that your signature at the bottom?

8    A.   Yes, it is.

9    Q.   And, in fact, does that accurately reflect the amount of the

10   mortgage payment to Greenpoint for the Greenpoint loan secured

11   by the residence that you bought?

12   A.   Presumably, yes.

13   Q.   Well, you make that payment every month?

14   A.   Someone in my office does, yes.

15   Q.   Okay.  So you have no reason to believe it's not the correct

16   amount?

17   A.   No.  I mean it's — obviously it's printed here, so.

18   Q.   Take a look at Exhibit 7.  Again, the second page of Exhibit

19   7, that's your signature?

20   A.   Okay.

21   Q.   On the first page you say that, "I do solemnly swear that I

22   am the exclusive fee simple owner of the property and that no

23   one has questioned our ownership or right to possession."

24        Is that a true statement?

25        Was it true —

*Hoffman - Cross/Goodrich*                                          78

1   A.  Well, certainly it was true at that point in time, obvio- —

2   yeah, absolutely.

3   Q.  Well, didn't you already execute a lease giving possession

4   to Mr. Lloyd and an option giving him a right to buy it?

5   A.  Well, obviously these are all simultaneous.  So.

6   Q.  Take a look at Exhibit 11.  I think you testified that the

7   meeting at Applebee's occurred on July 12th; is that your

8   testimony?

9   A.  I was hazarding a guess and the reason I state that is I

10  believe — and, again, the settlement, in the settlement I

11  believe we started — was the settlement started on the 12th?

12  Q.  You're talking about when the 90 days starts?  Would be July

13  12th.

14  A.  Yeah.  Yes, July — yeah, July 12th.  And the reason I say

15  that is because basically we hammered out our deal.  One of the

16  things that was happening when I got back, when I get back to

17  Blum after several days of not hearing from him, I'm saying,

18  "Hey, what's going on," again he was dragging his feet, really

19  not wanting to do the transaction.  He was more dragging his

20  feet.  It was both Tom and myself who said, no, we're going to

21  do.

22        And I stated to Blum that we're not going to play the

23  game of stretching me out longer and that we're all of a sudden

24  now be another 30, 45 days down the road, and then we're going

25  to try to head into an agreement.  I said, "We're done stalling.

*Hoffman - Cross/Goodrich*                                      79

1   We're now either going to do it or we're not going to do it."

2   Q.   So on — according to this exhibit the trial date was a week

3   away at the time you met Mr. Lloyd at Applebee's?

4   A.   Correct.

5   Q.   Take a look at Exhibit 14.  Is that your signature on

6   Exhibit 14, page 2?

7   A.   Yes.

8   Q.   And Exhibit 15, is that your signature for H&B Properties on

9   page 15-2?

10  A.   Correct.

11  Q.   Did Mr. Lloyd receive any of the money that you received

12  from NorCal Financial, Inc. —

13          MR. PAHL:  I'm going to object, irrelevant in light of

14  the Court's prior ruling and instructions.

15          THE COURT:  Okay.  Hold on a second.

16          Which document is this now?

17          MR. GOODRICH:  This is Exhibits 14 and 15, basically

18  the note and deed of trust which were prepared and recorded

19  after the settlement.  If I understand the Court's ruling, it's

20  fine.  We won't go into it, but I just want to preserve for the

21  record our —

22          THE COURT:  I don't want to go into that now.

23          MR. GOODRICH:  Okay.

24          THE COURT:  Obviously the issue is — that's a question

25  of whether there is a breach —

Plaintiff's EOR-168

*Hoffman - Cross/Goodrich*                                          80

1          MR. GOODRICH:  Correct.

2          THE COURT:  — of this.

3          MR. GOODRICH:  Right.

4          THE COURT:  I won't go into that now.

5          MR. GOODRICH:  Okay.

6          THE COURT:  That basically has to do with the rights

7    under the settlement agreement if enforceable.

8          MR. GOODRICH:  Right.

9          THE COURT:  And when we said enforceable, we meant as

10   — as I understood the issue, whether it was enforceable as — or

11   not with respect to the question of being void under — or

12   voidable under public policy considerations.

13         MR. GOODRICH:  Right.  Right.

14         THE COURT:  Okay.  And the statutory considerations,

15   not performance questions.

16         MR. GOODRICH:  I see.

17   BY MR. GOODRICH:

18   Q.  On direct examination you identified Exhibit A as the

19   purchase agreement under which you acquired title.  Is that

20   the —

21   A.  You're now referring to...

22   Q.  In your —

23   A.  You're referring to —

24   Q.  — attorney's, yeah, A through —

25   A.  Okay.  That's — yeah.

*Hoffman - Cross/Goodrich*                               81

1  Q.  Right.

2  A.  I presume that's the purchase agreement, is it?  Yeah, okay,

3  I see it.  Yes.

4  Q.  Is this copy of Exhibit A the complete copy of the purchase

5  real estate agreement that you entered into with Lloyd?

6  A.  I presume.

7  Q.  Do you think anything's missing?

8  A.  I don't know.  I don't know, again, I'm presuming.  As a

9  rule, it would make reference to it if there was an additional

10 addendum or at least would be.  But I would presume they would

11 have a reference to it, but I don't know that there wasn't

12 another addendum.  I don't know.

13 Q.  Just for your reference, if you take a look at Exhibit 18,

14 that's your proof of claim in this case?

15 A.  Okay.

16 Q.  And the same contract appears as Exhibit A to your proof of

17 claim, commencing with pages 18.12 through 18.19.  It does not

18 contain any other pages than those —

19 A.  Okay.

20 Q.  — contained in Exhibit A.

21 A.  Okay.

22      MR. GOODRICH:  Your Honor, I'm going to read for the

23 record from the same transcript starting at page 84, line 15.

24 The question is:  "If you wanted to explain to Mr. Blum at the

25 time that you were in negotiations with his client that his

Plaintiff's EOR-170

*Hoffman - Cross/Goodrich*                                          82

1   theories were not well substantiated, what documents would you

2   have provided him?

3            "MR. PAHL:  That assumes facts not in evidence, so I'm

4   going to place an objection on the record.

5            "THE WITNESS:" —

6            MR. PAHL:  I think it comes time for the Court to make

7   a ruling since there is now an objection, you can't just read.

8            MR. GOODRICH:  Yeah, that's true.

9            THE COURT:  The objection's overruled for this

10  particular context.  I understand what relevance it has.

11           MR. GOODRICH:  Okay.

12  BY MR. GOODRICH:

13  Q.  "THE WITNESS:" — that's you — "It would have been verbal.  I

14  would not have, as I say, started the copy machine and sending

15  off documents.  I would have had dialogue with him relative to

16  why you think so.

17           "QUESTION:  What did he say?

18           "ANSWER:  The only thing he would keep in mind at this

19  point in time, I viewed it more as saber-rattling, scaring me

20  off to maybe make a better settlement.  I don't know exactly

21  what purpose, but he would just say, 'Look, you just got

22  problems.  You got problems.  Make no mistake about that.'

23           "QUESTION:  So he didn't get specific?

24           "ANSWER:  Nope.  I don't believe he ever said it was

25  this document that's hanging you or this.  We would have had a

Plaintiff's EOR-171

*Hoffman - Redirect/Pahl*                                              83

1    dialogue at that point, I presume."

2            Is that testimony accurate?

3    A.  Yes, because that's referring to specific documents.  That's

4    what you're asking there.

5            MR. GOODRICH:  I have no further questions, Your

6    Honor.

7            THE COURT:  Okay.

8            MR. PAHL:  Mr. Hauser, I think has...

9            MR. HAUSER:  Your Honor, I am counsel for Mr. Blum.

10   About cross-examine, in many respects, Your Honor, I don't know

11   if I'm really a party to this particular proceeding.  Obviously

12   it's related.  Mr. Blum is being sued for recording the Notice

13   of Rescission, so it's slander of title.  Obviously this is a

14   related issue with the enforceability.  But, in any case, Your

15   Honor, I don't have any questions, so I don't —

16           THE COURT:  Okay.  That's the only real thing we need

17   to know.

18           MR. HAUSER:  Right.

19           THE COURT:  Okay, Mr. Pahl.

20           MR. PAHL:  Thank you, Your Honor.

21           THE COURT:  Go ahead.

22                        REDIRECT EXAMINATION

23   BY MR. PAHL:

24   Q.  You were just asked a series of questions — I only have one

25   area — you were just asked a series of questions, Mr. Hoffman,

*Hoffman - Redirect/Pahl*                                                84

1    which related to whether the purchase agreement was complete.

