1 | GOLDBERG, STINNETT, DAVIS & LINCHEY
A Professional Corporation
2 | DENNIS D. DAVIS, ESQ. CA Bar #070591
44 Montgomery Street, Suite 2900
3 | San Francisco, CA 94104
Telephone: (415) 362-5045
4 | Facsimile: (415) 362-2392

5 | Attorneys for Appellant, Jeffrey E. Hoffman

6

7                    IN THE UNITED STATES DISTRICT COURT

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 | JEFFREY E. HOFFMAN,                         No. 3:07-CV-2417 MHP

11 |              Plaintiff,

12 | vs.

13 | THOMAS   R.   LLOYD,   an   individual,
EDWARD  L.  BLUM,  an  individual,  and
14 | DOES 1 through 20, inclusive,,

15 |              Defendants.

16 | _____

17 | THOMAS LLOYD,

18 |              Cross-Plaintiff,

19 | vs.

20 | JEFFREY   E.   HOFFMAN,   dba   H&B
PROPERTIES; H&B PROPERTIES, LLC;
21 | J.  EDWARDS  INVESTMENT  GROUP,
INC., and NORCAL FINANCIAL, INC.,
22

23 |              Cross-Defendants.

24

25 |              **APPELLANT'S EXCERPTS OF RECORD ON APPEAL**

26 |              **VOLUME II cont.**

27

28

| | | Bktcy Ct Docket No. | Pages |
|---|---|---|---|
| 1. | Answer – Unlawful Detainer (Trial Exhibit 10) | | 1-4 |
| 2. | Settlement and Mutual Release Agreement (Trial Exhibit G) | | 5-9 |
| 3. | Complaint for Damages and to Cancel Instrument (filed April 5, 2005) | | 10-29 |
| 4. | Cross-Complaint for (1) Declaratory Relief:  (2) Avoidance of Fraudulent Conveyances and/or Obligations; (3) Transferee Liability; (4) Quiet title; (5) an Accounting; (6) Determination of Validity, Extent and Priority of Liens; and (7) Objection to Claim (filed June 16, 2005) | | 30-60 |
| 5. | Declaration of Thomas Lloyd in Support of Motion for Summary Judgment (filed 1/20/06) | 39 | 61-82 |
| 6. | Tentative Ruling Re Plaintiff's Motion for Summary Judgment (filed February 16, 2006) | 55 | 83-85 |
| 7. | Order Denying Motion for Summary Judgment (filed February 21, 2006) | 57 | 86-89 |
| 8. | Trial Transcript (filed February 28, 2006) | | 90-294 |
| 9. | Decision After Trial (Phase One) (filed March 20, 2006) | 59 | 295-297 |
| 10. | Hearing Transcript of Defendant's Motion for Summary Judgment (filed April 28, 2006) | | 298-330 |
| 11. | Order Granting Defendant Thomas Lloyd's Motion for Summary Judgment (filed May 15, 2006) | 83 | 331-338 |
| 12. | Tentative Ruling Re Rescission Payment (filed November 9, 2006) | 95 | 339-344 |
| 13. | Tentative Ruling Re Terms for Cancellation of Deed (filed 1/24/07) | | 345-347 |
| 14. | Declaration of Asher Robertson (filed 2/13/07) | 108 | 348-366 |

-1-

| 15. | Opinion (filed April 30, 2007) | 116 | 367-392 |
| 16. | Judgment and Rule 54(b) Certification (filed April 30, 2007) | 117 | 393-396 |
| 17. | Order Denying Stay Pending Appeal (filed May 7, 2007) | 125 | 397-399 |
| 18. | Plaintiff's Brief Relating to Court's Tentative Ruling of January 24, 2007 | 108 | 400-414 |
| 19. | Declaration of Jeffrey E. Hoffman in Support of Plaintiff's Opposition to Defendant Lloyd's Motion for Summary Judgment. | 75 | 415-444 |
| 20. | Trial Scheduling Order. | 29 | 445-448 |
| 21. | Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 42 | 449-472 |
| 22. | Reply Memorandum of Points and Authorities in Support of Defendant Thomas Lloyd's Motion for Summary Judgment. | 78 | 473-485 |
| 23. | Declaration of Jeffrey Goodrich in Reply to Plaintiff's Opposition to Defendant Thomas Lloyd's Motion for Summary Judgment. | 80 | 486-510 |

DATED: July 13, 2007

GOLDBERG, STINNETT, DAVIS & LINCHEY
A Professional Corporation

By:     /s/ Dennis D. Davis
        Attorneys for Appellant Jeffrey E. Hoffman

APPELLANTS' OPENING BRIEF
10329.705/113202.DOC

**DOCUMENT 8 cont.**

*Rothbard - Direct/Pahl*                                                    132

1   of California?

2   A.   Regrettably the NBA wouldn't accept me so, yes, I am.

3   Q.   Okay.  And you've been an attorney since 1975?

4   A.   That's correct.

5   Q.   And your practice is voluntarily restricted to unlawful

6   detainers and matters related to unlawful detainers?

7   A.   That's correct.

8   Q.   And you've been doing that since 1975?

9   A.   That's correct.

10  Q.   Okay.  In your — if I could get you to turn to Exhibit F,

11  and I think the exhibits are in front of you.  Not in the blue

12  binder, but the other one, the loose one.

13  A.   Okay.  Yes, I have it.

14  Q.   Okay.  Do you recognize the wonderful, masterful pleading

15  that Exhibit F reflects?

16  A.   I do represent this as a copy of an unlawful-detainer

17  complaint generated by my office.

18  Q.   And that was done in June of 2004?

19  A.   It is file-stamped June 2nd, 2004.  That's also the day it's

20  dated, so it was probably prepared that day, although there's a

21  small chance it may have been prepared a few days prior.

22  Q.   And after the filing of this unlawful-detainer complaint,

23  did you determine that Mr. Lloyd was represented by counsel?

24  A.   My office did determine that, yes.

25  Q.   And who did you ascertain was going to be representing Mr.

Plaintiff's EOR-221

*Rothbard - Direct/Pahl*                                                      133

1   Lloyd?

2   A.   I believe his name was Edward Blum.

3   Q.   Did you have any conversations with Mr. Blum?

4   A.   I did.

5   Q.   Prior to getting into that, in the years, now just excess of

6   30 years that you've been doing unlawful detainers, has it been

7   your experience that the unlawful-detainer form is utilized as a

8   methodology to resolve claims above and beyond simply the

9   possession of real property?

10  A.   Frequently.

11  Q.   And what has been your experience in that area?

12  A.   Well, unlawful detainer has an advantage and a limitation.

13  Its advantage is that it moves very quickly in comparison to

14  ordinary civil litigation.   For example, there is a five-day

15  response period to a summons as opposed to a 30-day responsive

16  period in a nonsummary proceeding.   There is a requirement under

17  Code of Civil Procedure 1170.5 that once a responsive pleading

18  has been filed, which can be either answer or demurrer, the

19  matter was be set for trial within 20 days.   So the average

20  lifespan of an unlawful-detainer proceeding is typically one to

21  two months, as opposed to years for other types of civil

22  litigation.

23          The tradeoff that's imposed for that accelerated pace

24  is that the issues which can be resolved in the context of the

25  unlawful detainer are limited.   The unlawful detainer is a

*Rothbard - Direct/Pahl*                                    134

1   summary proceeding designed to speedily adjudicate possessory

2   rights.  It is, however, not infrequent that the unlawful

3   detainer serves as the catalyst to a broader resolution.

4        A good example being a case that concluded yesterday

5   morning where we were suing a dentist for nonpayment of rent,

6   and the resolution of the case was that she wound up purchasing

7   the building in which her office was located for some two

8   million dollars, something which would clearly be outside of the

9   ambit of the unlawful detainer, but the UD served as the means

10  to bring the parties together and very quickly reach a

11  resolution.

12  Q.   And as part of your practice involving unlawful detainers

13  have you had experience with home equity sales contracts that's

14  covered by Civil Code Section 1695?

15  A.   I have.

16  Q.   And so you're familiar with that section?

17  A.   I am.

18  Q.   Okay.  Back to Mr. Blum.  You've determined that Mr. Blum

19  was going to be representing Mr. Lloyd in this matter, and you

20  had a conversation — you had one or more conversations with him?

21  A.   I had at least one, probably more like two or three — this

22  is going back a year or so — but one that I distinctly recall.

23  Q.   And do you recall who initiated the conversation?

24  A.   I don't.

25  Q.   Was it on the telephone?

Plaintiff's EOR-223

*Rothbard - Direct/Pahl*                                                135

1    A.  It was on the telephone and it was in the context of trying

2    to arrive at a resolution of the unlawful-detainer matter.

3    Q.  I want to see if I can put some context to this.  Are you

4    familiar that Mr. Hoffman and Mr. Lloyd met at an Applebee's

5    restaurant in Fresno?

6    A.  I was unaware of the location, but I'm certainly familiar

7    that Mr. Hoffman and Mr. Lloyd were working to try to arrive at

8    some global resolution, yes.

9    Q.  Okay.  And you're familiar that they did meet in Fresno?

10   A.  I — I'm familiar that they met.  I couldn't swear to the

11   location.

12   Q.  Okay.  Was your — were your conversations, at least one and

13   maybe two, with Mr. Blum before or after those — that meeting

14   between Mr. Hoffman and Mr. Lloyd?

15   A.  Well, it's interesting that you bring that up.  That does

16   sort of help to refresh my recollection, because I know we had

17   probably at least one before and at least one after, because I

18   recall that there were some discussions that they were going to

19   a meeting.  And I recall that there was some discussion

20   afterward that they had met.

21   Q.  Okay.  And during your conversations with Mr. Blum were

22   there — was there a dialogue between you and Mr. Blum concerning

23   the Home Equity Sales Contract Act as well as — or as it's

24   codified as Civil Code Section 1695?

25   A.  Yes, there was.

*Rothbard - Direct/Pahl* 136

1  Q.  And can you describe for the Court what those conversations

2  encompassed?

3  A.  Well, yes.  We had — it's not atypical in an unlawful

4  detainer the defendants filed an answer, I'll call it, in the

5  context of resolution we'll discuss what issues can be raised

6  within the context of the unlawful detainer.

7      Mr. Blum had indicated to me that he thought he had a

8  good defense to the unlawful detainer based upon the Home Equity

9  Sales Act.  And I indicated first I wasn't sure it could be —

10  that could be litigated in the context of the UD at all, but I

11  also — we had kind of a general philosophical discussion about

12  the — for lack of a better term — the equity of the Home Equity

13  Sales Act.  And that I remember very specifically because he

14  almost agreed with me philosophically that it was a legislative

15  attempt to villainize conduct in the absence of which the

16  alleged victim would have perhaps been in worse straits.

17  Q.  And how did he agree with you in that regard?

18  A.  Well, his comment was something to the effect of, you know:

19  Philosophically I agree with you but, guess what, it's a defense

20  and I intend to use it.

21  Q.  And did he actually use that as an affirmative defense, do

22  you recall?

23  A.  He didn't refer to it by code section, but he did, by way of

24  affirmative defense, allege that title to the property had been

25  improperly obtained.

*Rothbard - Direct/Pahl* 137

1  Q.  If I can get you in the blue binder in front of you to turn

2  to Exhibit Number 10 and specifically — well, ask first:  Do you

3  recognize Exhibit Number 10?

4  A.  This appears to be the answer that was filed in the

5  unlawful-detainer action.  And this is — I haven't looked at it

6  in some time, but this is in accord with my general recollection

7  as to what it said, yes.

8  Q.  And — and on the fourth page, as actually you and your

9  office address, on the proof of service?

10  A.  That's correct.

11  Q.  Okay.  Directing your attention to the second page, under

12  paragraph 3 and subparagraph J, ask that you look at

13  sub-subparagraph 3?