2    And my question to you is:  If a notice of a right of rescission

3    would be provided to a client under California Civil Code

4    Section 1695, would that necessarily be a part of a purchase

5    agreement?

6            MR. GOODRICH:  Objection, calls for a legal conclusion

7    and it's beyond the scope of this proceeding.

8            MR. PAHL:  It's directly related to the

9    cross-examination and it goes to what his practice is as to

10   whether that would be attached or a separate document.  I don't

11   know why — how it's either irrelevant or —

12           THE COURT:  His — I think it's relevant to his state

13   of mind at all these different times.  Not that he's an

14   authority on it.

15           MR. PAHL:  I understand that.

16           THE COURT:  I'm not taking him as an authority.  What

17   was his understanding at the time that he —

18           THE WITNESS:  Are you referring to the Notice of

19   Cancellation?

20   BY MR. PAHL:

21   Q.  Yes.

22   A.  Okay.

23   Q.  The Notice of Right to Cancel.

24   A.  Okay.  It would have been a part of the documents and it

25   wouldn't necessarily be attached or made reference to.  In fact,

Plaintiff's EOR-173

1   I don't think it would necessarily be made reference to in the

2   body of the contract, no.

3   Q.  So it wouldn't be — it wouldn't be an attachment to the

4   purchase contract?

5   A.  No, not per se.

6   Q.  And it wouldn't necessarily be referenced in the purchase

7   contract, to your understanding?

8   A.  That — right.  Correct.

9   Q.  It would just be a separate document in the body of

10  documents?

11  A.  Yes.

12  Q.  Much like the option agreement was a separate document?

13  A.  Correct.  Because it's something separate that he's going to

14  have — if he wants to rescind, he's got it.  He signs it, sends

15  it back, or whatever.

16          MR. PAHL:  No further questions.  Thank you, Your

17  Honor.

18          THE COURT:  Redirect — or recross, rather.  Sorry.

19                    RECROSS EXAMINATION

20  BY MR. GOODRICH:

21  Q.  Well, let's see.  You've testified that you, before this

22  whole transaction, knew about Section 1695 of the Civil Code,

23  correct?

24  A.  Correct.

25  Q.  And that you discussed this with counsel?

Plaintiff's EOR-174

*Hoffman - Recross/Goodrich*                                    86

1    A.   No.   When I said I discussed this with counsel, was prior to

2    the settlement.   And we're not talking years prior.   We're

3    talking about during the negotiations, if you will, if you call

4    them negotiations between the three people involved.

5              Again, like I say, I didn't —

6              THE COURT:   You've gone into this.   I think you're

7    outside the scope of the —

8              MR. GOODRICH:   Okay.

9              THE COURT:   — redirect.

10             MR. GOODRICH:   Well, the — I guess my —

11             THE COURT:   The only question was was it — would it be

12   included in that document.

13   BY MR. GOODRICH:

14   Q.   Why would it not be included when the law says — the law

15   that you read says it has to be attached and the notice has to

16   be next to the equity seller's signature?

17   A.   Okay.   Does that mean a paperclip, staple?   You know, keep

18   in mind what the document looks like.   It's a single-page

19   document, if I'm not mistaken.   I've got to go back to look, but

20   I believe that's what it is, a single-page document, certain

21   font, certain size.   It's a document that stays with the seller

22   and the seller has the right to rescind by writing his name down

23   and saying, 'I rescind it,' and sends it back.   And the

24   transaction's done.   It's over.   We — it doesn't move forward.

25   Q.   This was the first transaction, wasn't it, that you had

Plaintiff's EOR-175

*Hoffman - Recross/Goodrich*                                          87

1    under 1695?

2    A.   I don't know that.

3              MR. GOODRICH:  Bear with me, Your Honor.  I have a

4    citation to the deposition on this issue.

5              Well, I don't think it's that important.

6              THE COURT:  Any further questions?

7              MR. PAHL:  No further questions.

8              THE COURT:  Okay.  Thank you, Mr. Hoffman.  You may

9    step down.

10        (Witness excused.)

11             THE COURT:  Who's your next witness?

12             MR. PAHL:  Ms. Gustavson.  I think we can get her done

13   before the lunch break, Your Honor.

14             THE COURT:  Okay.

15             MR. PAHL:  She's going to be very short.

16             THE COURT:  Let's do that.

17             MR. HOFFMAN:  Do you want me to leave all of these

18   documents?

19             THE COURT:  Please do.  Yes.  Thank you.

20             MR. HOFFMAN:  Okay.

21             THE COURT:  Thank you.

22             All right.  Would you raise your right hand, please?

23             JULIE GUSTAVSON, PLAINTIFF'S WITNESS, SWORN

24             THE WITNESS:  I do.

25             THE COURT:  Please be seated and state your name for

*Gustavson - Direct/Pahl*                                    88

1    the record and address, either business or home, whichever you

2    prefer.

3              THE WITNESS:  Okay.  My name is Julie Gustavson.

4    G-u-s-t-a-v-s-o-n.  Address 2720 Holland Avenue, Clovis,

5    California.

6                        DIRECT EXAMINATION

7    BY MR. PAHL:

8    Q.  Good morning, Ms. Gustavson.  You're currently licensed as

9    an attorney in the State of California?

10   A.  Yes.

11   Q.  And you're affiliated with H&B Properties as their counsel?

12   A.  Yes.

13   Q.  And you work on a retainer with them?

14   A.  Yes.

15   Q.  I want to direct your attention to just one aspect and that

16   is Exhibit G, which hopefully Mr. Hoffman left up there.  Do you

17   have that in front of you?

18   A.  I'm sure I can find it.  Yes.

19   Q.  Were you aware that Mr. Hoffman was meeting with Mr. Lloyd

20   at the Applebee's?

21   A.  Yes.

22   Q.  Did you know about that before the meeting?

23   A.  Yes.

24   Q.  I don't want to know what you and Mr. Hoffman obviously

25   talked about.  After the meeting at Applebee's were you provided

Plaintiff's EOR-177

*Gustavson - Direct/Pahl*                                      89

1   instructions to begin drafting a settlement agreement?

2   A.   Yes, I was.

3   Q.   Is Exhibit G your — not the final product but the initial

4   draft.   Is Exhibit G your work?

5   A.   Partially.

6   Q.   Okay.   And would you explain to me what partially means?

7   A.   I drafted an initial settlement agreement, forwarded my

8   draft to Mr. Blum, who made some requests for changes.   We

9   discussed the requested changes and incorporated the ones in

10  that we could both live with.

11  Q.   And so basically it was you and Mr. Blum who drafted this

12  agreement jointly in the end?

13  A.   That is correct.

14  Q.   This is the resulting work product, is the product of both

15  of your work?

16  A.   Yes.

17  Q.   Did Mr. Rothbard participate in the drafting of the

18  settlement agreement?

19  A.   No.   I don't believe he saw it until it was completed.

20  Q.   Okay.   And prior to — were you involved in any unlawful-

21  detainer proceeding that was being handled by mr. Rothbard?

22  A.   No.

23  Q.   During the settlement negotiations with Mr. Blum, did you

24  have conversations with him concerning either the home equity

25  sales contract — Home Equity Sales Act or Civil Code 1695?

Plaintiff's EOR-178

*Gustavson - Direct/Pahl*                                    90

1   A.   Yes.

2   Q.   On how many occasions —

3              THE COURT:   Okay.   Her discussions with whom?

4              MR. PAHL:   Mr. Blum, counsel for Mr. Lloyd.

5   BY MR. PAHL:

6   Q.   On how many occasions did you have such a discussion that

7   you can recall?

8   A.   Such a discussion with regard to the 1695?

9   Q.   Yes.

10  A.   Probably four or five.

11  Q.   And what did Mr. Blum say concerning Section 1695?

12  A.   Prior to settlement discussions — I should say prior to the

13  meeting between Mr. Hoffman and Mr. Lloyd, Mr. Blum indicated

14  his belief that there were several violations of 1695 on the

15  part of Mr. Hoffman or H&B Properties, whichever, at the time of

16  the acquisition.   And he gave the opinion that the five-day

17  rescissionary right had not been properly done.   And I believe

18  that he indicated that he did not think the paperwork, aside

19  from the — the 1695 rescissionary period, had been done

20  properly.