14  A.  Yes.

15  Q.  And is that —

16  A.  Yeah.  That — that's the language that I recall he states —

17        THE COURT:  Well, wait a minute.  Wait a minute.

18  Where — where are we now?

19        MR. PAHL:  Sure, Your Honor.  I'm at Exhibit 10.

20        THE COURT:  Exhibit 10.  That's the defense.  Oh,

21  yeah, okay.  I remember this now.

22        MR. PAHL:  Page 2.  Second page, the end of the first

23  big paragraph.

24        THE COURT:  J3.

25        MR. PAHL:  Yes.

Plaintiff's EOR-226

*Rothbard - Direct/Pahl*                                    138

1          THE WITNESS:  Right.  And to quickly put this in

2    context, this entire pleading is on what's called the Judicial

3    Council Form Pleading.  Its use is optional, but it's frequently

4    used.

5          One of the requirements of the Judicial Council Form

6    Pleading is on the face page you check a number of boxes that

7    are preset to indicate which affirmative defenses you're having

8    to resort to.  And then with respect to each of them you're

9    instructed at the top of paragraph 3 on page 1 that you state in

10   the attachment or the second page the — or specifically in item

11   3J the specific underlying facts supporting the defense that

12   you're asserting.

13   BY MR. PAHL:

14   Q.  Now you had the conversation before the meeting between Mr.

15   Blum — excuse me — become Mr. Hoffman and Mr. Lloyd in which you

16   had a dialogue concerning the affirmative defense, 1695, and the

17   fact that philosophically it was a difficult issue.  Did you

18   have any other discussions that related to the Home Equity Sales

19   Act during that conversation that you recall?

20   A.  Well, I don't know what you mean by other discussions.  It

21   was — you know, it was — I don't want to say lengthy in the

22   sense of hours, but we spent quite a bit of time going over, you

23   know, what the defenses were and specifically that one because

24   that was what he felt to be his defense to the unlawful-detainer

25   action.

Plaintiff's EOR-227

*Rothbard - Direct/Pahl*                                          139

1   Q.  Were you trying to settle the case — in your own mind, were

2   you trying to settle the case in that conversation with Mr. Blum

3   at that time?

4   A.  I — yes.  I was attempting to work towards settlement.  I

5   knew that we weren't going to globally resolve all the issues in

6   the context of that discussion, but I was trying to work at

7   least towards a settlement or some idea of where we were going

8   with the unlawful-detainer action.

9   Q.  And jump forward, the next conversation you had was after

10  the parties had met?

11  A.  That's correct.

12  Q.  Would you please recount for Judge Carlson what the

13  substance of that conversation was?

14  A.  That, to the best of my recollection, was more a procedural

15  conversation than anything else.  At that point the parties had

16  met.  The parties had, I believe, arrived at terms and something

17  was — either had been drafted or was in the process of being

18  drafted by plaintiff's inhouse counsel, which was to constitute

19  a global settlement and release of all the issues between the

20  parties.

21  Q.  And did you participate in the drafting of that settlement

22  agreement?

23  A.  No, I didn't.

24  Q.  And did you understand what the, in essence, the settlement

25  terms were?

Plaintiff's EOR-228

*Rothbard - Direct/Pahl*                                                    140

1    A.   I eventually saw a copy of the agreement.  It may have

2    actually even been after it had been executed at that point.

3    But, yeah, I — I read it and understood it to be what I think it

4    was intended to be, which was a full global release.

5    Q.   And eventually when the terms of the settlement agreement

6    were not implemented, the stipulation for unlawful detainer was

7    actually filed by your office?

8    A.   That's correct.  At that point one of the terms, as I

9    recall, of the global resolution was that we would have a

10   stipulated judgment but that we would hold off on filing it for

11   a period, I think it was 90 days; and if there was full

12   performance of all the other terms and conditions, in essence,

13   the unlawful detainer would go away and Mr. Lloyd would then

14   once again be the owner of the property.  But if that failed to

15   happen we could — we were then free to file the

16   unlawful-detainer judgment and obtain restitution of possession.

17            MR. PAHL:  No further questions.  Thank you, Your

18   Honor.

19            THE COURT:  So the stipulated — the stipulated

20   judgment was filed?

21            THE WITNESS:  It was ultimately filed, that is

22   correct.

23            THE COURT:  Do you remember when?

24            THE WITNESS:  I don't.  I remember vaguely that there

25   was some kind of an administrative bullocks with the San

Plaintiff's EOR-229

*Rothbard - Cross/Goodrich*                                    141

1    Francisco court, which, without meaning to be offensive, is

2    somewhat typical for the San Francisco Superior Court when it

3    comes to clerical procedures that aren't what they do everyday.

4              And I remember we had to resubmit it and I can't

5    recall the reason why, but it —

6              THE COURT:  Was an appeal taken?

7              THE WITNESS:  No.  This had nothing to do the appeal —

8    or are you asking me was an appeal taken from the UD?

9              THE COURT:  Yeah.

10             THE WITNESS:  Not that I recall.  It's difficult to

11   appeal from a stipulated judgment.

12             THE COURT:  Okay.

13                        CROSS-EXAMINATION

14   BY MR. GOODRICH:

15   Q.  Good afternoon.

16   A.  Hi.

17   Q.  I'm going to take you back to the first conversation.  You

18   said there were two conversations.

19   A.  There were at least two.  Yeah, I had originally remembered

20   at least one.  But as my recollection got refreshed with this

21   timing vis-a-vis the meeting between the parties, I recall that

22   we had at least one before and at least one after.

23   Q.  Tell me everything you can remember about that first

24   conversation.

25   A.  Well, I remember sitting in my office.  I remember that it

*Rothbard - Cross/Goodrich*                    142

1    was a telephone call.   I can't recall which of us initiated it.

2    And I can't even recall the precise reason it was initiated.   It

3    may have been a calendaring issue, because I remember there were

4    one or two calendaring issues on the — on the case with Mr.

5    Blum.   But —

6    Q.   Would this have been before or after you filed an answer?

7    A.   Oh, this would have been after we filed the answer.

8    Q.   So you had in front of you probably the answer itself?

9    A.   That's correct.   I would have had our file which would have

10   consisted at that point of the complaint, the answer, probably

11   the request for setting.

12           And, again, we discussed, you know, our parties'

13   respective view of the equities and where we were going with the

14   unlawful detainer.

15   Q.   You said you were familiar with Section 1695 of the Civil

16   Code.   Was that at the time of that conversation you had already

17   had some cases involving it?

18   A.   Oh, yeah.   Yeah.   Not — and let me be clear, my familiarity

19   with Civil Code Section 1695 springs from the fact that in — let

20   me try to put it in context.

21           I've — I do about 400 unlawful-detainer actions a

22   month, about 5,000 a year.   In the course of that I might see in

23   any given a year a dozen cases where — or maybe even a couple of

24   dozen cases where title to the property was obtained in a way

25   which is being challenged by the defendant on the grounds that

Plaintiff's EOR-231

*Rothbard - Cross/Goodrich*                                    143

1 | it — it did not comply with Civil Code 1695.

2 |        Having said that, I don't do the nonsummary litigation

3 | that might be involved in litigating the issues of 1695, so I

4 | wouldn't profess to be the world's leading expert on what 1695

5 | does and does not allow.  But I'm certainly familiar with its

6 | general context, its general principle, and how it might or

7 | might not impact an unlawful-detainer action.

8 | Q.  With respect to this particular case, do you have a

9 | recollection of Mr. Blum actually using the phrase "1695"?

10 | A.  I have a recollection that he either used "1695" or that he

11 | used "Home Equity Sales Act," I can't recall which.  But I know

12 | that we had a very specific discussion.  And, again, to try to

13 | place it in context, 1695 is a very unusual statutory provision.

14 | It is, in my view, highly counterintuitive.  It's one of those

15 | things that you either know about it or you don't.  And if you

16 | know about it, most people when they see it are kind of

17 | surprised it's there.

18 |        And in that context, when I spoke with Mr. Blum he was

19 | very clearly aware it was there.  And we very clearly discussed

20 | its implications and how it might or might not impact the

21 | unlawful detainer.

22 | Q.  But you never confirmed any of this conversation with Mr.

23 | Blum in writing?

24 | A.  No.

25 | Q.  Is it possible that, given the fact that you have 5,000 of

*Rothbard - Cross/Goodrich*                                    144

1    these cases a year and you've got maybe as many as two dozen of

2    them involving 1695, what you're recalling about this one case,

3    which is now two years old, is that you knew about 1695, as you

4    read the affirmative defense, you interpreted that as a 1695

5    defense, and so you had a general discussion about whether title

6    could be set aside; is that possible?

7    A.   That might be possible were it not for the particular facts

8    of this case and my very particular recollection of Mr. Blum's

9    candor in acknowledging that — yeah, he kind of agreed with me,

10   it was sort of an unfair provision, but he was going to use it.

11   So I would say, no, it's not possible that we had that

12   conversation and that he was not fully aware of — of what Civil

13   Code 1695 was.

14   Q.   Do you think Mr. Blum thought it was unfair that Mr. Lloyd

15   be given notice of his statutory rights?

16   A.   You're wording the question in a way that's a bit

17   misleading.   What Mr. Blum agreed with me was — the overall

18   point that I made in our conversation was this:   When people

19   acquire property that's in foreclosure and things fall apart,

20   it's easy to assign some form of villainy to the person who

21   acquired the title, forgetting that had it not been for the

22   intervention of that person the so-called victim would have been

23   dispossessed by the bank and foreclosed upon.

24           And in most of the cases I have seen, and again I see

25   a couple of dozen of them a year where this is — is raised, it's

Plaintiff's EOR-233

*Rothbard - Cross/Goodrich*                                                    145

1   almost invariably the case that the net effect of the

2   intervention is that the person gets a year or two years of

3   additional occupancy, essentially rent free, of a property from

4   which he or she would have been foreclosed.  And it was in that

5   context that Mr. Blum and I discussed it.  And it was in that

6   context that he said, 'Yeah,' he says, 'You know, I agree with

7   you.  It's — it is sort of a try to point a finger and find a

8   bad guy, but it's there, and I'm going to use it.'

9   Q.   So maybe you were thinking about another case because there

10  was no free rent under this deal?

11  A.   Counsel, when I say that's the net effect what I mean is the

12  following:  Generally, it's in the unlawful-detainer posture

13  because the person hasn't paid the rent.  And, generally, the

14  unlawful detainer itself takes some time to prosecute.  So by

15  the time that the landlord gets around ultimately to serving the

16  three-day notice, which is generally many, many months after the

17  tenant first goes into default, and then a UD is filed, and then

18  an answer is filed, and then you go to trial, and then you get

19  it resolved, frequently — and then you go through whatever

20  stays, et cetera, happen after — frequently a year or two go by

21  from the time the tenant last actually paid rent — I'm not

22  saying the tenant wasn't obligated to — but frequently in net

23  effect a year or so goes by from the time when the tenant was

24  obligated to pay rent to the time that the tenant is ultimately

25  dispossessed.

*Rothbard - Cross/Goodrich*                                    146

1         Now in the grand theory of things, yes, there's a

2    judgment for that money.  I have about a billion dollars of

3    those judgments I'll be happy to sell you for a penny on the

4    dollar.  The reality is that statistically they're almost

5    invariably uncollectible because of the financial straits in

6    which the judgment debtor originally found himself.

7    Q.  But in this case there was $300,000 of equity that went to

8    Mr. Hoffman from day one.

9    A.  Well, —

10   Q.  Why would Mr. Blum, who is representing Mr. Lloyd, tell you

11   that, 'Well, it's a technicality,' and he kind of believed that

12   you were right philosophically in this case but he was just

13   going to raise it?

14   A.  I don't believe I — I said that he's testified that it was

15   just a technicality.  What I said was that he agreed with me in

16   our discussion that the legislative characterization of the

17   person who acquires title from a property that's in foreclosure

18   appears to be an attempt to villainize conduct, which in most

19   cases, works to the benefit of the party who allegedly is

20   victimized.