21  Q.   And I assume you didn't agree with him?

22  A.   I did not agree with him.

23  Q.   Okay.   When you drafted the Settlement and Mutual Release

24  agreement, did the topic of Civil Code 1695 or the Home Equity

25  Sales Contract Act come up during those dialogues also?

Plaintiff's EOR-179

*Gustavson - Direct/Pahl*                                              91

1    A.  It came up during those dialogues not so much as in a

2    provision for the agreement as much as he continued to state

3    that he believed that his client should go after rescission of

4    the contract under 1695, that he did not believe that the

5    settlement was the best thing for his client.

6    Q.  And you obviously didn't agree with him on that either?

7    A.  Of course not.

8    Q.  Page 2 of Exhibit G contains a 1542 release?

9    A.  Yes.

10   Q.  You intentionally put that in there?

11   A.  Yes.

12   Q.  And why did you intentionally put a 1542 release in there?

13   A.  I intentionally put it in for the purpose of eliminating any

14   and all claims whether known or unknown at the time of the

15   settlement.

16   Q.  And is that your standard practice?

17   A.  Yes, it is.

18   Q.  Okay.  Directing your attention on the recitals to

19   subparagraph G, where it indicates the answer?

20   A.  Yes.

21   Q.  Do you have that in front of you?

22   A.  Paragraph G?  Yes.

23   Q.  Yes.  Of the recitals on page 6.

24   A.  Yes.

25   Q.  Did you type that sentence in there?

Plaintiff's EOR-180

*Gustavson - Direct/Pahl* 92

1  A.  I typed it in, but I do not believe it was something that I

2  put in originally.  I believe that that was something that

3  opposing counsel actually wanted in.

4  Q.  So Mr. Blum —

5         THE COURT:  I'm sorry.  I'm a little behind here.

6         MR. PAHL:  No problem.

7         THE COURT:  What are we speaking of?

8         MR. PAHL:  We're on — Your Honor, we're on page 2,

9  subparagraph G of the recitals, which makes reference to the —

10         THE COURT:  Yes, I remember.  Thank you.

11         MR. PAHL:  Okay.  And —

12         THE COURT:  I was just a little behind.

13         MR. PAHL:  No problem.

14  BY MR. PAHL:

15  Q.  And it's your testimony, Ms. Gustavson, that the

16  subparagraph G was actually added by Mr. Blum?

17  A.  To the best of my recollection, yes.

18  Q.  Did you have — other than — you had — let me make sure I get

19  this right.

20         You indicated you had four conversations with Mr. Blum

21  that you recall where the issue of home equity sales contract or

22  Section 1695 came up?

23  A.  Yes.

24  Q.  How many were before the Applebee's meeting and how many

25  were after, if you can recall?

*Gustavson - Direct/Pahl*                                              93

1  A.  I would say that approximately three were before the meeting

2  and one or two were after the meeting.

3  Q.  So it may have been four or five conversations?

4  A.  Correct.

5  Q.  Okay.  And did you ever speak to Mr. Lloyd?

6  A.  No, never.

7  Q.  And I assume you had no participation in the underlying

8  purchase agreement relating to the Elizabeth Street property?

9  A.  That is correct.

10        MR. PAHL:  I have no further questions.  Thank you,

11  Your Honor.

12        THE COURT:  Okay.  Cross-exam.

13        MR. HAUSER:  Your Honor, the cross-examination I think

14  is going to go far into the lunch hour, so could we take a lunch

15  break now?  We will not be complete.  It's...

16        THE COURT:  Okay, that's fine.

17        MR. HAUSER:  Thank you.

18        MR. PAHL:  Thank you.

19        THE COURT:  All right.  Let's start at five to 1:00.

20  Let's limit it to one hour.

21        MR. HAUSER:  Okay.

22        MR. PAHL:  Thank you.

23        THE CLERK:  All rise.

24     (Luncheon recess taken from 11:52 a.m. to 1:03 p.m.)

25        THE CLERK:  All rise.

Plaintiff's EOR-182

*Gustavson - Cross/Hauser*                                                94

1          THE COURT:  Please be seated.

2          All right.

3      (Julie Gustavson, plaintiff's witness, retakes the witness

4   stand.)

5          THE COURT:  Go ahead.

6          MR. HAUSER:  Good afternoon, Your Honor.

7                      CROSS-EXAMINATION

8   BY MR. HAUSER:

9   Q.  Good afternoon, Ms. Gustavson.

10  A.  Good afternoon.

11  Q.  You're going to have to excuse my cold if you can't

12  understand me.

13  A.  As long as you don't give it to me, I'll excuse it.

14  Q.  Okay.  How long have you been an attorney?

15  A.  Eighteen years.

16  Q.  And you are currently on salary with Mr. Hoffman's company?

17  A.  No, I'm not.

18  Q.  You're not on salary?

19  A.  No.

20  Q.  How are you paid?

21  A.  I am a consultant.  I'm paid on a retainer basis.

22  Q.  And how does the retainer work, is it a flat fee or do you

23  provide services and get paid for those services?

24  A.  It's a flat fee.

25  Q.  Flat fee, okay.  And where is your office?

*Gustavson - Cross/Hauser*                                                    95

1   A.   My office is in Fresno.

2   Q.   Okay.  And it's the same office as Mr. Hoffman's?

3   A.   I have an office at my home as well, but I do spend time in

4   his office.

5   Q.   Okay.  Mr. Hoffman testified in his deposition that you

6   pretty much come into the office almost every day; would that

7   be —

8   A.   That is correct.

9   Q.   — accurate?

10  A.   Yes.

11  Q.   Okay.  Could you pay rent to Mr. Hoffman?

12  A.   No, I do not.

13  Q.   Okay.  And many times — do you communicate with people on

14  your own letterhead?

15  A.   From time to time, yes.

16  Q.   But many times you communicate with individuals on the

17  letterhead of J. Edwards Company?

18  A.   If I am doing work for Mr. Hoffman or J. Edwards, yes.

19  Q.   Okay.  And when you communicate with third parties on Mr.

20  Hoffman's letterhead, do you indicate you're an attorney or you

21  just sign it your name, "J. Edwards Company"?

22  A.   Usually I sign it "Julie Gustavson, General Counsel" for

23  whichever entity.

24  Q.   Did you do that in the case involving Mr. Lloyd and the

25  property?

Plaintiff's EOR-184

*Gustavson - Cross/Hauser*                                    96

1    A.   I may have.   I have no recollection.

2    Q.   Would it surprise you that all your communications didn't

3    have "General Counsel," you just simply signed as the "J.

4    Edwards Company"?

5    A.   It wouldn't surprise me or not surprise me.   I don't know

6    what I did back then.

7    Q.   Take a look at — I believe —

8              MR. HAUSER:   Do we have the exhibit book?

9              THE COURT:   Do you have the blue book?   You have the

10   blue book there.

11             THE WITNESS:   Is this what you're talking about?

12             THE COURT:   I can see it.   Yes, nice bright color.

13   BY MR. HAUSER:

14   Q.   Yes.   Exhibit 17.   I don't have a copy of it, but Exhibit

15   17, what is Exhibit 17, please?

16   A.   It's a fax coversheet.

17   Q.   Okay.   And is there a letter that you've signed in there?

18   A.   Yes, there is.

19   Q.   Okay.   And how did you sign that letter?

20   A.   With my name.

21   Q.   Okay.   Do you indicate you're general counsel?

22   A.   No.

23   Q.   And how long have you rented space with Mr. Hoffman —

24   A.   I didn't indicate that I rented space.

25   Q.   Oh, excuse me.   How long have you operated out of Mr.

Plaintiff's EOR-185

*Gustavson - Cross/Hauser*                                              97

1  Hoffman's office?

2  A.  I have been retained by Mr. Hoffman for about a year and a

3  half.

4  Q.  And how long have you been operating out of his office where

5  you had — were you located — you have an office located in Mr.

6  Hoffman's office, correct?

7  A.  I have space that I work from in Mr. Hoffman's office, yes.

8  Q.  And how long have you been doing that?

9  A.  Since June of 19- — of 2004.

10  Q.  And prior to June of 2004 did you work for Mr. Hoffman?

11  A.  I was retained in a number of matters for Mr. Hoffman from

12  my private law firm.