21   Q.  Did you think it worked as a benefit to Mr. Lloyd in this

22   case?

23   A.  I didn't do a — first of all, remember, my context of the

24   case, in general, was I'm doing an unlawful detainer.

25   Q.  Right.

*Rothbard - Cross/Hauser*                                            147

1   A.  So —

2   Q.  In fact, — in fact, isn't it true that when you filed an

3   unlawful detainer you did not provide the purchase agreement and

4   you did not provide the option agreement, you only attached the

5   lease?

6   A.  Of course, because it's an unlawful detainer.

7   Q.  Right.  And you said earlier that one of the beauties of

8   unlawful detainer is that it acts as leverage to settle other

9   issues; isn't that right?

10  A.  That's exactly correct.

11  Q.  Isn't that what was done in this case, is that Mr. Hoffman

12  used unlawful detainer to get a settlement of his violations

13  under 1695?

14  A.  I think absolutely.  The unlawful detainer was the catalyst

15  which brought the parties together and — and ultimately went to

16  a resolution.

17        MR. GOODRICH:  I have no further questions.

18                    CROSS-EXAMINATION

19  BY MR. HAUSER:

20  Q.  This property wasn't in foreclosure, was it?

21  A.  I have no idea.

22  Q.  Okay.  When Mr. — you claim Mr. Blum raised the 1695

23  question.  Did that cause you any concern?

24  A.  No.

25  Q.  Why not?

Plaintiff's EOR-236

*Rothbard - Cross/Hauser*                          148

1   A.   Because it's not a defense to an unlawful detainer.

2   Q.   Did you think any of his affirmative defenses created a

3   defense to the unlawful detainer?

4   A.   Let me take another look at his answer.  The defense listed

5   in paragraph 3E, "Plaintiff served defendant with the Notice to

6   Quit to retaliate against defendant," no, I didn't.  It's a

7   common misperception that that defense is applicable to notices

8   — to actions for nonpayment of rent.

9        In fact, under Civil Code Section 1942(a), the

10  retaliatory eviction defense is expressly restricted to those

11  not in default in the payment of their rent.  Further, the

12  California Supreme Court recently in a case called *Drew Way*

13  *versus Superior Court* (phonetic) affirmed that retaliatory

14  eviction is not a defense when someone's in default under their

15  leasehold obligations.

16       With respect to the defense set forth in paragraph 3F,

17  "Plaintiff is arbitrarily discriminating against the defendant

18  in violation," again in over 100,000 unlawful detainers, I've

19  never seen that be a successful defense to an eviction for

20  nonpayment of rent.  So, no, I wasn't concerned about that.

21       "The demand for possession violates the local rent

22  control or eviction control ordinance," and they checked the

23  box, but they set forth no supporting facts in the — in

24  paragraph 3J.  And I couldn't see any defense that was

25  applicable under the San Francisco Rent Control Ordinance.

Plaintiff's EOR-237

*Rothbard - Cross/Hauser*                                           149

1     And the only other affirmative defense was the one

2     based upon improper acquisition of title.

3     Q.  And did you consider improper acquisition of title to be an

4     affirmative defense?

5     A.  No.

6     Q.  Okay.  Did Mr. Blum in his conversation with you use the

7     term "disguised security device," that this was really a

8     disguised security device?

9     A.  He may have.  I don't — I don't recall.

10    Q.  He may have.  And wasn't that his main philosophical

11    argument with you, that the unlawful-detainer process was wrong

12    because this was a security device and the proper method should

13    have been a foreclosure?

14    A.  That wasn't what I understood his main argument to be.

15    Q.  But he may have discussed that with you?

16    A.  He may have.

17    Q.  The conversation that you had with Mr. Blum, the first one,

18    that was a phone conversation?

19    A.  That's co- — all of my conversations with Mr. Blum — I've

20    never met the man, so they were all by telephone.

21    Q.  Did you make any notes of that conversation?

22    A.  What do you mean by "notice"?

23    Q.  I'm sorry.  Did you make any notes of that conversation?

24    A.  I don't believe I did so, no.

25    Q.  When did you first become aware of this lawsuit?

Plaintiff's EOR-238

*Rothbard - Cross/Hauser*                                    150

1  A.  Which lawsuit?

2  Q.  This lawsuit right now, the bankruptcy matter.

3  A.  I have to say, and I'm somewhat embarrassed to say, I'm

4  still not aware of the context that there is, in fact, a lawsuit

5  pending, although I imagine that would be the logical inference

6  from the fact that we're all sitting here.  I didn't know if

7  this was a bankruptcy proceeding or a lawsuit.

8          I became aware that there was a question as to whether

9  or not the release which was entered in the unlawful detainer

10  constituted a release of 1695 claims some time within the last

11  year, but I couldn't be terribly specific as to time.

12  Q.  Okay.  So within the last year.

13  A.  I know that I was called to — again, to try to give you a

14  little context, I know I was called by Mr. Pahl's office asking

15  me who in my office did the negotiations, who had discussions,

16  and what we recalled.

17  Q.  And did you inform Mr. Pahl's office that you discussed 1695

18  with Mr. Blum?

19  A.  I went through with Mr. Pahl's office what I've just gone

20  through in my testimony today.

21  Q.  And that may have been a year ago?

22  A.  It was within the past year.  I couldn't be more — much more

23  specific as to time.  It would say it was certainly more than

24  three or four months ago, but less than a year.

25  Q.  Okay.  And was that Mr. Pahl himself that you informed him

*Rothbard - Examination by the Court*                                      151

1   about 1695?

2   A.   Orig- — I believe my original discussions were with a young

3   lady by the name of Cheri MacArthur in Mr. Pahl's office.   And

4   then I believe that Mr. Pahl and I had a follow-up conversation.

5   Q.   And that was at least three or four months ago, possibly a

6   year ago?

7   A.   The initial conversations were, yes, in that timeframe.   We

8   — we've had subsequent conversations as well.

9            MR. HAUSER:   Right.   I'm focusing on the initial one

10  when 1695 was raised.

11           I have no further questions.

12                      EXAMINATION BY THE COURT

13  BY JUDGE CARLSON:

14  Q.   I have a question for you.

15  A.   Yes, sir.

16  Q.   In — if a question is raised about 1695 in — as a purported

17  defense in an unlawful detainer, can that be the occasion for

18  converting the unlawful detainer into a plenary action?

19  A.   Well, it's an interesting question.   And there are a number

20  of dimensions to that, and let me say preliminarily, I read Your

21  Honor's order in the summary judgment motion.   And if I may be

22  so bold as to say so, I think that you're very astute on one

23  point, but there's another point where I think —

24  Q.   Well, I don't — I don't have to be right.   My question is —

25  it's not that I don't have to be right.

Plaintiff's EOR-240

*Rothbard - Examination by the Court*                                    152

1   A.   Well, I just want —

2   Q.   My question is this:  Have you ever before this case had —

3   had a case in which 1695 was raised in an unlawful detainer that

4   became a plenary action?

5   A.   No.   In many cases I — the tactic which is generally

6   employed is the defense in the unlawful detainer will typically

7   file a nonsummary action based on 1695 and then move either to

8   enjoin —

9   Q.   Consolidate, yeah.

10  A.   — or to consolidate.   And — and I would say those motions

11  are never granted.

12  Q.   Except they seem to be in those two appellate cases.

13  A.   Which two appellate cases?

14  Q.   Well, I cited a couple of cases —

15  A.   Oh, you're talking about *Asuncion* which is a very unusual

16  case.   And if you go back and read *Asuncion*, it's a very limited

17  applicability now because it was in an era when there was a

18  municipal and a superior court.   And the principal contention

19  and holding of *Asuncion* was that the municipal court lacked

20  jurisdiction because the value of the property which had been

21  put in issue by the answer exceeded the jurisdictional limit of

22  the municipal court.

23        Those arguments became essentially meaningless when

24  the two courts consolidated, so —

25  Q.   But you never had a case that turned into — or led to — did

Plaintiff's EOR-241

*Rothbard - Examination by the Court*                    153

1   you ever have a case in which a general action was filed and

2   there — the unlawful detainer was stayed?

3   A.   No.   And there is very specific authority and I can cite the

4   Court case after case that says that should not be done, because

5   to do that would defeat the very purpose of the summary unlawful

6   detainer statutes.

7           *Asuncion* is really an anomaly in that regard and has

8   been distinguished.   It was distinguished in a case called

9   *Seeborg versus National Financial Services* (phonetic),

10  thereafter, and it almost totally lost vitality with the merger

11  of the two courts.

12          The one — the one point I wanted to make —

13          THE COURT:   That's the end of my question.   I just

14  wanted to know if you ever had one of those types.

15          Okay.   Anybody, any further questions?

16          MR. PAHL:   Nothing further, Your Honor.

17          THE COURT:   Okay.   Any further questions?

18          MR. GOODRICH:   No, Your Honor.

19          THE COURT:   Okay.   Thank you very much.

20      (Witness excused.   Comments off the record.)

21          THE COURT:   Okay.   Thank you.

22          MR. GOODRICH:   I'd like to call Mr. Blum.

23          THE COURT:   Okay.

24              EDWARD BLUM, DEFENDANT, SWORN

25          THE CLERK:   Please be seated.   Please state your full

Plaintiff's EOR-242

*Blum - Direct/Goodrich*                                      154

1    name and address for the record.

2            THE WITNESS:  My name is Edward Lewis Blum.

3    L-e-w-i-s, Lewis.  And my address at my office is 201 Nineteenth

4    Street, Suite 200, Oakland 94612.

5                        DIRECT EXAMINATION

6    BY MR. GOODRICH:

7    Q.  Mr. Blum, can you give a brief description of the area of

8    practice that you engage in as an attorney?

9    A.  Yes.  I have been practicing since January of 1972.  I

10   practiced as a litigator for a commercial transaction law firm,

11   which was called Blum, Kay and Merkel (phonetic).  I then — and

12   that was for probably the first 12 or 13 years of my practice,

13   after having started off in a very small partnership with my

14   brother.  That law firm, I then left it and had two years with

15   Wilson, Ryan, Blum and Campalongo (phonetic) in San Francisco.

16   And then left and started my own practice.

17           During all of those years I have done primarily

18   commercial real estate matters involving litigation and have

19   done a general practice involving business matters.

20   Q.  Did you represent Mr. Lloyd in the H&B Properties unlawful-

21   detainer action?

22   A.  Yes, I did.

23   Q.  And did you prepare an answer on his behalf?

24   A.  Yes.

25   Q.  Can you take a look at Exhibit 10?

Plaintiff's EOR-243

*Blum - Direct/Goodrich* 155

1   A.   Yes.

2   Q.   Is that your answer?

3   A.   Yes.

4   Q.   At the time you prepared the answer had you had any

5   opportunity to examine the purchase agreement by which Mr.

6   Hoffman came into title?

7   A.   No.

8   Q.   Did you have any opportunity to look at the option

9   agreement?

10   A.   No.

11   Q.   I notice that the complaint attached a copy of the lease, so

12   I assume you had reviewed the lease?

13   A.   Yes.

14   Q.   And Exhibit B to the complaint being a three-day notice?

15   A.   Yes.

16   Q.   At the time you prepared the answer did you know anything

17   about the Home Equity — or Home Equity Sales Contract Act?

18   A.   No, I did not know that act. I knew the concepts that

19   apparently are in — stated in that act, as I indicated in the

20   answer. But I had not familiarity with that act.

21   Q.   And when you say the concepts, are these concepts rooted in

22   common law?

23   A.   Yes, they are, as I understand it.

24   Q.   Can you explain for the Court if you weren't familiar with

25   Section 1695, et seq. of the Civil Code, what were you using as

Plaintiff's EOR-244

*Blum - Direct/Goodrich*                              156

1   your legal ground for raising the affirmative defenses in your

2   answer?

3   A.   My knowledge of this area goes back to cases in which I had

4   an associate, John Hetland (phonetic), with me in commercial

5   matters in which the issue of a deed used in lieu of a deed of

6   trust was deemed a disguised security interest.