13  Q.  And what law firm was that?

14  A.  The Law Office of Julie Gustavson.

15  Q.  Okay.  And where was that law office office located?

16  A.  Orangevale, California — Orangevale, California.

17  Q.  Okay.  Do you provide any bills to Mr. Hoffman?

18  A.  Occasionally.

19  Q.  In this matter involving Mr. Lloyd or the property, did you

20  provide any itemized bills?

21  A.  Not to the best of my recollection.

22  Q.  Okay.  Did you keep any recordkeeping of your time?

23  A.  Not to the best of my recollection.

24  Q.  Are you aware of a single document involving a written

25  communication between you and Mr. Blum in which 1695 was

*Gustavson - Cross/Hauser*                                        98

1    referenced?

2    A.   I don't know if there was one or not.

3    Q.   Have you — before you testified today did you review any

4    records?

5    A.   No.

6    Q.   You testified that you believed that you thought that the

7    clause in, I believe it's, Exhibit G, the settlement

8    agreement, —

9    A.   Yes.

10   Q.   — about the defenses was put in there by Mr. Blum?

11   A.   That would be my recollection.

12   Q.   Why is that?  What about —

13   A.   Because that is —

14   Q.   I'm sorry.

15   A.   Okay.  Because that is not something I would normally put

16   in.

17   Q.   Why is that?

18   A.   That's just not something I would have normally put in.  I

19   would have —

20   Q.   Did you —

21   A.   — left it that they filed an answer and I would not have put

22   what their claims were.

23   Q.   How did you transmit that settlement agreement to Mr. Blum

24   in the first draft —

25            THE COURT:  Who is this person?

Plaintiff's EOR-187

1          MR. GOODRICH:  This is Mr. Blum.

2          THE COURT:  But he's a party, right?

3          MR. GOODRICH:  He's a party.

4          THE COURT:  Yeah, okay.  So he can stay.  That's

5    right.

6    BY MR. HAUSER:

7    Q.  How did you transmit that settlement agreement to Mr. Blum?

8    A.  I don't recall.  It was either by fax or by mail or by

9    email.

10   Q.  Okay.  Would it surprise you that most of your

11   communications with Mr. Blum with the settlement agreement was

12   by email?  Would that surprise you at all?

13   A.  It would surprise me if most of my communication to him was

14   by email, yes.

15   Q.  Okay.  Did you look at any transmittal records or the first

16   draft of the agreement to see if you're correct of who put that

17   clause in there?

18   A.  I have not looked at any documents.

19   Q.  Was there any reason why?

20   A.  I had no reason to look at any documents.

21   Q.  You knew you were going to be testifying today, —

22   A.  Yes.

23   Q.  — did you?

24   A.  Yes.  And I'm testifying to the best of my recollection.

25   Q.  Okay.  Did you think that you had some type of paper trail

Plaintiff's EOR-188

*Gustavson - Cross/Hauser*                                    100

1   that one could easily look at to see who put that clause in

2   there?

3   A.   If I did it would be attorney work product and I would not

4   produce it anyway, so —

5   Q.   The communication to Mr. Blum would be attorney work

6   product?

7   A.   Any notes that I had.

8   Q.   No.  I'm asking about the communication to Mr. Blum; is that

9   attorney work product?

10  A.   No, it is not.

11  Q.   Did it occur to you before you came into court today to

12  testify to look at the first draft that you sent to Mr. Blum to

13  see who put in that clause?

14  A.   As I've already testified, I did not look at anything.

15  Q.   But it didn't occur to you to do that?

16  A.   No.

17  Q.   How come you didn't file the unlawful-detainer action

18  against Mr. Lloyd?

19  A.   I don't do unlawful detainer.

20  Q.   What role did you have in the unlawful-detainer action?

21  A.   I did not have a role in the unlawful detainer until it came

22  to settlement.

23  Q.   Till it came to settlement.  And that was it came to

24  settlement in, I think, July 9th, July 12th, the Apple- —

25  Apple...

*Gustavson - Cross/Hauser*                                           101

1   A.   Applebee's.

2   Q.   Applebee's.   Thank you.

3            So that's when it first came to settlement, at

4   Applebee's?

5   A.   As far as I know.

6   Q.   Okay.   So prior to that you had no role?

7   A.   Not in the unlawful detainer itself, no.

8   Q.   What role did you have prior to Applebee's meeting?

9   A.   With regard to what?

10  Q.   Anything involving Mr. Lloyd.

11  A.   Involving Mr. Lloyd.   I had discussions with Mr. Blum.   I

12  had discussions with my client.

13  Q.   What was the first discussion you had with Mr. Blum?

14  A.   I don't recall as I'm sitting here.

15  Q.   You don't recall.   Was it before the unlawful-detainer

16  action was filed?

17  A.   I believe so, but I can't say for sure.

18  Q.   And what was the subject matter of that first conversation,

19  before the unlawful-detainer action was filed —

20  A.   I don't recall.

21  Q.   What?

22  A.   I don't recall.

23  Q.   You don't recall that conversation?

24  A.   No, I don't.

25  Q.   You don't recall anything said in the first conversation?

Plaintiff's EOR-190

*Gustavson - Cross/Hauser*                                    102

1   A.   I could not tell you what was said in any specific

2   conversation, no.

3   Q.   How did you have this conversation with Mr. Blum?

4   A.   On the telephone.

5   Q.   Okay.  Who called who?

6   A.   I don't recall.

7   Q.   Okay.  How did you get Mr. Blum's telephone number — well,

8   you don't know if you — he may have called you, right?

9   A.   Yes, he may have.

10  Q.   Do you know why you — and you don't know why you were having

11  this contact with Mr. Blum?

12  A.   I would have to guess.

13  Q.   Okay.  Well, we don't want you to guess.  So in at least the

14  first contact, you don't recall anything that was said?

15  A.   I don't recall the specifics of the conversation.

16  Q.   All right.  Do you recall how long that conversation lasted?

17  A.   No.

18  Q.   Do you recall where you were when that conversation took

19  place?

20  A.   I could only presume I was at the office at J. Edwards

21  Company.

22  Q.   Okay.  Was it during the week?

23  A.   I wouldn't be talking to him on the weekend, so it must have

24  been.

25  Q.   Okay.  All right.  And do you know how long that

*Gustavson - Cross/Hauser*                                      103

1   conversation lasted?

2   A.   No idea.

3   Q.   Okay.  Do you have any notes of that conversation?

4   A.   I don't know whether I have notes or not.

5   Q.   So you didn't look at your file to see if you had any notes?

6   A.   No, I did not look at my file.

7   Q.   Would it have been your practice to make notes of that

8   conversation?

9   A.   Typically I do make notes of the conversations.

10  Q.   Okay.  Do you believe that you made any notes of any

11  conversation that you had with Mr. Blum?

12  A.   I may have.  I don't know.

13  Q.   Do you know the reason why you didn't follow your normal

14  practice in making notes?

15  A.   I — I didn't say that I didn't follow my normal practice.

16  Q.   Okay.  Are you aware that documents were produced in this

17  litigation and there was no privilege log involving any —

18  identifying any document involving notes of conversations you

19  had with Mr. Blum?

20  A.   I am not a party to this litigation.  At no time was — were

21  any documents subpoenaed for me.

22  Q.   But you — so where do you maintain your files?

23  A.   My files are maintained at my house.

24  Q.   How about when you're writing letters as J. Edwards Company?

25  A.   That would be logged in the file according to whatever J.

Plaintiff's EOR-192

*Gustavson - Cross/Hauser*                                    104

1   Edwards file it is.

2   Q.   Okay.   So if you had notes and you kept them in J. Edwards —

3   if you had notes of your conversation, would you keep them in

4   any of the J. Edwards file?

5   A.   No, I would not.

6   Q.   You would not.

7   A.   No.

8   Q.   How about letters that you sent out as name — as a J.

9   Edwards Company letter, where would you keep that letter?

10  A.   If it's not a privileged communication it would go in the J.

11  Edwards file.

12  Q.   Okay.   If it was a privilege communication where would you

13  do it?

14  A.   I would keep it.

15  Q.   Okay.   Did you inform anybody that you had notes of any

16  conversations with Mr. Blum?