7           My understanding of the concept was that if in fact

8   that was the mechanism that was used and thereafter if in fact a

9   lease were entered into based upon that, that is to say that

10  there is a transfer of title but retention of possession

11  governed then by a lease, that the concept I was working under

12  when I prepared this answer was that they were effectively

13  denying Mr. Lloyd the ability to assert his rights as a mortgage

14  obligor in which case he would have had the benefit of the

15  foreclosure rights of 90 days to cure.  Here there was no

16  ability to cure.  And in fact they titled — that they gained by

17  virtue of that deed was contrary to law, based on the common

18  law, and that the deed itself was a void deed.  Those were the

19  concepts that I believe that I was placing in issue.

20  Q.   Have you ever had any discussions with H&B's

21  unlawful-detainer counsel, who just testified, Todd Rothbard?

22  A.   Yes, I did.

23  Q.   And how many discussions did you have?

24  A.   I do recall two.

25  Q.   Okay.  Was one before the settlement between Mr. Hoffman and

*Blum - Direct/Goodrich*                                              157

1    Mr. Lloyd at Applebee's?

2    A.   Yes.

3    Q.   And what do you recall discussing in that conversation?

4    A.   I called him, I believe, and I called him because, number

5    one, I wanted to introduce myself to him because I was going to

6    be going forward in this case and I wanted to let him know that

7    I thought title was an issue in this case; and that, as far as I

8    knew, unlawful detainer could only proceed if in fact the

9    plaintiff could establish that he has title and a right to

10   possession; and that title was an element of unlawful detainer.

11            I was dismissed rather quickly by Mr. Rothbard, the

12   way in which he communicated with me was fairly dismissive.  And

13   I indicated to him, "Well, look, I think that that deed by which

14   Mr. Hoffman takes title was inappropriately obtained.  I believe

15   that my client is now faced with having to deal with loss of his

16   — possession of his home" and that we were in a position where

17   we felt we needed to deal with title in the case and that I was

18   planning to do that.

19   Q.   And what was his response?  You say it was dismissive.

20   A.   He was dismissive.  It was — it was — I think the

21   conversation then in fact moved into the area of:  Well, wait a

22   minute, you're really saying that the guy who bailed Mr. Lloyd

23   out of a loan is now being punished.

24            And I'm saying, "You know, Mr. Lloyd is being punished

25   by virtue of this transaction.  He is vulnerable.  He's now

Plaintiff's EOR-246

*Blum - Direct/Goodrich*                                              158

1  faced with losing possession of his home." And, yeah, I agreed

2  with him that Mr. Hoffman did advance funds for a loan, but that

3  was the nature of the vulnerability that Mr. Lloyd had.

4  Q.  So you do recall a philosophical discussion with him about —

5  A.  Yes.

6  Q.  — the appropriateness of undoing the title?

7  A.  That was what I recall discussing with him.  It was — it was

8  — I mean he was a very mechanical guy in that discussion.  He

9  just said, "This is the way it is."

10          And I'm saying, "Well, you know, that doesn't fit with

11  my concepts of the way the law would treat this."  And I was

12  drawing reference to my experience over the years and I had not

13  had experience involving a primary residence.

14  Q.  Because your work was primarily commercial?

15  A.  My work was commercial.

16  Q.  In that conversation did he ever notify you that Mr. Lloyd

17  might have a right to rescind under something other than the

18  common law doctrine of reforming the deed, —

19  A.  I don't —

20  Q.  — such as 1695?

21  A.  I don't recall him telling me that 1695 provided me with a

22  better remedy than what I was talking about.

23  Q.  Did you — do you recall him or you in that conversation

24  using the phrase "home equity sales contract"?

25  A.  No.  I wasn't familiar with that phrase.

Plaintiff's EOR-247

*Blum - Direct/Goodrich*                                      159

1   Q.  Do you remember either one of you talking about the Civil

2   Code Section 1695?

3   A.  No.

4   Q.  Do you have a fairly good memory of that conversation?

5   A.  Yes.

6   Q.  And why do you have a fairly good memory of that

7   conversation?

8   A.  Well, I had not had a case, frankly, where I was faced with

9   watching a person lose his home that he owned by virtue of an

10  unlawful detainer.  I was upset by the whole — the whole

11  conversation that I was having with Mr. Rothbard, it was

12  essentially that he was ignoring the policies that I thought

13  were pretty strong policies in the law.

14  Q.  Did Mr. Rothbard over to provide any of the underlying

15  documentation in the transaction, such as the purchase agreement

16  or the option agreement?

17  A.  No.

18  Q.  Do you recall ever asking him for that?

19  A.  Well, I had asked Mr. Lloyd for them, but I had yet to get

20  them.  And I don't recall asking Mr. Rothbard for them.

21  Q.  Okay.  Can you take a look at Exhibit 11?

22  A.  Yes.

23  Q.  Is that the trial-setting order of the Court in the

24  unlawful-detainer action?

25  A.  As far as I know.

*Blum - Direct/Goodrich*                                        160

1    Q.   So a trial was set for July 19th?

2    A.   That's correct.

3    Q.   Did the trial proceed?

4    A.   No.

5    Q.   Why not?

6    A.   It — well, Mr. Lloyd and Mr. Hoffman had a meeting of the

7    minds that avoided that trial.

8    Q.   And when did you first learn of that?

9    A.   A few days before the trial date.

10   Q.   And how did you first learn of that?

11   A.   Well, Mr. Lloyd had called and indicated to me that he was

12   talking with Mr. Hoffman and he wanted me to get involved in the

13   phone conversation, and that's how I learned of it.

14   Q.   And did you have any discussions after that with anyone from

15   Mr. Hoffman's side?

16   A.   Yes.   I think I had a discussion both with Mr. Hoffman and

17   with Ms. Gustavson.   My best recollection is the conversation

18   occurred with the four of us on the phone:   Mr. Lloyd, myself,

19   Mr. Hoffman, and Ms. Gustavson.

20   Q.   Okay.   And that would have been within a few days of the —

21   first being advised there was a settlement?

22   A.   Yes.   Actually —

23   Q.   Or maybe the same day?

24   A.   It may have been the same day.   I believe that Mr. Lloyd

25   called me and said, "I'm working it out with them.   Would you

Plaintiff's EOR-249

*Blum - Direct/Goodrich*                                                  161

1  please try to be available for a phone call."  I don't know if

2  that phone call occurred that day or within a day or two.

3  Q.  And do you recall the conversation?

4  A.  I do.  I —

5           THE COURT:  Which conversation?

6           MR. GOODRICH:  The one — the first one with the four

7  of them.

8           THE COURT:  You're not talking about with Mr. Lloyd

9  now, but with this plenary one?

10          MR. GOODRICH:  Correct.  In other words, the —

11          THE WITNESS:  A conversation with the four people, if

12  that's the one that I think you're talking about.

13  BY MR. GOODRICH:

14  Q.  Right.  Where — where Mr. Lloyd was there on the phone with

15  Ms. Gustavson and —

16          THE COURT:  So present were —

17          THE WITNESS:  As far as I recall, it was Mr. Lloyd,

18  myself, Mr. Hoffman, and Ms. Gustavson.

19          THE COURT:  Thank you.

20          Go ahead.

21  BY MR. GOODRICH:

22  Q.  What do you recall of that conversation?

23  A.  I — I recall that Mr. Lloyd had indicated to me that there

24  was a deal in place between himself and Mr. Hoffman.  When I got

25  on the phone they recited the deal and Mr. Hoffman then said

*Blum - Direct/Goodrich*                                     162

1   that Ms. Gustavson will document the deal and will work with me

2   to essentially put the deal in writing.  And that the intention

3   was that this would avoid the unlawful-detainer trial that was

4   coming up in the next few days.

5   Q.  Anything else discussed?

6   A.  Just the terms of the settlement.  It wasn't —

7   Q.  So you went through deal points of the settlement?

8   A.  That's my best recollection, yeah.

9   Q.  Was there any discussion of the merits of Tom's case or his

10  defenses?

11  A.  No, I had had prior discussions with Mr. Hoffman in which I

12  discussed these concepts with him.  One of the comments he gave

13  to me was, "Oh, you don't want to test that.  I've won that

14  every time I've had to deal with it."

15  Q.  Okay.  Let's go back to those conversations with Mr.

16  Hoffman.  Those would have been before you heard there was a

17  settlement?

18  A.  Yes.  Those were fairly early —

19  Q.  How did those conversations take place, by telephone?

20         THE COURT:  Wait a minute.  Wait a minute.  You had

21  discussions with Mr. Hoffman?

22         THE WITNESS:  Yes.  I had discussions with Mr. Hoffman

23  going back several months, actually.

24  BY MR. GOODRICH:

25  Q.  Okay.  At your first conversation with Mr. Hoffman, what was

Plaintiff's EOR-251

*Blum - Direct/Goodrich*                                                    163

1 | your understanding as to whether you had permission to speak

2 | with him directly?

3 | A.  I didn't know Mr. Hoffman was represented by counsel at the

4 | time I talked with him.  He — he was handling matters directly

5 | with Mr. Lloyd, and I was asked to get involved and I called Mr.

6 | Hoffman.  There was never a reference to his counsel.  I had not

7 | heard of Ms. Gustavson at that point.

8 | Q.  And would this have been before or after the filing of the

9 | UD case?

10 | A.  Well before.

11 | Q.  Okay.  So you were involved with Mr. Hoffman before the

12 | filing of the UD case —

13 | A.  Yes.

14 | Q.  — concerning what?

15 | A.  There had been a prior transaction involving Mr. Lloyd and

16 | Mr. Hoffman that related to another property.

17 | Q.  Is that commercial property?

18 | A.  Yeah.  It was a property in Marin County in Lagunitas.

19 | Q.  Okay.  So you had a prior kind of relationship with Mr.

20 | Hoffman not having anything to do with this particular property

21 | or the unlawful-detainer action?

22 | A.  Right.

23 | Q.  Okay.  When did the first conversation with Mr. Hoffman

24 | occur concerning the unlawful-detainer action?

25 | A.  I don't have a recollection of the date.  If it was

Plaintiff's EOR-252

Blum - Direct/Goodrich                                      164

1   concerning the unlawful-detainer action, it seemed to me it was

2   well before the unlawful-detainer action.  There had been

3   discussions about trying to get Tom Lloyd to try and sell the

4   property and trying to get him to listen to all of the things

5   that Mr. Hoffman felt were in Mr. Lloyd's best interests.  Mr.

6   Hoffman came across as somebody who was trying to help Mr. Lloyd

7   help himself, and that was the way those conversations

8   proceeded.

9   Q.  So once — once the unlawful-detainer action was filed,

10  though, your next conversation concerning it was with Mr.

11  Rothbard?

12  A.  Yes.  After I got the unlawful-detainer action, I called and

13  introduced myself to Mr. Rothbard.  And we had this discussion

14  eventually.

15  Q.  Okay.  Did you have any conversations with Mr. Hoffman after

16  the filing of the unlawful-detainer action and before you heard

17  about settlement?

18  A.  Not that I can recall.

19  Q.  Okay.  After you heard about the settlement you had this one

20  conversation with four of you on the phone, right?

21  A.  Essentially the conversation in which I learned of the

22  settlement.

23  Q.  I see.  And during that time you talked about the deal

24  points but not the merits of the case?

25  A.  No.  There was no reason to talk about the merits of the

Plaintiff's EOR-253

*Blum - Direct/Goodrich*                                            165

1   case.  The people had reached a settlement.

2   Q.  Do you recall ever discussing with Ms. Gustavson the Home

3   Equity Sales Contract Act?

4   A.  No.

5   Q.  Do you recall ever discussing with Ms. Gustavson Section

6   1695 of the Civil Code?