17  A.   No.

18  Q.   Okay.   Did anyone ask you, including Mr. Hoffman or Mr.

19  Hoffman's lawyer here, ask you if you had notes of conversations

20  with Mr. Blum?

21          MR. PAHL:   I assume — I have allowed this long enough.

22  There is an attorney-client privilege here.

23          MR. HAUSER:   Well, Your Honor, —

24          MR. PAHL:   Any communication I've had with Ms.

25  Gustavson would be privilege.

1          MR. HAUSER:  Your Honor, I'll submit —

2          THE COURT:  Why not —

3          MR. HAUSER:  — for the record that we received no

4    privilege log of any documents involving notes of communications

5    between Ms. Gustavson and Mr. Blum.  And so I think based on

6    that I don't think any records exist.  And I think that's the

7    point of the line of the questioning.

8          THE COURT:  Well, there haven't been any introduced to

9    this point and she says she didn't bring any along, so I don't

10   think we have any evidence in here.

11         MR. HAUSER:  Okay.  But —

12         THE COURT:  That's for sure.

13         MR. HAUSER:  I just want to know if anything exists.

14   All right.

15   BY MR. HAUSER:

16   Q.  Okay.  Now your first contact — the unlawful-detainer action

17   was filed on June 2nd of 2005, I believe; is that your

18   understanding?  Do you have a recollection —

19   A.  I don't recall.

20         MR. PAHL:  Objection, misstates the — excuse me —

21   misstates the document that's in evidence.

22         MR. HAUSER:  Well, whatever —

23         MR. PAHL:  There is no evidence that it was on June

24   2nd of 2005.  I can only assert that's an attempt to mislead the

25   Court.

Plaintiff's EOR-194

*Gustavson - Cross/Hauser*                                          106

1      THE COURT:  It was 2004.

2      MR. PAHL:  The document says June 2nd —

3      MR. HAUSER:  2004.  I'm sorry, Your Honor.

4      THE COURT:  2004.

5      MR. HAUSER:  Wasn't an attempt to mislead.  It was my

6  error.

7  BY MR. HAUSER:

8  Q.  All right.  Now prior to June of 2004, what was your role in

9  this transaction involving Mr. Lloyd and Mr. Hoffman?

10  A.  I didn't have a specific role in that transaction.

11      I'm — just stuck here.

12  Q.  Okay.

13  A.  I'm too close to this.

14      I didn't have a role in that specific transaction or

15  specifically in that transaction except to advise my client as

16  he had the need.

17  Q.  Well, I'm just trying to figure out why you would have

18  contacted or why you had contact with Mr. Blum prior to June of

19  2004.

20  A.  I presume I responded to an inquiry from him.  I don't know.

21  Q.  Okay.  But you're not sure?

22  A.  I am not sure.

23  Q.  Okay.  All right.  So you had — you recall at some point

24  prior to the Applebee meeting, can you recall any specific

25  conversation that you had with Mr. Blum?

*Gustavson - Cross/Hauser*                                    107

1   A.   Prior to the Applebee's.  I can't say specifically that it

2   was — I can't recall a specific conversation.  I recall two or

3   three conversations before the settlement was reached, —

4   Q.   Well, you tes- —

5   A.   — which would have been prior to Applebee's.

6   Q.   Okay.  You testified before the lunch break you were pretty

7   sure it was three.  You didn't say two or three, —

8   A.   I —

9   Q.   — you said three.

10  A.   No.  You're misstating my testimony.  He said three after I

11  had said four or five.  And he said three.

12  Q.   Okay.  So you recall two or three specific conversations

13  prior to the Applebee meeting between Mr. Lloyd and Mr. Hoffman?

14  A.   Yes.  I don't recall —

15          THE COURT:   Two or three prior to Apple- —

16          MR. HAUSER:   Yes.

17          THE COURT:   Prior to Applebee's, the restaurant?

18  BY MR. HAUSER:

19  Q.   Is that your testimony?

20  A.   Yes.

21  Q.   Okay.  Tell me about the first conversation you recall.

22  A.   I don't know which conversation was which.  All three

23  conversations are more or less jumbled up in my memory.  There

24  were two or three conversations.  I can tell you what the gist

25  of all of the conversations were together.

Plaintiff's EOR-196

*Gustavson - Cross/Hauser*                                              108

1    Q.   Okay.  Well, let me ask you the question:  Did you — in any

2    of these conversations did you initiate the contact?

3    A.   I may have.

4    Q.   But you don't recall?

5    A.   I don't recall.

6    Q.   Well, let's take the first one that you recall.  What was

7    the subject matter of that first?

8    A.   The subject matter would have been, to the best of my

9    recollection, the fact that my client was allegedly in violation

10   of 1695 and the transaction should be voided all together.

11   Q.   So your recollection is that it would have been.  I mean

12   would have been or are you sure that this took place?

13   A.   I've already told you, I'm not sure of any of the

14   conversations.  I recall generally what was discussed in the

15   conversations before and after the settlement was reached.

16   Q.   Okay.  Well, I'm — I'm focusing now before.  I'm going to

17   very specific.

18   A.   I understand.

19   Q.   Okay.

20   A.   And that's what I just responded to.

21   Q.   So you can't tell me when or not a certain conversation took

22   place.  You just believe two or three, but they all kind of run

23   together?

24   A.   Two or three prior to the settlement having been reached,

25   yes.

**Plaintiff's EOR-197**

*Gustavson - Cross/Hauser*                                   109

1    Q.   Okay.  And how did 1695 come up in these conversations —

2    A.   Mr. —

3    Q.   — that you're not sure?

4    A.   Mr. Blum indicated that my client was in violation of

5    Section 1695, et seq.

6    Q.   And do you know why — but you don't know how these

7    conversations initiated.  You may have called him?

8    A.   I may have called him.  I believe that he made the first

9    contact, I don't recall.

10   Q.   Now when you made this phone call to him, if you made the

11   phone call would it have been on the phone — Mr. Hoffman's phone

12   or your phone?

13   A.   I don't know.  Probably on Mr. Hoffman's phone.

14   Q.   In a conversation in which 1695 came up for the first time,

15   how long did that conversation last?

16   A.   I don't know.

17   Q.   What was discussed in that first conversation when 1695 was

18   raised?

19   A.   I have already told you that.

20   Q.   And what's that?

21              THE WITNESS:  Do I need to repeat myself again, Your

22   Honor?

23              THE COURT:  Yes.  This is a fair question.

24              THE WITNESS:  That my client was in violation of 1695

25   in many regards, one of which was that the paperwork was not in

*Gustavson - Cross/Hauser*                                110

1   order, another of which was that the five-day rescission was not

2   done properly.

3   BY MR. HAUSER:

4   Q.   And what did you respond?

5   A.   That I didn't agree with him.

6   Q.   Why didn't you agree?

7   A.   For a number of reasons.

8   Q.   Why?

9   A.   Because I believe that the five-day rescission period was

10  done properly and the paperwork was in proper order.

11  Q.   Did you tell that to Mr. Blum?

12  A.   Yes, I did.

13  Q.   Did you transmit the — why did you believe the five-day

14  cancellation was in proper order?

15  A.   Because I looked in the file and found one.

16  Q.   Oh, you found one.  And did you tell Mr. Blum that you had

17  that document?

18  A.   I don't recall whether I told him or not.

19  Q.   Did you send that document to Mr. Blum?

20  A.   No.

21  Q.   Ms. Gustavson, you're a lawyer.  A client — another lawyer

22  calls you up and says your client's in violation of 1695 because

23  he doesn't have this notice, yet you know you have this notice

24  in your file and it didn't occur to you to send it to Mr. Blum?

25  A.   Mr. Blum did not tell me that he did not have the notice.

Plaintiff's EOR-199

*Gustavson - Cross/Hauser*                                      111

1   He said that the notice was improper.

2   Q.  And why did he say the notice was improper?

3   A.  You would have to ask him that.

4   Q.  But you never sent the notice to him, did you?

5   A.  I had no reason to, no.

6   Q.  And you never saw — and where did you see that notice?

7   A.  In the J. Edwards file at H&B property —

8   Q.  Where in the file?

9   A.  In the H&B file for this property.

10  Q.  Where would — a separate document?  Was it attached to

11  anything?