7   A.  No.

8   Q.  Do you recall having any such conversations with Mr.

9   Hoffman?

10  A.  No.  I recall having a similar conversation with Mr. Hoffman

11  saying, "I don't understand how you're allowed to stay in

12  business doing what you're doing."

13  Q.  And what did he say?

14  A.  I think that's when he said, "Well, you know, what do you

15  mean?  If it weren't for me these guys would be, you know, out

16  on the street."  I mean he perceived himself as performing a

17  public service.  This was — this was a pure clash of worlds in

18  these conversations.  I don't know how else to say it.

19  Q.  Who made the first draft of the settlement agreement?

20  A.  I believe Julie did.

21          THE COURT:  I'm sorry?

22          THE WITNESS:  Julie Gustavson — Gustavson did.

23  BY MR. GOODRICH:

24  Q.  And Ms. Gustavson at first thought maybe you had drafted

25  recital G.  Are you familiar with recital G?

*Blum - Direct/Goodrich*                                                    166

1   A.   Yeah, I looked at it as she was testifying.

2           Is there an exhibit number you can point to?

3   Q.   Yeah.  It would be — the settlement agreement's Exhibit 13

4   in our blue book there.

5   A.   Right.

6           THE COURT:  It's also G.

7   BY MR. GOODRICH:

8   Q.   And it's also Exhibit G.  It's in the loose exhibit —

9           THE COURT:  That's the final version, though.

10          MR. GOODRICH:  Yeah.

11          THE WITNESS:  Is that the final version of the

12  settlement agreement?

13  BY MR. GOODRICH:

14  Q.   Right.  Would you take a look at the actual statement in

15  that settlement agreement which is at issue with —

16  A.   Yes.

17  Q.   — this recital G?

18  A.   Yes.

19  Q.   Who drafted that?

20  A.   I don't — I didn't draft that.  I certainly had made my

21  position clear in earlier conversations about — with Mr. Hoffman

22  about what the concerns were that I had.  When the document came

23  to me it came to me as you see it with respect to that — that

24  phrase.  I gather she simply went to the answer that I had filed

25  and put the words in there that were what I had — had put in my

Plaintiff's EOR-255

*Blum - Cross/Pahl*                                                      167

1   answer.

2   Q.  So that in the final document is exactly as it came from Ms.

3   Gustavson by email attachment?

4   A.  Yes.

5          MR. GOODRICH:  I have no further questions, Your

6   Honor.

7          THE COURT:  Any cross-exam?

8                    <u>CROSS-EXAMINATION</u>

9   BY MR. PAHL:

10  Q.  Mr. Blum, you said that you had a conversation with Mr.

11  Hoffman before the unlawful-detainer filing where you indicated

12  that you had a difficulty with the concepts that he was viewing

13  himself as performing a public service; is that a correct

14  statement?

15  A.  It's similar to what I said, —

16  Q.  Okay.

17  A.  — but it isn't exactly.

18  Q.  And you were aware — you said you affiliated with Professor

19  Hetland to discuss these issues relating to a disguised security

20  agreement, and I'm trying to use your phrases, a secured debt,

21  and that the transaction was void and illegal, correct?

22  A.  I don't know.  You're mixing concepts.  I think I testified

23  that in the years of my practice I had had cases in which I had

24  associated John Hetland into the case, in some instances as

25  counsel and in other instances just simply to advise on these

Plaintiff's EOR-256

*Blum - Cross/Pahl*                                                     168

1  issues, and I had developed an understanding of the issues based

2  on my association with —

3           MR. PAHL:  Okay.  Your Honor, I'd like to have marked

4  as next in order Exhibit H, being marked Exhibit H.  I have a

5  courtesy copy for the Court.

6  BY MR. PAHL:

7  Q.  This is another copy of the answer and this — you recognize

8  your signature on the second page of Exhibit H?

9  A.  Yes.

10  Q.  And directing your attention, if I might, up to the

11  affirmative defenses, this is similar — there's a slight

12  difference — but this is similar to defense Exhibit 10, "The

13  subject transaction by which plaintiff claims to have become the

14  owner of record title is void and illegal."  Do you see that?

15  A.  Yes.

16  Q.  Okay.  And before you prepared this, you obviously —

17           THE COURT:  Is this a different document?

18           MR. PAHL:  There are slight differences.  This — this

19  reflects the payment and this is the actual filed copy.  I think

20  the other one is not —

21           THE COURT:  Okay.  But the text you're referring to is

22  the same as 10?

23           MR. PAHL:  The text is the same.  I just want to use

24  the exact — the true answer.

25           THE COURT:  Okay.

Plaintiff's EOR-257

*Blum - Cross/Pahl*                                                    169

1    BY MR. PAHL:

2    Q.  In this particular document, Exhibit H, you — you state that

3    the claim of ownership is void and illegal — the claim to title

4    is void and illegal, correct?

5    A.  Yes.

6    Q.  You did the legal research to do that?

7    A.  No.

8    Q.  You — you performed no legal research?

9    A.  No.

10   Q.  And were there any cases — well, since you didn't perform

11   any legal research, then you were not aware that there were no

12   cases in which a disguised security agreement was a void

13   transaction, correct?

14   A.  I don't know what I was aware of at the time.  I wrote what

15   I believe to be the law pertaining to these issues.  I did not

16   research the law before I wrote those.

17   Q.  Well, you didn't —

18   A.  These were affirmative defenses only.

19   Q.  You didn't just craft this thing out of plain air.

20   A.  Why not?

21   Q.  It had to have been — it had to have come out of some

22   knowledge base that you had.

23   A.  I crafted it out of my understanding of the law.

24   Q.  And there was a case, your understanding of the law, there

25   is a case, at least one I hope, where a disguised security

Plaintiff's EOR-258

*Blum - Cross/Pahl*                                                    170

1   transaction is a void transaction; is that your testimony?

2   A.   Well, I'll tell you what I understood.   I don't know of a

3   name of a case —

4          MR. PAHL:   That's not my question.   Your Honor, can

5   the witness be instructed to answer the question?

6          MR. HAUSER:   Your Honor, he is answering the question.

7          THE WITNESS:   I'm trying to.

8          THE COURT:   I think the question is intended to be

9   very precise as to whether the whole transaction was void.   I

10  think that's the one thing that he wants to get at, and he just

11  asked you whether you know of any cases.

12         THE WITNESS:   He —

13         THE COURT:   It doesn't mean it's not sustainable.   He

14  just wants to know whether any case says it's void.

15         THE WITNESS:   At that time I wasn't focusing on any

16  case in particular.

17  BY MR. PAHL:

18  Q.   So when you drafted this, there was no case that you were

19  aware of that supported your argument or your affirmative

20  defense?

21  A.   I wasn't aware of a case that supported it.

22  Q.   And you didn't do any legal research such as looking up the

23  word "foreclosure" in the California Civil Code to see if there

24  was any law in that area?

25  A.   Oh, I had looked at the law of foreclosure in the California

Plaintiff's EOR-259

*Blum - Cross/Pahl*                                          171

1    Civil Code.

2    Q.  And you were aware then of Civil Code Section 1695?

3    A.  I was aware of Section 2924(c).

4    Q.  Were you aware that there was another section?

5    A.  I wasn't aware of 1695.

6    Q.  And did you make a number of modifications to the settlement

7    agreement that were — that was sent to you by Ms. Gustavson?

8    A.  I'm not certain if I did.  I have produced all the versions

9    of the document that I had.

10          MR. PAHL:  Your Honor, I'd like to have marked for

11   identification — or, excuse me — as Exhibit I, a one-page

12   document.

13   BY MR. PAHL:

14   Q.  Do you recognize, Mr. Blum, on the very bottom there's an

15   "ELB 608" on the bottom?

16   A.  I see that.

17   Q.  That reflects it comes from your file?

18   A.  I don't know that, but that may be.  I didn't mark it, so I

19   don't know that.

20   Q.  Do you recognize this document as coming from your file?

21   A.  No.

22   Q.  You have never seen this document before?

23   A.  I don't know if I ever have.

24   Q.  Why don't you take a minute and look at it and see if you

25   recognize the document as coming from your file.

Blum - Cross/Pahl                                                 172

1   A.    (Perusing document.)  I can't tell even after I read it.  I

2   don't know.

3   Q.    You were aware in the settlement discussions that there was

4   no amount being agreed upon as the amount of money the option

5   would require to repurchase the property in the event that Mr.

6   Lloyd was able to purchase the property back at the end of the

7   90-day period, correct?

8   A.    In the settlement discussions, I don't think there was any

9   discussion about the option.

10  Q.    Okay.  Well, paragraph 5 on Exhibit I, and directly in front

11  of you, does not reflect an amount in paragraph 5 that was

12  included at this time?

13  A.    Okay.

14  Q.    Correct?

15  A.    I don't know.  It speaks for itself.

16  Q.    Okay.

17  A.    If it doesn't, it doesn't.

18  Q.    And — and you obviously understood that there was

19  general-release in the settlement agreement, correct?

20  A.    Yes.

21  Q.    Okay.  And without doing legal research, do you have an

22  understanding of what a 1542 release does?

23  A.    Yes.

24  Q.    What does it do?

25  A.    It releases claims known or unknown existing on the date of

Blum - Cross/Pahl                                                    173

1    the release.

2    Q.  And even though it was an inadvertent disclosure, your email

3    to your client, your understanding, your knowledge is that if

4    Mr. Lloyd signed this agreement along with Mr. Hoffman, they

5    both released each other from any and all claims they had, known

6    or unknown, at that moment?

7    A.  Are you asking me about the document I sent to him?

8    Q.  Well, either way.

9    A.  I don't quite get the question.

10   Q.  Well, let me ask it this way.  If the — if Exhibit G was

11   signed, was it your understanding at the time that that would

12   vitiate any claims that Mr. — do you know what the term means?

13   A.  I know "vitiate," but I only know it in the context of a

14   privilege, but go ahead.

15   Q.  Let me say it in a different phrase then.  I want you to be

16   comfortable.

17          Was it your understanding that if Mr. Lloyd signed

18   what eventually was executed as Exhibit G, that that would

19   eliminate any and all claims he might have in the future against

20   Mr. Hoffman related to this transaction?

21   A.  That was my understanding.

22   Q.  And you were aware, were you not, that the amounts that

23   would be included in the amount of repurchase was not simply

24   what was the amount under the lease, correct?

25   A.  Oh, yes.  It was the amount of the liens of record as of

*Blum - Cross/Pahl*                                                    174

1    that day, and whatever accrued interest they'd be on.

2    Q.  Now you've said that there was a conference call, a four-way

3    conference call, between yourself, Mr. Lloyd, Ms. Gustavson, and

4    — and yourself — I apologize.  Strike that.

5    A.  Mr. Hoffman.

6    Q.  Let's start again.  Let's start again.

7    A.  Yes.

8    Q.  Mr. Lloyd, yourself, Ms. Gustavson, Mr. Hoffman —

9    A.  Yeah.

10   Q.  — at one point?

11   A.  Yes.

12   Q.  Who started that — that conference call —

13   A.  I —

14   Q.  — physically?

15   A.  I was asked by Mr. Lloyd to tie him into a call to Mr.

16   Hoffman, which I was able to do on my telephone.

17   Q.  So you initiated that conference call?

18   A.  As I understand the way the process worked, Mr. Lloyd called

19   me saying that Mr. Hoffman is there, they want to talk about the

20   settlement, could I please hook us together with Mr. Hoffman.

21   And so Lloyd and I on one, essentially on my end, called

22   Hoffman.

23          THE COURT:  And Ms. Gustavson was with Mr. Hoffman?

24          THE WITNESS:  As best I recall, Ms. Gustavson was in

25   that conversation and was introduced to me as the person who

*Blum - Cross/Pahl*                                                    175

1   would document the deal.

2   BY MR. PAHL:

3   Q.  And during this entire — well, let me ask this.  How much

4   time — strike that.

5         Do you bill your clients on an hourly basis?

6   A.  Yes.

7   Q.  Do you keep time records of the time you spend on cases?

8   A.  I certainly try to keep time records.  Yes.

9   Q.  How much time did you spend on this matter up till the date

10  of the Applebee's?