12  A.  I have no idea.

13  Q.  No idea.  How long did this conversation with 1695 come up?

14  How long did that last?

15  A.  I don't know.

16  Q.  More than ten minutes?

17  A.  I don't know.

18  Q.  When, in five minutes?

19  A.  I don't know.

20  Q.  What else was discussed?

21  A.  I don't know.

22  Q.  But you — you don't remember anything else except the 1695?

23  A.  That was the gist of the conversation.

24  Q.  What else did you speak to Mr. Blum about prior to the

25  Applebee meeting?

Plaintiff's EOR-200

*Gustavson - Cross/Hauser*                                      112

1    A.   That was basically it.

2    Q.   So in all those three conversations, the only thing

3    discussed was 1695?

4    A.   The violation — the alleged violations of 1695 and the fact

5    that he thought that the transaction should be terminated —

6    Q.   Okay.  And that was —

7    A.   — avoided.

8    Q.   — took place in all three conversations?

9    A.   Generally speaking, yes.

10   Q.   All right.  What else was discussed?

11   A.   I don't know.

12   Q.   Was that the sole subject of the conversation or is that the

13   only thing that you remember?

14   A.   That's the only thing I remember.  I believe there were

15   other things discussed with regard to potential settlement, but

16   I don't recall.

17   Q.   And how far apart were these conversations?

18   A.   I don't know.

19   Q.   Days, weeks, months?

20   A.   Probably the three — two or three conversations in the space

21   of two or three weeks.

22   Q.   Okay.  Now the second conversation when 1695 came up, what

23   was different about that conversation from the first?

24   A.   No different.

25   Q.   No difference.  Just everyone said the exact same thing over

*Gustavson - Cross/Hauser*                                                    113

1   again?

2   A.   More or less.   I've already told you I don't know

3   specifically what was discussed.

4   Q.   And then the third conversation that you had, the same

5   thing, everyone just repeated the exact same thing, nothing new?

6   A.   More or less, yes.

7   Q.   More or less.   So you simply repeated yourself for three —

8   A.   Exactly.

9   Q.   — for three conversations?

10          And at one — and you never sent the cancellation

11  notice?

12  A.   No.

13  Q.   Why aren't you claiming that you — so you're claiming that

14  this whole trial is meaningless because you've complied with

15  1695?

16          MR. PAHL:   Objection.   I think that calls for a legal

17  conclusion on the part of the witness.   Also —

18          THE COURT:   That's argumentative.   Let's try — try

19  another question.

20  BY MR. HAUSER:

21  Q.   Where is that notice, the cancellation notice —

22  A.   I have no idea.

23  Q.   You have no idea, okay.   Is it in evidence here?

24  A.   I have no idea.

25  Q.   Okay.   Now all the conversations that you had, the two or

Plaintiff's EOR-202

*Gustavson - Cross/Hauser*                                              114

1    three were on phone.   Now after the Applebee meeting you

2    informed of the settlement, do you recall speaking to Mr. Blum

3    again?

4    A.   I recall speaking to Mr. Blum once the settlement was

5    reached.   I can only presume that was after Applebee's.

6    Q.   And by after Applebee's, you discussed 1695 again?

7    A.   I believe so, yes.   I can't say for certain.

8    Q.   You're not sure?

9    A.   I'm not positive, no.

10   Q.   Okay.  So all the conversation about 1695 took place before

11   the settlement?

12   A.   That is not what I said.

13   Q.   Okay.  Well, what makes you believe that you discussed 1695

14   after this Applebee meeting?

15   A.   I believe we discussed it because Mr. Blum was still trying

16   to say that we were in violation of 1695.   Whether we discussed

17   the statute or not, I don't know.

18   Q.   Well, what did you say to Mr. Blum?

19   A.   That the clients had reached a settlement and whether there

20   were violations or not was immaterial.

21   Q.   Okay.  So you knew that Mr. Blum was raising 1695?

22   A.   Yes.

23   Q.   All right.  How come you didn't put that in the settlement

24   agreement?

25   A.   Because as far as I'm concerned 1542 covers it.   All

Plaintiff's EOR-203

*Gustavson - Cross/Hauser*                                    115

1   claims —

2   Q.  Well, why did you put the other claim in there to the

3   settlement agreement, Exhibit G?

4   A.  Mr. Blum asked me to, I believe, because it was not my

5   standard way of — and it wasn't a claim anyway.  It's just a

6   recital.

7   Q.  So it was just a recital.  It didn't even occur to you to

8   put — since it was just a recital, to put a full recital in?

9   A.  It is a full recital.

10  Q.  But it doesn't say 1695?

11  A.  So?

12  Q.  Why didn't you put — I mean why did you put in one clause

13  about the — well, take a look at the settlement agreement.

14  A.  I can see it.

15  Q.  Okay.  And please read paragraph G.

16  A.  I have read it.

17  Q.  All right.  Why is that there but not 1695?

18  A.  I can only guess because Mr. Blum chose not to put 1695 in

19  or he didn't think of it either.

20  Q.  But you prepared the first draft?

21  A.  I prepared the first draft, yes.

22      MR. HAUSER:  Your Honor, I have some exhibits that I

23  want to mark.  These will be impeachment exhibits.

24      THE COURT:  Okay.  Have you marked them?  Have copies

25  for counsel?

*Gustavson - Cross/Hauser*                                    116

1              MR. HAUSER:  Yes.

2              Your Honor, it's going to be a group exhibit.

3              THE COURT:  How are you numbering yours?

4              MR. GOODRICH:  Oh, we could make it next in order on

5      the defendants' side.

6              THE COURT:  Are you offering exhibits jointly, more or

7      less?

8              MR. GOODRICH:  Yes.

9              MR. HAUSER:  Yes.

10             MR. GOODRICH:  So that would be Exhibit —

11             THE COURT:  So it will be 19?

12             MR. GOODRICH:  — 19?  19, yes.

13             THE COURT:  Okay.

14             MR. HAUSER:  Your Honor, may I approach the witness?

15             THE COURT:  Yes.

16             MR. HAUSER:  Thank you.

17     BY MR. HAUSER:

18     Q.  Looking at Exhibit Number 19, Ms. Gustavson, this is a —

19     these are pages of emails received by Mr. Blum.  What I want to

20     know, is that your email address, JulieBeth?

21     A.  JVGus13@HotMail.com is my email address at work, yes.

22     Q.  Okay.  All right.  And —

23             THE COURT:  I'm sorry.  Hold on a said.

24             MR. HAUSER:  Just looking at the first page.

25             THE COURT:  This was sent, Julie — this JVGus, that's

*Gustavson - Cross/Hauser* 117

1    yours?

2                THE WITNESS:   Yes.

3                THE COURT:   Yeah.   Okay.   Thank you.

4    BY MR. HAUSER:

5    Q.   And do you recall that July 14th was the first time that you

6    sent a draft of any settlement agreement to Mr. Blum?

7    A.   I don't recall that, no.

8    Q.   Let's take a look at Exhibit 19, the third page.   Can you

9    see that document there?   Again that's your email address,

10   JVGus13?

11   A.   Yes, it is.

12   Q.   And that's dated July 14th?

13   A.   Yes.

14   Q.   And there's attachments talking about a stipulation

15   settlement agreement?

16   A.   Yes.

17   Q.   Okay.   Does this refresh your recollection that you sent the

18   settlement agreement to Mr. Blum for the first time on July

19   14th?

20   A.   No.   I can see that it says that, but it doesn't refresh my

21   recollection.

22   Q.   Are you aware of any emails or communications prior to the

23   July 14th, 2004 in which you sent a settlement agreement to Mr.

24   Blum?

25   A.   No.

*Gustavson - Cross/Hauser*                                 118

1   Q.   Now I'd like you to take a look at the next series of pages

2   right after that.  This would be page 4 of Exhibit 19.  And it

3   states, "The Settlement and Mutual Release Agreement."

4            THE COURT:  I'm confused about something here.  "Here

5   are the drafts."  Page 1 is the earliest, right?  These go in

6   chronological order?

7            MR. HAUSER:  Yes, Your Honor.  It looks like it's

8   10:58.

9            THE COURT:  Yes.

10           MR. HAUSER:  See, what happens, if you look at it,

11  Your Honor, — I'll just briefly explain — if you look at the

12  various emails, then you get to page 3.  Then she says, "Forgot

13  the attachments," —

14           THE COURT:  Yes.

15           MR. HAUSER:  — "didn't I," so the first two emails

16  were sent on the 14th, but didn't have the attachments.  And you

17  can see from the computer printout there's no reference to the

18  attachments.