11  A.  First off, I don't know about the Applebee's.  I only know

12  what I told you.

13  Q.  Okay.

14  A.  I know that I was called and told that they had worked out a

15  deal and I've only heard the word Applebee's in the context of

16  this trial today.

17  Q.  Okay.  And let's do —

18  A.  And —

19  Q.  When you were called and told by Mr. Lloyd they had worked

20  out a deal, how much time had you spent on this transaction?

21  A.  I'm not quite certain what you mean by "this transaction."

22  Q.  All the calls to Mr. Hoffman, all your thought processes,

23  the drafting of the answer, and the affirmative defenses.

24  A.  I — I have no idea as I sit —

25  Q.  Thirty minutes, an hour?

*Blum - Cross/Pahl*                                                      176

1    A.  Oh, considerably more than that.

2    Q.  How much of that time did you spend doing basically your

3    research?

4    A.  I didn't spend — and I can't tell you what time I spent

5    doing basic legal research.  I don't have that recall right now.

6    Q.  After you recalled talked to by Mr. Lloyd, saying that they

7    had worked out a deal, you were against that deal, weren't you?

8    A.  No.  I — I had a client who said to me, "I got no choices,

9    Ed.  I can't fight this fight."  And, frankly, my intellectual

10   side of this was put aside in terms of my personal side of this

11   and Mr. Lloyd's circumstances.

12   Q.  We all have clients who do things that we as attorneys don't

13   want them to do, personally, but it's a master-servant

14   relationship.  We understand it, we go along with it, correct?

15   A.  Well, I don't know about you, but I don't — I wanted Mr.

16   Lloyd to get on with his life.  Mr. Lloyd had had a number of

17   difficult, difficult months.  The hope was that he could try to

18   turn things around.  And he said to me, "I don't have the

19   ability to fight.  I don't have the money to fight.  I know I'm

20   giving it up, but I need to get on with my life and the only way

21   I can do it is try to find somebody to buy the property and help

22   me pull my equity out."

23   Q.  And you knew, and you knew when he did that —

24           THE COURT:  I assume we're talking here about this

25   same conversation with the four people?

Plaintiff's EOR-265

*Blum - Cross/Pahl*                                                    177

1          THE WITNESS:  Oh, no.  That — I didn't understand that

2    we were talking about that conversation.

3          THE COURT:  I'm just worried about the privilege

4    question, so just —

5          MR. GOODRICH:  I don't know where this is going, but

6    I —

7    BY MR. PAHL:

8    Q.  I'm not asking you about your — I'm not asking you about

9    your conversation with Mr. Lloyd.  What I'm trying to get at is

10   you didn't like the deal even after Mr. Lloyd told you he had to

11   do the deal.  You didn't like it?

12   A.  No, I don't think that makes sense.  I —

13   Q.  You liked it?

14   A.  No, neither one of them make sense.  When you're a lawyer

15   and you're trying to do the best thing for your client, you

16   think in terms of your client whether you like it or not.

17   Q.  Okay.  And — but you personally didn't think he was doing

18   the right thing?

19   A.  Absolutely — you're absolutely incorrect.  I thought he was

20   doing the right thing if it meant that he could get on with his

21   life and try to sell this property and pull money out.

22   Q.  And you understood — you understood in signing the 1542

23   release that was a complete release, even — even a release as to

24   — as to the — I'm trying to use the right words here — I don't

25   want to objected to — as to the security interest, the disguised

Plaintiff's EOR-266

*Blum - Cross/Pahl*                                      178

1   security interest, right?

2   A.   I felt that he was giving up his right to talk about that

3   issue.

4          MR. PAHL:   I have no further questions.   Thank you,

5   Your Honor.

6          THE COURT:   Okay.   Any other questions?

7          MR. GOODRICH:   No.

8          THE COURT:   Okay.   Thank you, Mr. Blum.   You may step

9   down.

10          THE WITNESS:   Thank you.

11      (Witness excused.)

12          THE COURT:   Do we have anyone else?

13          MR. GOODRICH:   Mr. Lloyd.

14          THE COURT:   Okay.   Take a break at this point?

15          MR. GOODRICH:   It's going to be very short.

16          THE COURT:   Okay, that's fine.   I'm just good as long

17   — how about you, Jane, are you okay?

18          THE REPORTER:   I'm fine.   Thank you.

19          THE COURT:   Everybody else all right?   Okay.

20          Would you raise your right hand, please?

21              THOMAS R. LLOYD, DEFENDANT, SWORN

22          THE WITNESS:   Yes, I do.

23          THE COURT:   Please have a seat.   Give us your name and

24   your address, either home and business — your home or business.

25          THE WITNESS:   I'm Thomas Robert Lloyd.   Address:   180

*Lloyd - Direct/Goodrich*                                    179

1   - 182 Guerrero Street, which I would characterize as a business

2   address.

3            THE COURT:  Okay.

4                    DIRECT EXAMINATION

5   BY MR. GOODRICH:

6   Q.  What is 180 - 182 Guerrero Street?

7   A.  It's an apartment building I co-own with two other owners.

8   Q.  Okay.  Are you living in the garage there now?

9   A.  I'm out of the garage at the moment until — until the end of

10  next month.

11  Q.  Good.  In — in 2003 did you own a home in San Francisco?

12  A.  Yes, I did.

13  Q.  And where was the property located?

14  A.  At 940 Elizabeth Street.

15  Q.  And in May of 2003 did you enter into an agreement with Mr.

16  Hoffman to sell that property?

17  A.  Yes, I did.

18  Q.  Okay.  Take a look at the binder there in front of you.  And

19  I was just going to ask you to take a look at three documents.

20  One is Exhibit 19, the other is Exhibit 3, and the last one is

21  Exhibit 4.

22  A.  Did you say 19?

23  Q.  Yeah.  19.

24  A.  This only goes to 18 in here.

25  Q.  Hold on one second.  That's not right.

Plaintiff's EOR-268

*Lloyd - Direct/Goodrich*                                        180

1          Actually why don't we use their exhibit because ours

2   is actually part of 18, so it would be Exhibit A.

3          Yeah.  So we have a purchase agreement.  We have an

4   option and we have a lease.  And my question is:  Do you recall

5   when you signed these documents, approximately?

6   A.   These were at the time of the initial agreement with Mr.

7   Hoffman.

8   Q.   Did you sign them all on the same day?

9   A.   I believe I did, yes.

10  Q.   There has been testimony that an unlawful-detainer action

11  was filed against you.  Did you receive a copy of that by

12  service — were you served with a copy of the unlawful-detainer

13  action?

14  A.   I don't recall being served personally, no.

15  Q.   Take a look at Exhibit 9.  And tell me if you recognize that

16  document.

17  A.   (Perusing document.)

18  Q.   Do you —

19  A.   I can't say I recognize the document.

20  Q.   Okay.  Did you do something such as hire an attorney in

21  defense of the unlawful-detainer complaint, which is Exhibit 9?

22  A.   Yes.  I spoke with my attorney Edward Blum.

23  Q.   And what — what were you understanding that he would do for

24  you at that time, that he hired you?

25          MR. PAHL:  Your Honor, the difficulty, and I'm —

Plaintiff's EOR-269

*Lloyd - Direct/Goodrich*                                          181

1          MR. GOODRICH: Well, that's okay. I'll just — I'll

2    move on.

3          MR. PAHL: — okay with the answer, but it's just —

4    it's absolutely calling for attorney-client communication.

5          MR. GOODRICH: Okay.

6          THE COURT: Yes.

7    BY MR. GOODRICH:

8    Q.  Mr. Lloyd, in —

9          THE COURT: I think he's rephrasing his question.

10         MR. GOODRICH: Yeah.

11   BY MR. GOODRICH:

12   Q.  — in the unlawful-detainer action, did you have any

13   conversations with Todd Rothbard at any time?

14   A.  No.

15   Q.  Have you ever met him?

16   A.  No.

17   Q.  Till today?

18   A.  No.

19   Q.  How about Julie Gustavson?

20   A.  To be honest, I don't remember specifically the — the

21   conference call that's referred to that she participated in, but

22   I don't recall any conversation with just the two of us, no.

23   Q.  Okay. So other than that conference call that you don't

24   have a specific recollection of, you've never had a conversation

25   with her directly? No, —

Plaintiff's EOR-270

*Lloyd - Direct/Goodrich* 182

1      MR. PAHL:  I'm sorry, Your Honor.  He's misstating

2  what the witness just said.  He doesn't have any recollection of

3  a conference call and now counsel's —

4      THE COURT:  That's what I understand, yes.

5      MR. PAHL:  — adopting that there is a conference call.

6      MR. GOODRICH:  No, I'm saying other than the

7  conference call, which he doesn't —

8      THE COURT:  Maybe — maybe I misunderstood.  I thought

9  he said he didn't remember the conference call.

10     MR. GOODRICH:  Right.

11     MR. PAHL:  He said he's never —

12     THE WITNESS:  No, I remember the conference —

13     MR. PAHL:  Which would be code for he doesn't have any

14  recollection of any conversation with Julie Gustavson then.

15     THE COURT:  Okay.

16     MR. GOODRICH:  What I say —

17     THE COURT:  Why don't we clear this up.

18     MR. GOODRICH:  Right.

19     THE COURT:  I think he said — well, never mind.  You

20  clear —

21  BY MR. GOODRICH:

22  Q.  Do you have any — any recollection of any conversations with

23  Julie Gustavson?

24  A.  No.

25  Q.  You just heard Mr. Blum testify that his recollection is

*Lloyd - Direct/Goodrich*                                              183

1   there was a four-way conversation where you were one participant

2   and she was another; do you have a recollection of that

3   conversation?

4   A.   I recall the conversation and certainly I recall Mr. Hoffman

5   and Mr. Blum were in the conversation.  And I — I don't doubt

6   Mr. Blum's memory as far as Mrs. Gustavson being part of it.   I

7   just do not specifically recall her participation.

8   Q.   Okay.  Now have you had any conversations with Mr. Hoffman

9   over this period of time, from the date the unlawful detainer

10  was filed to the date that you filed bankruptcy?

11  A.   Starting at the time I called him for the Applebee's

12  rendezvous.

13  Q.   Okay.  So you initiated that —

14  A.   I did.

15  Q.   — meeting?

16       And did you have a long conversation on the phone or

17  was it just for the scheduling the meeting?

18  A.   It was pretty brief.  I basically said I wanted to come and

19  talk to him about things.

20  Q.   Okay.

21            THE COURT:  Who initiated the call?

22            THE WITNESS:  I did.

23            THE COURT:  Okay.

24  BY MR. GOODRICH:

25  Q.   And did he ask you anything about the merits of your case in

· *Lloyd - Direct/Goodrich*                    184

1    that conversation?

2    A.  I don't recall that he did.

3    Q.  Did you discuss with him the merits of the case in that

4    conversation?

5    A.  No.

6    Q.  When you went to Applebee's, can you tell us what you

7    discussed with Mr. Lloyd — Mr. Hoffman?

8    A.  Basically that I wanted to reach an agreement with him that

9    would allow me to either sell or to repurchase the property.

10   Q.  And why did you want to do that?

11   A.  Because there was a couple of hundred thousand dollars of

12   equity in it.  I wanted to retain the property as a residence,

13   which would be contingent on selling this building, which...

14   Q.  The Guerrero building?

15   A.  The Guerrero building.  But in either case, I had — I had

16   options to buy it myself in partnership to separate individuals

17   or a third person, a friend, who was interested in buying it at

18   a good price outright.

19   Q.  And this meeting took place some time in mid-July?

20   A.  That's right.

21   Q.  And at that time how close was the trial in the

22   unlawful-detainer action?

23   A.  Oh, it was just a few days.  I think, as I recall, it was

24   going to be Tuesday, and I think I drove up there.  I mean to go

25   to Fresno, you wait as long as possible I guess, but it was on

*Lloyd - Direct/Goodrich*                                        185

1    the preceding Thursday.