19           THE COURT:  Yes, I could see that.  Okay, the first

20  one to which there's an attachment is on July 14th at 11:26.

21  And then there follows a draft of the settlement agreement; is

22  that —

23           MR. HAUSER:  That's correct, Your Honor.

24           THE COURT:  Okay.  You don't have anything earlier

25  than that?

Plaintiff's EOR-207

*Gustavson - Cross/Hauser*                                    119

1          MR. HAUSER:  That's correct, Your Honor.

2   BY MR. HAUSER:

3   Q.  Now right behind this third page, the fourth page, we have

4   the Settlement and Mutual General — Release Agreement, all

5   right.  And if you look — will you please look through those

6   five pages?

7   A.  Done.

8   Q.  Okay.  Okay.  And do you recall getting drafts back from Mr.

9   Blum in terms of a redline version, the way this was done?

10  A.  I don't recall getting it that way, but I may have.

11  Q.  Okay.  And let's take a look at on page 2 of this draft,

12  which would be the — I know it's going to confuse — fifth page

13  of Exhibit 19.  Do you see number G, "Whereas Lloyd filed an

14  answer claiming that the sales transaction was a disguised

15  security device and thereby unenforceable"?  Do you see that?

16  A.  Yes.

17  Q.  Is there any redline version there?

18  A.  No.

19  Q.  Does this refresh your recollection that it was you who

20  included that clause there, not Mr. Blum?

21  A.  No.  I would presume it was a term that he had given me

22  before I did this, but it's always possible that it wasn't.

23  Q.  Oh, okay.  This was — you got this term then before you sent

24  the settlement agreement?

25  A.  We discussed the settlement document before I drafted it.

Plaintiff's EOR-208

*Gustavson - Cross/Hauser*                                    120

1   We discussed the terms that would be included in the settlement

2   document before I drafted the document. My recollection would

3   be that that was something that he had wanted in it, but I don't

4   — I can't say for sure.

5   Q.  So you don't know. I don't want you speculating.

6   A.  I have just said I can't say for sure.

7   Q.  Okay. All right. Now when was the Applebee meeting, I

8   think the testimony was, what, I think earlier, July 12th?

9   A.  I don't know.

10  Q.  Okay. But within a couple of days of the Applebee meeting

11  you sent this document; don't you recall?

12  A.  I don't recall.

13  Q.  Okay. Well, when did this conversation with Mr. Blum about

14  what's going to be in the settlement agreement take place

15  between the Applebee meeting and July 14th?

16  A.  It took place some time between the time of the Applebee

17  meeting, which may or may not have been on July 12th, according

18  to the testimony, and apparently July 14th.

19  Q.  How did that communication take place?

20  A.  What communication?

21  Q.  About the settlement agreement before you sent the draft.

22  A.  Presumably he called me or I called him, I don't know.

23  Q.  So you really don't know who put that clause in there; isn't

24  that correct?

25  A.  That's what I've said.

*Gustavson - Cross/Hauser*                                121

1   Q.   Okay.   So you may have?

2   A.   That's correct.   I may have.   I don't —

3   Q.   And Mr. Blum may have asked for it and may not have asked

4   for it?

5   A.   That's correct.   Yes.

6   Q.   Thank you.

7          Now we've printed out here in Exhibit 19 all the

8   written communications between you and Mr. Blum.   I would like

9   you to take a look at Exhibit 19 —

10         MR. PAHL:   Excuse me.   Your Honor, is that a

11   representation of fact?   Because that's not in question —

12         MR. HAUSER:   Okay.   Well, I'll rephrase it, Your

13   Honor.

14   BY MR. HAUSER:

15   Q.   Please look at Exhibit 19 and tell me if you're aware of any

16   other written communications between you and Mr. Blum?

17   A.   Well, I would have said there would have been communications

18   on letterhead as opposed to email, but I don't see any in here.

19   And there might have been.   I don't use email very often for

20   communicating with people.

21   Q.   All right.

22   A.   I don't like it.

23   Q.   Are you aware of any such letterhead communications?

24   A.   No.

25   Q.   All right.

Plaintiff's EOR-210

1    A.  I'm just surprised that there aren't any in here.  I would

2    have thought there would have been some.

3    Q.  And would it surprise you that no such records were produced

4    in this litigation?

5    A.  Well, it would surprise me if there aren't — if there were

6    some, they would presumably have been produced.

7    Q.  Okay.

8    A.  I'm just surprised that there aren't because I don't like

9    email.

10   Q.  So as far as you know, at least for your best recollection,

11   this represents all the written communications between you and

12   Mr. Blum?

13   A.  As far as I know, yes.

14   Q.  Okay.  All right.  Now in any of these communications did

15   you see any reference in there to 1695?

16   A.  I didn't read the communications and it would take quite a

17   while —

18   Q.  Okay.  Well, please take a look.

19   A.  How much time do you have?

20   Q.  We have all day.

21          THE COURT:  You're talking about only the emails?

22          MR. HAUSER:  Yes.  Obviously it's not in any document.

23          THE WITNESS:  (Perusing document.)  I don't see a

24   reference to Section 1395 [sic].

25   BY MR. HAUSER:

*Gustavson - Cross/Hauser*                                      123

1   Q.  Take a look at Exhibit — now using these emails, if you can

2   as a reference point, can you tell me when the conversation you

3   had with Mr. Blum about 1695 arose after you sent the settlement

4   agreement?

5   A.  After I sent the settlement agreement?

6   Q.  You said there was one conversation — well, let me ask you a

7   question.  Maybe I misspoke.  You said you had a conversation

8   with Mr. Blum about 1695 after the settlement.  Are you

9   referring to after Mr. Hoffman and Mr. Lloyd reached a

10  settlement agreement but before you sent the document or after

11  you sent the document?

12  A.  I'm talking about after Mr. Lloyd and Mr. Hoffman reached an

13  agreement.  I couldn't say specifically where it is with regard

14  to all this, but I believe it was before we had the settlement

15  document drafted.

16  Q.  Okay.  So before you had the settlement document drafted you

17  believe you had a discussion with Mr. Blum where he claimed that

18  the transaction was invalid because of 1695; that's your best

19  recollection?

20  A.  That's the best recollection, yes.

21  Q.  All right.  Now take a look at Exhibit G, paragraph G.  Now

22  as a lawyer is a disguised security device, do you know if that

23  has any relationship to 1695?

24  A.  Yes, it does.

25  Q.  And how is that?

Plaintiff's EOR-212

*Gustavson - Cross/Hauser*                                            124

1   A.   1695, subsection something or other says that a transaction

2   that falls within that code section or that chapter is a

3   mortgage, is deemed a mortgage, which is, in other words, a

4   disguised security device.

5   Q.   So that's how you interpreted that?

6   A.   That's what I'm saying that means, just in response to your

7   question.

8   Q.   And what's that understanding based on?

9   A.   Reading 1695.

10  Q.   And did you read 1695 during this transaction?

11  A.   Probably several times.

12  Q.   Okay.  In your conversations with Mr. Blum did he ever

13  raise, use the term "disguised security device"?

14  A.   I believe that — I believe that he put it in his answer to

15  the unlawful detainer.

16  Q.   I understand that.  But I want to know if that was — those

17  terms were discussed with Mr. Blum?

18  A.   Oh, I don't recall.

19  Q.   Okay.  You don't recall if those terms were discussed, but

20  you recall 1695, but you included "disguised security device,"

21  but not 1695 in the agreement; is that correct?

22  A.   I've answered that several times.

23  Q.   That's correct, isn't it?

24  A.   Yes.

25  Q.   Thank you.

Plaintiff's EOR-213

*Gustavson - Cross/Goodrich*                                    125

1   A.   So what.

2                          CROSS-EXAMINATION

3   BY MR. GOODRICH:

4   Q.   Ms. Gustavson, you identified two or three conversations

5   before the settlement — settlement was reached and then one or

6   two after.   What date are you using for when the settlement was

7   reached?

8   A.   Well, in reading through these emails, I note that the

9   agreement apparently was reached on July 9th.

10  Q.   Okay.   So you're saying when the settlement was reached was

11  when my client and Mr. Hoffman met at Applebee's?