2    Q.  And in that conversation did you have any discussion about

3    your defenses in the unlawful-detainer action?

4            THE COURT:  I'm sorry.  What day of the week did you

5    meet, do you remember?

6            THE WITNESS:  I recall it being a Thursday.  This

7    could have been Wednesday, but it was less than a week before

8    the trial date, I do recall that.

9            THE COURT:  Was it the same day as the conference

10   call?

11           THE WITNESS:  No.

12           THE COURT:  How soon after was the conference call?

13           THE WITNESS:  It could have been the next day, I don't

14   recall exactly.  But if I had to guess, I would say that I met

15   Mr. Hoffman on either Thursday or Wednesday, and the conference

16   call was Friday.  I think — I think Monday, if I'm not mistaken,

17   the trial was Tuesday, and I don't recall being quite that

18   stressed out in terms of cutting it quite that close.  So if I

19   had to guess I would say Friday.

20   BY MR. GOODRICH:

21   Q.  Okay.  But it may have been as much as a week and a half

22   down the road?

23   A.  The trial?

24   Q.  Yeah.

25   A.  I recall it was the next week, but I may be mistaken.

Plaintiff's EOR-274

*Lloyd - Direct/Goodrich*                                              186

1   Q.   Okay.

2              THE COURT:   Okay.   Thank you.

3   BY MR. GOODRICH:

4   Q.   In the discussion at Applebee's, did the subject of your

5   rights under Section 1695 come up?

6   A.   No.

7   Q.   Did Mr. Hoffman tell you that you had a right to rescind the

8   original transaction?

9   A.   No.

10  Q.   Did he ask you to explain why you felt you could unwind the

11  deal, as he described his conversation with Mr. Blum — did that

12  ever come up?

13  A.   No.

14  Q.   What did you discuss?

15  A.   We had a very pleasant lunch and we talked somewhat

16  philosophically about — I mean Mr. Hoffman and I had had a

17  history even before the subject of today's proceedings, so we

18  talked some about that.   Talked about the fact that we both

19  wanted to, you know, to reach a settlement and move on with

20  things.   And that was pretty much it.

21             I think there was some discussion of Mr. Blum's

22  participation and I recall Mr. Hoffman was concerned that Mr.

23  Blum was going to obstruct things.   And —

24  Q.   What did he actually say about that; do you recall?

25  A.   It was generally that he thought Mr. Blum was being

*Lloyd - Direct/Goodrich*                                    187

1   unreasonable.

2   Q.  Did he say why?

3   A.  No.  Not — not specifically, no.

4   Q.  Was he encouraging you not to listen to Mr. Blum?

5   A.  Well, yes, he was.  But I have to say that I was there

6   meeting with Mr. Hoffman because I had decided I did not want to

7   chance losing my house.  I felt quite confident that I would be

8   able to either sell or buy it, as I have explained.  And I

9   believe that if our agreement had been promulgated as — as

10  understood, that I would have done that.

11  Q.  Was there something that had happened between you and Mr.

12  Hoffman in the recent past, meaning prior to that meeting at

13  Applebee's, that made you concerned about losing your house?

14  A.  Well, most — most of the last year I had been, I guess

15  preoccupied is a fair word, with — with a second property, which

16  is —

17  Q.  That's not Guerrero, that — this is a different one or

18  it's —

19  A.  This is the property alluded to previously in Marin County.

20  Q.  Oh, Lagunitas?  Okay.  And what happened there with Mr.

21  Hoffman that made you concerned about losing your home?

22  A.  Well, to put it in a nutshell, I had — I also had a sale

23  purchase option lease arrangement on that property.  And — and

24  had been assured by Mr. Hoffman that he would support me in

25  selling it if I chose to do that.  This was to be a retirement

Plaintiff's EOR-276

*Lloyd - Direct/Goodrich* 188

1   home.  I really didn't want to.  And, again, the Guerrero

2   property was in — in play then as well.  And Mr. Robertson was

3   involved in both of those situations as well as Elizabeth

4   Street.

5           And for — for various reasons, some miscommunication

6   and difficulty with the buying tenant who were living in the

7   house, and my concern over the tenants in the cottage who were

8   Section 8 tenants and I knew they would be right away if the

9   deal was consummated, I had delayed a few months on going ahead

10  with the sale with them.  And then they got very upset because

11  they insisted they would be stuck now with the tenant because

12  they were there 12 months and they were going to deal with Mr.

13  Hoffman, which they had been told, I think, by Mr. Robertson,

14  you know, that they could buy it cheaper that way.  And then I —

15  I just closed down.

16          And I called Mr. Hoffman, and he said, "No, that's not

17  right?"  You know, "I will definitely help you sell this.  You

18  call me — if you decide to sell it, you call me."

19          And I called him in January —

20  Q.  This is 2003?

21  A.  This would have been now 2000 and —

22          MR. PAHL:  Your Honor, this is just replete with

23  double and triple —

24          THE COURT:  But it has —

25          MR. PAHL:  — hearsay, and it's irrelevant.

Plaintiff's EOR-277

*Lloyd - Direct/Goodrich*                                    189

1        THE COURT:  Well, —

2        MR. GOODRICH:  I didn't expect —

3        THE COURT:  I don't know that it's hearsay.  It's Mr.

4  Hoffman speaking —

5        MR. PAHL:  I mean Mr. Robertson is now in this and

6  what Mr. Robertson's saying and the representations —

7        THE COURT:  Okay.  What is the relevance of this?

8        MR. GOODRICH:  The relevance is that just prior to

9  this meeting at Applebee's he had lost the Lagunitas property

10  through an exact same thing, except because it wasn't

11  residential, he doesn't have any rights under 1695.  And he had

12  been evicted, basically.  And he was now facing exactly the same

13  thing on his only remaining home.  And it goes to —

14        THE COURT:  Okay.  Well, let's get it done more

15  quickly.

16        MR. GOODRICH:  Okay.

17        THE COURT:  We don't need to get into the details.

18        MR. PAHL:  And without hearsay, please?

19        MR. GOODRICH:  Yeah.

20        THE COURT:  Yes.  I think he can testify to the basic

21  details without any hearsay.

22        THE WITNESS:  So, well, the upshot is I lost the

23  property, $140,000 in equity after trying to reach Mr. Hoffman

24  for four months, not being able to, and was informed by the

25  cottage tenant that my —

Plaintiff's EOR-278

1           MR. PAHL:  Objection.

2   BY MR. GOODRICH:

3   Q.  Without — without telling anyone what someone told you, —

4   A.  Oh, yeah.

5   Q.  — did you go up there and see for yourself what happened to

6   your house in Lagunitas?

7   A.  Yes.

8   Q.  And what had happened?

9           MR. PAHL:  That's just — objection, calls for —

10          THE COURT:  Sustained.  The —

11          MR. GOODRICH:  Well, I —

12          THE COURT:  — probative effect isn't worth much here.

13          MR. GOODRICH:  Since we're only looking at the waiver

14  issue, I absolutely agree, I mean.

15          MR. GOODRICH:  I have no further questions.

16          THE COURT:  Any cross-exam?

17          MR. PAHL:  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19  BY MR. PAHL:

20  Q.  Mr. Lloyd, do you have Exhibit G in front of you?  It's not

21  in the binder.  It's one of the —

22          THE COURT:  That's the settlement agreement, right?

23          MR. PAHL:  Yes, Your Honor.

24          May I help him, Your Honor?

25          THE COURT:  Please.

Plaintiff's EOR-279

*Lloyd - Cross/Pahl*                                                    191

1    BY MR. PAHL:

2    Q.  Do you have Exhibit G in front of you?

3    A.  I do.

4    Q.  Okay.  Turning to the last page, you signed that document?

5    A.  Yes.

6    Q.  When you went down to Applebee's to see Mr. Hoffman, you

7    went there with the desire to resolve, to get this overwith?

8    A.  That's right.

9    Q.  Stop the train wreck?  Good analogy.

10   A.  I'll accept that.

11   Q.  Okay.  And Mr. Blum had told you — .

12   A.  Blum.  Blum [pronouncing to rhyme with "sum."]

13   Q.  Blum.  I apologize.

14        You told Mr. Hoffman Mr. Blum had told you that he

15   could unwind the transaction?

16        MR. GOODRICH:  Objection, calls for speculation

17   attorney-client privilege.  I didn't — you're saying what Mr.

18   Blum had told him or what Mr. Hoffman said?

19        MR. PAHL:  I am saying what Mr. Lloyd told Mr.

20   Hoffman.

21        MR. GOODRICH:  Okay.

22        MR. PAHL:  That would be attorney-client privilege —

23        THE COURT:  Yes, that would be okay.

24        MR. GOODRICH:  Yeah.

25        THE WITNESS:  Would you repeat the question?

1    BY MR. PAHL:

2    Q.  Sure.  You told Mr. Hoffman Mr. Blum had told you that he

3    could unwind this transaction?

4    A.  I don't recall specifically what I told him.  I did tell him

5    that Mr. Blum had big reservations about the transaction.

6    Q.  And that he could unwind the transaction?

7    A.  I don't believe Mr. Blum ever — I don't believe I told Mr.

8    Hoffman that Mr. Blum told me that because in fact I don't

9    believe he ever told me that.

10             THE COURT:  Don't get into what your attorney said to

11   you yet.

12   BY MR. PAHL:

13   Q.  Did you ever see the answer that Mr. Blum filed for you in

14   the unlawful-detainer action?

15   A.  I don't recall if I've seen that.

16   Q.  Okay.  Let me show you what's been marked — it's right on

17   top here — as Exhibit H.  And I'm turning to the second page of

18   Exhibit H.  And ask if you would look down on Exhibit H to where

19   it says at the end of the first paragraph, I believe it says,

20   "Null and" — "Null and void."  I'm trying to repeat it — "Void

21   and illegal."  Do you see that?

22             MR. PAHL:  May I approach, Your Honor?

23             THE COURT:  Yes.

24             THE WITNESS:  Where are these, page 2?

25   BY MR. PAHL:

Plaintiff's EOR-281

*Lloyd - Cross/Pahl*                                           193

1    Q.   Yes.   I'll point it out to you, Mr. Lloyd.

2              THE COURT:   Small print.

3    BY MR. PAHL:

4    Q.   It says, "Void and illegal."  Why don't you read the

5    sentence first.

6    A.   (Perusing document.)

7    Q.   Do you see that?

8    A.   Yes.

9    Q.   And did you see that after your attorney filed it on your

10   behalf?

11   A.   I don't recall.

12   Q.   Okay.  Well, you don't recall one way or the other.  You may

13   have seen it, may not have, don't know.  Okay.

14             Let's go back to Exhibit G, that's the settlement

15   agreement.  And you indicated just recently, just a few seconds

16   ago, you signed this.  And it looks like on page 5 next to your

17   signature there's a date, the date of August 3rd, 2004.  Do you

18   see that?

19   A.   Yes.

20   Q.   And that's — that "August 3, 2004" is in your handwriting?

21   A.   Where it says "dated"?

22   Q.   And then has a handwritten date?

23   A.   Yes.  That looks like my — my handwriting.

24   Q.   Okay.  Did you read this before you signed it?

25   A.   (Perusing document.)  Yes, I did.

Plaintiff's EOR-282

*Lloyd - Cross/Pahl*                                            194

1  Q.   Okay.  If I can get you to turn, if I might, to the second

2  page of Exhibit G, and I'd like to focus, if I might, on

3  paragraph 1A, okay.

4            THE COURT:   Page 2, 1A?

5            MR. PAHL:   Page 2, 1A.

6  BY MR. PAHL:

7  Q.   The first paragraph under the words, "Agreement and Mutual

8  General Release."  Do you see that?

9  A.   Yes.

10 Q.   Okay.  And the last two and a quarter lines — basically

11 "Release is related to the property," do you see where it says,

12 "Release is related to the property," almost to the bottom of

13 the paragraph?