12  A.   That is correct.

13  Q.   Okay.   And I may have missed this when I went downstairs to

14  help Mr. Blum, but did you confirm any of these conversations

15  with Mr. Blum about 1695?   And I think there were three of them

16  that you said he repeated over and over 1695.   Did you confirm

17  any of them in writing?

18  A.   You mean write back to him, say, 'Confirming our

19  conversation'?

20  Q.   Right.

21  A.   No, I did not.

22  Q.   That's not your usual practice?

23  A.   No, it is not.

24  Q.   Is it a concern of yours that a lawyer in your position

25  representing Mr. Hoffman should have done that?

Plaintiff's EOR-214

*Gustavson - Cross/Goodrich*    126

A.   No.

   MR. PAHL:  Objection.  This is not a malpractice case.
We're certainly not dealing with the standard of care in a — and
the issue is whether it was a discussed term.  I recognize this
is impeachment, Your Honor, but I'm going to object.  Obviously
it's irrelevant and it goes way beyond the scope of the direct.

   MR. GOODRICH:  The question is intended to determine
whether this client — this person is testifying a certain way
because of her concern about a malpractice suit.

   THE COURT:  You can have the question.

   THE WITNESS:  I'm sorry.  I didn't hear you, Your
Honor.

   THE COURT:  The objection's overruled.  I'm sorry.  I
didn't —

   THE WITNESS:  So answer is what you said.

   THE COURT:  Answer the question, yes.

   THE WITNESS:  Okay.  No, I'm not concerned about that.

BY MR. GOODRICH:

Q.   Is that because you're in business with Mr. Hoffman?

A.   No.  It's because I don't think that anything that I did was
done improper.

Q.   But you're in business with Mr. Hoffman, right?

A.   I'm not in business with Mr. Hoffman.  I'm a consultant to
Mr. Hoffman.

Q.   You only provide legal services?

Plaintiff's EOR-215

*Gustavson - Cross/Goodrich*         127

1    A.   That is correct.

2    Q.   But you're president of NorCal Financial Lending Services,

3    Inc.; is that not true?

4    A.   That is true.

5    Q.   And NorCal Financial Lending Services, Inc. has its address,

6    at least according to the public records, at two different

7    places, one of which is 5132 North Palm Avenue, Suite 103; isn't

8    that correct?

9    A.   That was the address that I used when I started it, yes.

10   Q.   And NorCal Financial Lending Services, Inc. is hard-money

11   lender, right?

12   A.   It is a loan brokerage firm.

13   Q.   Okay.   And don't you receive compensation as president for

14   loans that are brokered through Mr. Hoffman?

15   A.   I do not receive compensation.

16   Q.   Do you have any economic interest whatsoever in loans that

17   are facilitated or brokered by NorCal Financial Services?

18   A.   I have an economic interest in that I am the president and,

19   in fact, I'm the only officer of the corporation.   And if

20   something were to happen, I have some liability issues.   But for

21   — other than that, all the money goes back into the corporation.

22   Q.   Okay.   And you have no interest in that corporation?

23   A.   I do not hold any shares in the corporation.

24   Q.   No.   Do you have an interest in the corporation?

25   A.   I have an interest in it as in that my name is on the

Plaintiff's EOR-216

*Gustavson - Cross/Goodrich*                                                128

1    corporation.

2    Q.   How about Gusthoff Enterprises, LLC?

3    A.   It does not exist any longer.

4    Q.   But it did exist at one time, did it not?

5    A.   It did exist.

6    Q.   And wouldn't it be fair to say that the term "Gusthoff" was

7    Gustavson and Hoffman?

8    A.   Could be.

9    Q.   Was it?

10   A.   It — no.   It could — could be, but, no, it wasn't.

11   Q.   Well, what was it then?

12   A.   It was just a name that was picked out of the air.

13   Q.   It's a limited liability company, correct?

14   A.   Yes.

15   Q.   And you were a member and a manager of that, correct?

16   A.   Yes.

17   Q.   Isn't it true that you decided not to go forward once this

18   lawsuit was filed and you wanted to sever your relationship with

19   Mr. Hoffman?

20   A.   I never had — I have the same relationship now with Mr.

21   Hoffman as I have ever had, which is retained counsel.   I

22   terminated Gusthoff because I wasn't using it and I didn't want

23   to pay the $800 filing fee.   So I paid for the two years that it

24   was active, although never used, and closed it.

25   Q.   So who came up with the name Gusthoff?

Plaintiff's EOR-217

*Gustavson - Cross/Goodrich*                                129

1   A.   I did.

2   Q.   And you don't remember why you came up with the name?

3   A.   It just popped into my head.

4         MR. GOODRICH:  Just popped in your head, okay.

5         Thank you.

6         THE COURT:  That's it?

7         MR. PAHL:  Well, Your Honor, I wanted to bring to the

8   Court's attention, Exhibit 19 appears to have some

9   attorney-client privilege documents in it.  And I'm bound,

10  obviously, —

11        THE COURT:  Yes.  They're — there are some —

12        MR. PAHL:  — and I'm very concerned about —

13        THE COURT:  — some forwarding things.

14        MR. PAHL:  If there is not a problem, and I direct the

15  Court's attention to page 9 of Exhibit 19, where there's

16  apparently an email from Mr. Blum to Mr. Lloyd where they're

17  having a conversation about the settlement.

18        THE COURT:  Okay.

19        MR. PAHL:  Do we want to —

20        THE COURT:  What —

21        MR. PAHL:  Is this — is this deemed a waiver?

22        THE COURT:  What page is what?

23        MR. PAHL:  It's the ninth page of the exhibit that I

24  was handed.

25        THE COURT:  Well, —

Plaintiff's EOR-218

*Gustavson - Cross/Goodrich*                                    130

1        MR. PAHL:  God knows — God knows, —

2        THE COURT:  — they aren't numbered.

3        MR. PAHL:  I know.  I just counted.  It's the one with

4   an email, Your Honor, —

5        THE COURT:  What's the date and time?

6        MR. PAHL:  July 14th at 11:38 a.m.

7        THE COURT:  I have 11:38, yes.

8        MR. PAHL:  If there's a waiver, I'm game and I'll take

9   it.  But I'm duty bound to advise the Court.

10       MR. GOODRICH:  I'm not seeing it here.  Oh, I see it.

11       THE WITNESS:  It's immediately following the

12  settlement agreement.

13       MR. HAUSER:  Your Honor, that was inadvertent.

14       MR. GOODRICH:  Yeah, I did not see this before it was

15  submitted.  It came directly from Mr. Blum when he walked into

16  the court this afternoon.

17       Let me just take a look.

18       MR. PAHL:  Well, Your Honor, for the record I would

19  object, but we're not going to be able to unring the bell.  So I

20  think it's an inadvertent disclosure by counsel — I mean I did

21  not produce this and did not have an opportunity to talk to my

22  client about it.  But I, quite frankly, —

23       THE COURT:  All right.  Well, I've already seen it.

24       MR. PAHL:  Right.

25       THE COURT:  But I will — I have to consider whether I

*Rothbard - Direct/Pahl*                                                    131

1   should consider it.  I will note your objection.

2           MR. PAHL:  Thank you.

3           I have no further questions.

4           THE COURT:  Okay.  Thank you, Ms. Gus- —

5           MR. PAHL:  We'll call Todd Rothbard —

6           THE COURT:  Ms. Gustavson, you may step down.  Thank

7   you.

8           THE WITNESS:  Thank you.

9       (Witness excused.)

10          MR. PAHL:  We'll call Todd Rothbard at this time.

11          THE COURT:  All right.

12          THE CLERK:  Raise your right hand, please.

13          <u>TODD ROTHBARD, PLAINTIFF'S WITNESS, SWORN</u>

14          THE WITNESS:  I do.

15          THE CLERK:  State your full name for the record,

16  please.

17          THE WITNESS:  My name is Todd Rothbard.  Last name is

18  spelled R-o-t-h-b-a-r-d.  My work address is 4261 Norwalk Drive,

19  Suite Number 107, San Jose.  The Zip Code is 95129.

20          THE COURT:  Please go ahead.

21          MR. PAHL:  Thank you, Your Honor.

22                          <u>DIRECT EXAMINATION</u>

23  BY MR. PAHL:

24  Q.  And, Mr. Rothbard, like pretty much everyone else in this

25  case, you're an attorney licensed to practice law in the State

Plaintiff's EOR-220