14 A.   This is the in- — the inset?

15 Q.   No.  No.  I'm in the first paragraph.

16            Okay.  Let's start off again.  Are you at paragraph

17 1A?

18 A.   Yes.

19 Q.   Okay.  It says, "In consideration of the foregoing"; do you

20 see that?

21 A.   Yes.

22 Q.   And "The promise as a condition set forth herein"; do you

23 see that?

24 A.   Yes.

25 Q.   "Lloyd, H&B, Hoffman, and J. Edwards," and you're Lloyd,

Plaintiff's EOR-283

*Lloyd - Cross/Pahl*                                          195

1   right?

2   A.   That's right.

3   Q.   Okay,  "Hereby mutually release," and then I want to drop —

4   I want you to drop about six sentences — or six lines down.   Are

5   you with me?

6   A.   Yeah.

7   Q.   And then it says, "Related to the property"?

8   A.   Yes.

9   Q.   And then it goes, "The purchase by H&B"; do you see that?

10  A.   Yes.

11  Q.   "The lease," yes?

12  A.   Yes, I'm reading that.

13  Q.   "The option or the repurchase agreement except as set forth

14  herein below"; do you see that?

15  A.   Yes.

16  Q.   Did you read this paragraph before you signed it or did you

17  rely on your attorney?

18  A.   I — I can't say that I recall these individual lines.

19  Q.   Do you recall reading?

20          MR. GOODRICH:  Objection, asked and answered.

21          THE COURT:  He did say he read it.

22          MR. PAHL:  Okay.

23  BY MR. PAHL:

24  Q.   Did you — do you believe you understood it when you read it?

25          MR. GOODRICH:  To what — objection, vague.  What part,

Plaintiff's EOR-284

*Lloyd - Cross/Pahl*                                          196

1    the whole thing —

2              MR. PAHL:   Settlement agreement.

3    BY MR. PAHL:

4    Q.  Mr. Lloyd?

5    A.  Yes.

6    Q.  Do you believe — Mr. Lloyd, do you have — what's your

7    educational background?

8    A.  It's a doctorate in business.

9    Q.  You have a doctorate in business?

10   A.  Yes.

11   Q.  From what institution?

12   A.  Harvard.

13   Q.  And what year did you receive your Ph.D. in business from

14   Harvard?

15   A.  1975.

16   Q.  In 1975.  Did you get a master's before you got your

17   doctorate?

18   A.  Yes, I did.

19   Q.  And what was your master's degree in?

20   A.  Also in business.

21   Q.  So you have an MBA?

22   A.  Yes.

23   Q.  Also from Harvard?

24   A.  No.

25   Q.  Where did you get your MBA from?

Plaintiff's EOR-285

*Lloyd - Cross/Pahl*                                                    197

1    A.    Indiana University.

2    Q.    Indiana University.    And what year did you get that in?

3    A.    1966.

4    Q.    Okay.    And do you have a bachelor's degree also?

5    A.    Yes.

6    Q.    And from what institution did you receive that from?

7    A.    The University of Cincinnati.

8    Q.    And was that in what year?

9    A.    1964.

10   Q.    1964.    As part of your Ph.D. were you required to write a

11   dissertation?

12   A.    Yes.

13   Q.    And did you fulfill the requirements for the Ph.D.?

14   A.    I did.

15   Q.    And so you wrote a dissertation of original work that you

16   authored?

17   A.    Yes.

18   Q.    Okay.    As part of your business degrees, were you required

19   to read legal documents for business purposes?

20   A.    No.

21   Q.    Okay.    And have you ever read a settlement agreement before?

22   Is this the first settlement — let me withdraw.

23           Is this the first settlement agreement you've ever

24   signed?

25   A.    To the best of my recollection it is.

Plaintiff's EOR-286

*Lloyd - Cross/Pahl*                                          198

1  Q.  This is the first one?

2  A.  Yes.

3  Q.  Okay.  Did you understand that Mr. Hoffman was giving up his

4  rights to seek his unlawful detainer against you when you and he

5  signed Exhibit G?

6          MR. GOODRICH:  Objection.  This does not — he's

7  misstating the document itself.

8          MR. HAUSER:  It was a delay, Your Honor.  Had a

9  stipulated judgment.

10         THE COURT:  It was a delay, not a —

11         MR. GOODRICH:  Yeah.

12         THE COURT:  He didn't give it up.  He delayed it.

13         MR. GOODRICH:  Yeah.

14         MR. PAHL:  Okay.  Let me rephrase.

15 BY MR. PAHL:

16 Q.  Did you understand —

17         THE COURT:  I think that's paragraph 3, right?

18         MR. GOODRICH:  Yeah.

19 BY MR. PAHL:

20 Q.  Did you understand that when Mr. Hoffman signed this

21 document he was delaying his right to go to trial on July 19th

22 to seek a writ of possession against you —

23 A.  Yes.

24 Q.  — relating to the Elizabeth Street property; you understood

25 that?

Plaintiff's EOR-287

1  A.  Yes.

2  Q.  What were you giving up, if anything?

3  A.  I don't know that, though, that I was giving up anything

4  other than the — the right to — to oppose this under the

5  disguised security agreement.

6  Q.  Okay.

7  A.  You know, basically to fight it out in court.

8  Q.  Now you're currently a debtor in a Chapter 11 bankruptcy

9  proceeding, correct?

10  A.  That's right.

11  Q.  And that was filed on October 14th, 2004?

12  A.  That's right.

13  Q.  Okay.  And as part of your bankruptcy you were required to

14  provide a series of schedules to the bankruptcy court as to your

15  debts and liabilities?

16  A.  That's right.

17  Q.  Okay.  And you did so?

18  A.  Yes.

19  Q.  And you attempted to be, I assume, truthful when you

20  prepared that and filed that?

21  A.  Yes.

22  Q.  And in doing so you listed a number of liens against — you

23  claim the Elizabeth Street property as your property?

24  A.  Yes.

25  Q.  With a value of a million dollars?

Plaintiff's EOR-288

*Lloyd - Cross/Pahl*                                                    200

1    A.    Yes.

2    Q.    And you claim there was a first owed against it for

3    $652,000?

4    A.    I don't recall the specific amounts.

5              MR. GOODRICH:  Your Honor, this is going beyond the

6    scope of direct.  I don't know where we're going with this.

7              THE COURT:  I think it goes — okay.  How is it within

8    the scope of direct?

9              MR. PAHL:  I think it goes obviously to his knowledge

10   and his actions with regard to the settlement agreement.  That's

11   all what this goes to.

12             THE COURT:  Okay.  I agree.

13   BY MR. PAHL:

14   Q.    You recognized in your schedules a second for approximately

15   $114,000; do you recall that?

16   A.    Actually, no, I don't recall that 114,000.  This is on that

17   property?

18             MR. PAHL:  Your Honor, I'd like to mark — to be marked

19   as Exhibit N, the bankruptcy schedules for Mr. Lloyd.

20   BY MR. PAHL:

21   Q.    Mr. Lloyd, if I could get you to turn to Schedule A, Real

22   Property, it's the second page — well, first, do you recognize

23   this as the Summary of Schedules that have been filed for your

24   benefit in this Court?

25   A.    I recognize some of these figures as my estimates.

*Lloyd - Cross/Pahl*                                    201

1   Q.  And on page 2, do you recognize 940 Elizabeth Street as real

2   property that you claim that you own?

3   A.  Yes.

4   Q.  And it shows a million dollars?

5   A.  Yes.

6   Q.  Okay.  And there's a first of $652,000 —

7   A.  Yes.

8   Q.  — right next to it?

9          There's a second directly below that, $114,455?

10  A.  I see that, yes.

11  Q.  And below that there's another, apparently a third maybe,

12  for $45,543?

13  A.  Yes, I see that.

14  Q.  Okay.  And you also recognized in the Summary of Schedules

15  that you had a settlement agreement with Mr. Hoffman; do you

16  remember that?

17  A.  Yes.

18  Q.  And that's — that's Schedule G, which is about 12 pages

19  back?  Exactly 12 pages.

20         Do you see Schedule G there?

21  A.  Yes.

22  Q.  And it says, "Settlement Agreement with Jeffrey Hoffman, et

23  al.  Debtor intends to assume this contract"?

24  A.  Yes, I see this.

25  Q.  Okay.  That was done with your knowledge?

Plaintiff's EOR-290

*Lloyd - Redirect/Goodrich*                                    202

1          MR. GOODRICH:  What was done —

2          MR. PAHL:  The schedules.

3          MR. GOODRICH:  That it was a sum — you mean they were

4    prepared — I think he's already testified that he signed them.

5    BY MR. PAHL:

6    Q.  Well, did you sign the schedule?

7    A.  Yes.

8    Q.  Okay.  Now the Guerrero Street transaction was never sold at

9    any time while you were dealing with Mr. Hoffman, correct?

10   A.  No.  It still hasn't been.

11         MR. PAHL:  Still hasn't been as of today.  I have no

12   further questions.  Thank you, Your Honor.

13         THE COURT:  Any redirect?

14                    REDIRECT EXAMINATION

15   BY MR. GOODRICH:

16   Q.  Mr. Lloyd, if you could take a look at page 9 of the Exhibit

17   N that Mr. Pahl just gave you.

18         THE COURT:  I'm sorry.  What page?

19         MR. GOODRICH:  Exhibit 9 — I'm sorry — it's Exhibit N

20   and it's page 9.

21         THE COURT:  Page 9, okay.

22   BY MR. GOODRICH:

23   Q.  Do you see the NorCal Financial obligation there?

24   A.  Yes.

25   Q.  And the check mark — the check mark under "Disputed," did

Plaintiff's EOR-291

*Lloyd - Redirect/Goodrich*                                            203

1    you dispute the existence of this NorCal obligation as one of

2    your obligations at the time you prepared these schedules?

3    A.  Yes.

4    Q.  And did you dispute the obligation of H&B Properties in your

5    schedules here?

6    A.  I'm sorry.  The dispute — just repeat it.  I didn't hear it.

7    Q.  Oh, yeah.  The claim to H&B Properties for $45,000.

8    A.  Yes.

9    Q.  So you listed that as disputed?

10   A.  Yes.

11          MR. GOODRICH:  I have no further questions, Your

12   Honor.

13          THE COURT:  Okay.  Mr. Pahl?

14          MR. PAHL:  Nothing further, Your Honor.

15          THE COURT:  Okay.  Thank you, Mr. Lloyd.  You're

16   excused.

17       (Witness excused.)

18          THE COURT:  Are we done with the witnesses?

19          MR. GOODRICH:  Yes, Your Honor.

20          THE COURT:  Okay.  Why don't we take ten minutes.  You

21   want to argue?

22          MR. GOODRICH:  Yes.

23          THE COURT:  Are you done, Mr. Pahl?

24          MR. PAHL:  Yes, Your Honor.

25          THE COURT:  Okay.  Let's just take ten minutes and

Plaintiff's EOR-292

*Lloyd - Redirect/Goodrich*                                          204

1    I'll hear your argument.  Does that work?

2         Is that suitable to you all?

3         MS. [SPEAKER]:  Yes.

4         MR. GOODRICH:  Yes.

5         MR. PAHL:  I apologize, Your Honor.  I was —

6         THE COURT:  I said we'll take ten minutes, and then

7    I'll hear your argument.  Is that suitable?

8         MR. PAHL:  That will be fine.

9         THE COURT:  Okay.  All right.  Thank you.

10        (Recess taken at 3:24 p.m.  The transcript of closing

11   arguments is contained in a separate transcript.)

12                           —o0o—

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff's EOR-293

State of California          )
                             )      SS.
County of San Joaquin        )


      I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify that I am not a party to nor in any way interested in the outcome of this matter.

      I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


                      Susan Palmer
                      Palmer Reporting Services

                      Dated February 6, 2007

Plaintiff's EOR-294